**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 26-5172**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

MASSIMILIANO CALI, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

**EMERGENCY MOTION FOR AN IMMEDIATE
ADMINISTRATIVE STAY AND STAY PENDING APPEAL**

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant
  Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney
  General*

SHARON SWINGLE
JOSHUA M. KOPPEL
  *Attorneys, Appellate Staff
  Civil Division, Room 7212
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-4820*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Defendants-appellants are Donald J. Trump, Todd Blanche (substituted for Pamela Bondi), Scott Bessent, and Marco Rubio. Plaintiffs-appellees are L.C., a minor child, by and through her father Massimiliano Cali, and Massimiliano Cali.  Nancy Hollander, United Nations Watch, Susan M. Akram, Sandra L. Babcock, Asli U. Bali, Thomas Becker, James Cavallaro, Lawyers for the Rule of Law, Inc., Democracy for the Arab World Now, Inc., Foundation for Middle East Peace, American Center for Law and Justice, and JVP Action filed amicus briefs in district court.  No other parties, intervenors, or amici curiae appeared before the district court or have entered appearances in this Court.

### B.    Rulings Under Review

Defendants seek review of the May 13, 2026, memorandum opinion and order of the district court (Leon, J.) granting plaintiffs a preliminary injunction.  *See* Dkts. 48, 49.  The district court's opinion

has not yet been assigned a citation in the Federal Supplement but is available on Westlaw at 2026 WL 1329750.

## C.    Related Cases

This case has not previously been before the Court.  Defendants-appellants are not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

 */s/ Joshua M. Koppel*
Joshua M. Koppel

## TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ..................................................................................... 1

STATEMENT ........................................................................................... 4

      A.    Statutory And Regulatory Background .................................. 4

      B.    Factual Background ............................................................. 6

      C.    Prior Proceedings ............................................................. 11

ARGUMENT ......................................................................................... 14

I.    THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS ............ 15

      A.    The First Amendment Does Not Protect Albanese .............. 15

      B.    The Injunction Is Also Grossly Overbroad .......................... 22

II.    THE EQUITABLE FACTORS FAVOR A STAY ...................................... 25

CONCLUSION ...................................................................................... 28

CERTIFICATE OF COMPLIANCE

ADDENDUM

# GLOSSARY

| | |
|---|---|
| ICC | International Criminal Court |
| IEEPA | International Emergency Economic Powers Act |
| OFAC | Office of Foreign Assets Control |
| SDN List | List of Specially Designated Nationals and Blocked Persons |
| U.N. | United Nations |

## INTRODUCTION

The district court issued a sweeping injunction that categorically blocks the sanctions that the President and Secretary of State imposed on Francesca Albanese, a United Nations "Special Rapporteur" who has threatened U.S. foreign policy by pushing to investigate and prosecute U.S. companies and allied officials. The district court ruled that the sanctions likely violate Albanese's First Amendment rights—even though she is a foreign national who has not lived in the United States for over a decade and her speech occurred abroad. And the court enjoined the sanctions *in their entirety*—even though the only plaintiffs in this action are Albanese's husband and minor child, whose injuries (if cognizable at all) could easily be redressed by exempting *them* from the sanctions. The injunction is thus both legally indefensible and grossly overbroad. Yet if allowed to stand, it will undermine important national-security and foreign-policy interests of the United States, thus usurping the authority that the Constitution and Congress alike have conferred on the President in this sensitive area. This Court should stay the injunction in whole or at least in part, and should grant an immediate administrative stay while it considers this motion.

Congress and the Executive Branch have long recognized the threat that the International Criminal Court (ICC) poses to the United States and its allies by exposing servicemembers and officials to the risk of criminal prosecution for decisions and conduct necessary to national security.  In February 2025, President Trump issued an executive order declaring a national emergency to address that threat after the ICC targeted the United States and Israel.  Exercising his authority under the International Emergency Economic Powers Act (IEEPA), the President imposed sanctions on persons determined to have engaged in an effort by the ICC to investigate, arrest, detain, or prosecute certain protected persons.

In July 2025, the Secretary of State designated Albanese—who has, in her position at the U.N., urged the ICC to investigate U.S. executives and companies and to issue arrest warrants for Israeli officials—for sanctions under that executive order.  Albanese's husband and daughter (but not Albanese herself) sued to challenge those sanctions.  The district court entered a preliminary injunction facially barring enforcement of the sanctions because it concluded that they violated Albanese's supposed First Amendment rights.

2

The preliminary injunction is fundamentally flawed.  The law is clear that "foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution."  *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020).  Albanese is a foreign citizen living outside the United States, and her allegedly protected speech occurred outside the United States.  That dooms these claims.  "Substantial connections" to the United States are not enough to qualify a non-citizen residing abroad for First Amendment protection, but even if they were, Albanese lacks such connections.

Merits aside, the injunction sweeps far broader than necessary to remedy any injury to plaintiffs.  Again, Albanese herself is not a party; plaintiffs are Albanese's husband and daughter.  A tailored injunction exempting *them* from the sanctions could have prevented the harm the district court found they had established (which itself was speculative and unsubstantiated).  Instead, the court blocked *any and all* applications of the sanctions on Albanese, leveraging plaintiffs' marginal and limited harms into unlimited relief.  That overbroad remedy violates the most basic equitable principles, and independently warrants at least a partial stay of the injunction.

The district court's injunction irreparably injures the government and the public by intruding on the Executive's judgment in the sensitive areas of national security and foreign affairs.[1]

## STATEMENT

### A.    Statutory And Regulatory Background

1.  For nearly its entire history, the United States has used economic sanctions as a critical means to protect national security and achieve foreign-policy goals.  Through IEEPA, Congress gave the President broad authority to impose sanctions in response to "any unusual and extraordinary threat" arising from outside the United States.  50 U.S.C. § 1701(a).  Upon declaring a national emergency with respect to such a threat, the President may "regulate … or prohibit" any "transactions involving[] any property" in which any foreign national "has any interest by any person … subject to the jurisdiction of the United States."  *Id.* § 1702(a)(1)(B).

Presidents have invoked IEEPA to block the property of designated persons under a variety of sanctions programs responding to declared national emergencies.  *See, e.g.*, Exec. Order 13694, 80 Fed.

---

[1] The district court denied a stay pending appeal on May 20.  Dkt. 55.

Reg. 18,077 (Apr. 2, 2015) (blocking property of persons responsible for malicious cyber activities); Exec. Order 13382, 70 Fed. Reg. 38,567 (July 1, 2005) (blocking property of persons who contributed to the proliferation of weapons of mass destruction). In general, persons designated under an IEEPA-based sanctions program are added to the List of Specially Designated Nationals and Blocked Persons (SDN List), which is administered by the Treasury Department's Office of Foreign Assets Control (OFAC). Persons placed on the SDN List generally have their property within U.S. jurisdiction "blocked" (*i.e.*, frozen), and U.S. persons are generally prohibited from transacting with them absent authorization from OFAC. *See* 50 U.S.C. § 1702(a)(1)(B).

2. The Rome Statute established the International Criminal Court in 2002. *See* Jennifer Elsea, Cong. Rsch. Serv., RL 31437, *ICC: Overview and Selected Legal Issues* 1 (2002). The United States is not a party to the Rome Statute and has consistently declined to accept the ICC's jurisdiction over U.S. nationals. As Congress found in the American Servicemembers' Protection Act, Pub. L. No. 107-206, tit. II, 116 Stat. 820, 899-909 (2002), the Rome Statute exposes members of the U.S. Armed Forces and senior government officials, including the

5

President, to the "risk of criminal prosecution for national security decisions involving such matters as responding to acts of terrorism, preventing the proliferation of weapons of mass destruction, and deterring aggression," 22 U.S.C. § 7421(9).

Congress recognized the danger that, although "[t]he United States is not a party to the Rome Statute," 22 U.S.C. § 7421(11), the ICC would nonetheless assert jurisdiction over American servicemembers and officials.  It therefore prohibited certain forms of cooperation with the ICC and restricted U.S. participation in certain U.N. operations that could expose U.S. personnel to prosecution before the ICC.  *Id.* §§ 7423-7425.

### B.    Factual Background

1.  On February 6, 2025, President Trump issued Executive Order 14203, finding that the ICC has "engaged in illegitimate and baseless actions targeting America and our close ally Israel."  90 Fed. Reg. 9369, 9369 (Feb. 12, 2025).  Israel is also not a party to the Rome Statute and has not recognized the ICC's jurisdiction.  *Id.*  The ICC nonetheless asserted jurisdiction over and opened investigations into U.S. and Israeli personnel and issued arrest warrants against Israeli Prime

Minister Benjamin Netanyahu and former Defense Minister Yoav Gallant. *Id.* President Trump found that these actions "set a dangerous precedent, directly endangering current and former United States personnel, including active service members of the Armed Forces, by exposing them to harassment, abuse, and possible arrest"; "threaten[] to infringe upon the sovereignty of the United States"; and "undermine[]" U.S. "national security and foreign policy." *Id.*

President Trump determined that "any effort by the ICC to investigate, arrest, detain, or prosecute" protected persons—defined as U.S. persons or foreign citizens of a U.S. ally that has not consented to ICC jurisdiction—"constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States," and declared a national emergency to address that threat. 90 Fed. Reg. at 9370-9371. The executive order blocks the property of, and prohibits certain transactions with, the ICC prosecutor and, *inter alia,* any foreign person determined by the Secretary of State to have "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality." *Id.* at 9370. Absent an applicable exemption or OFAC

7

authorization, U.S. persons may not provide funds, goods, or services to, or for the benefit of, a designated person. *Id.* Invoking the President's authority under 8 U.S.C. § 1182(f), the order also prohibits the travel to the United States of any designated person or "immediate family members." 90 Fed. Reg. at 9730.

2. Francesca Albanese and her husband, plaintiff Massimiliano Cali, are Italian citizens. Dkt. 1, at 1. Albanese and Cali lived in the United States from 2012 to 2015 while Cali worked at the World Bank's headquarters; their daughter, plaintiff L.C., was born in the United States in 2013. *Id.* at 5-6. In 2012, Albanese and Cali opened a U.S. bank account with Bank Fund Staff Federal Credit Union and purchased a condominium in Washington, D.C., with a mortgage from the same credit union. *Id.* at 5. The World Bank relocated Cali to Indonesia in 2015, and then to Tunisia in 2021. *Id.* at 6. He, Albanese, and L.C. have not lived in the United States since 2015.

In 2022, the U.N. Human Rights Council appointed Albanese as a Special Rapporteur on the Palestinian Territory. Dkt. 1, at 6. In that position, Albanese has urged the ICC to prosecute Israel's prime minister and former defense minister. Albanese joined an amicus brief

8

arguing that the ICC had jurisdiction to issue arrest warrants for Israeli officials and urging that the ICC prosecutor's request for arrest warrants "be processed expeditiously." *Situation in the State of Palestine*, ICC-01/18-320, *Amicus Curiae* Submission by U.N. Mandate Holders (Aug. 6, 2024), https://perma.cc/5TRU-3JQH. She also submitted a report to the U.N. General Assembly "urg[ing] the ICC Prosecutor to investigate" alleged "crimes" by Israel. Albanese, *Genocide as Colonial Erasure* 32, U.N. Doc. A/79/384 (Oct. 1, 2024), https://perma.cc/BF5P-WZ3M.

Albanese has also advocated for punitive action against U.S. individuals and entities. In July 2025, she urged the ICC "to investigate and prosecute corporate executives and/or corporate entities for their part in the commission of international crimes and laundering of the proceeds from those crimes." Albanese, *From Economy of Occupation to Economy of Genocide* 27, U.N. Doc. A/HRC/59/23 (July 2, 2025), https://perma.cc/JM8R-SM5Y. She specifically accused U.S. companies including Lockheed Martin, Caterpillar Inc., and Chevron of, among other things, providing "heavy machinery in service of settler-colonial destruction." *Id.* at 7, 12, 17. Albanese also alleged that

9

"[f]aith-based charities" in the United States have been "financial enablers of illegal projects" and that U.S. universities partner with Israeli institutions "in areas directly harming Palestinians." *Id*. at 23-24.

Albanese's recommendations as Special Rapporteur carry weight with the ICC because of its close working relationship with the U.N. *See* Negotiated Relationship Agreement Between the ICC and the U.N., art. 3, Oct. 4, 2004, https://perma.cc/3H6J-E4QV (providing that the U.N. and ICC "shall cooperate closely" and "consult each other").

3.  On July 9, 2025, the Secretary of State designated Albanese for sanctions pursuant to Executive Order 14203.  *See* Press Release, Marco Rubio, Sec'y, U.S. Dep't of State, *Sanctioning Lawfare that Targets U.S. and Israeli Persons* (July 9, 2025), https://perma.cc/5D8W-HN8H.  Secretary Rubio explained that "Albanese has directly engaged with the [ICC] in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel, without the consent of those two countries." *Id*.  The Secretary specifically observed that Albanese had "recommend[ed] that the ICC, without a legitimate basis, issue arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu

10

and former Defense Minister Yoav Gallant" and "pursue investigations and prosecutions" of major U.S. companies. *Id.* He warned that "these campaigns of political and economic warfare … threaten our national interests and sovereignty." *Id.*

OFAC implemented the designation by adding Albanese to the SDN List. OFAC, *ICC-Related Designation* (July 9, 2025), https://perma.cc/U9H3-MAPM. OFAC issued a general license authorizing the wind down of certain transactions involving Albanese before August 8, 2025. OFAC, *General License No. 8: Authorizing the Wind Down of Transactions Involving Francesca Paola Albanese* (July 9, 2025), https://perma.cc/Q6DN-Z23S. OFAC also issued two specific licenses permitting certain transactions incidental to the care of Albanese's minor child, L.C., and related to the upkeep and sale of Albanese's and Cali's condominium in the United States. Dkt. 1, at 22, Exs. C, D.

## C.    Prior Proceedings

Cali and L.C. sued on February 25, 2026—nearly eight months after Albanese's designation—challenging that action on statutory and

constitutional grounds. Dkt. 1, at 25-31. On May 13, the district court granted a preliminary injunction. Dkt. 48 (Op.).

The court concluded that Cali has Article III standing because he has suffered harms to his property interests in the U.S. condominium. Op. 10. The court concluded that L.C., a U.S. citizen, has standing because she suffered injuries to her constitutional right to travel, reasoning that, as a minor, she is "effectively" unable to travel internationally without her parents, who are barred from the United States; and to her constitutional liberty interest in "familial relations" because she faces potential liability for transactions with her mother, notwithstanding the license that OFAC granted. Op. 10-11.

The district court further declared that plaintiffs have third-party standing to bring claims alleging the violation of Albanese's supposed First Amendment rights. Op. 13-15. Among other things, the court determined that Albanese is hindered in her ability to challenge her designation on the SDN List, citing a letter from the U.N. stating that it was "not in a position to authorize [Albanese] to file suit in a United States court contesting the imposition of … sanctions." Dkt. 1-13, Ex. E, at 2; *see* Op. 14-15.

12

On the merits, the court held that plaintiffs are likely to prevail on their claim invoking Albanese's First Amendment rights.  Op. 15.  The court ruled that the First Amendment protects Albanese, a non-citizen, in speaking outside the United States.  *Id.*  The court recognized that foreign nationals generally do not possess constitutional rights, but opined that a foreign national can obtain such rights by developing substantial connections with the country.  *Id.*  The court determined that Albanese has such substantial connections based on her prior residence here; the fact that she owns property in the United States, has a mortgage, and pays property taxes; that Albanese has a U.S.-citizen daughter; and that she was affiliated with U.S. universities and would occasionally travel to the United States before the imposition of sanctions.  Op. 16-17.[2]  The court further held that the designation of Albanese was a content-based regulation of her speech, Op. 19-20, and that the sanctions are not narrowly tailored to further the foreign-policy interests of the United States, Op. 21.

---

[2] Plaintiffs have since clarified that Cali and Albanese no longer have a U.S. mortgage.  Dkt. 52, at 7 n.3.

The district court next reasoned that Albanese's designation would cause plaintiffs irreparable harm "by burdening L.C.'s entry into the United States, freezing the family's property assets, and chilling their familial relations," notwithstanding that OFAC issued licenses relative to both the condominium and to care of L.C. Op. 22-24. The court rejected the government's argument that any injunction should be limited to that necessary to redress the limited harms established by plaintiffs. Op. 25 n.5. It instead broadly enjoined Albanese's designation on the SDN List "in full." *Id.*; *see* Dkt. 49, at 1-2.

## ARGUMENT

In considering a stay pending appeal, this Court examines "(1) whether the stay applicant … is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties …; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). These factors overwhelmingly favor a stay.

## I.    THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS

The injunction is predicated on a fundamental legal error, and it sweeps far too broadly even on its own terms.  For both these reasons, the government is likely to prevail on appeal.

### A.    The First Amendment Does Not Protect Albanese

1.  The injunction rests on the district court's incorrect ruling that Albanese's speech is protected by the First Amendment.  "[I]t is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Alliance for Open Soc'y*, 591 U.S. at 433.  In *Alliance for Open Society*, the Court held that the United States could impose speech-based conditions on funding to "foreign organizations operating abroad." *Id.* at 436.  And the foreign organizations' American affiliates could not "export their own First Amendment rights to shield foreign organizations from Congress's funding conditions." *Id.* at 438.  Just last year, the Court again affirmed that "[t]o the extent that" a foreign entity's "asserted expressive activity occurs abroad, that activity is not protected by the First Amendment." *TikTok Inc. v. Garland*, 604 U.S. 56, 69 n.2 (2025) (per curiam).

15

As the district court acknowledged, plaintiffs allege a violation of Albanese's First Amendment rights, not their own.  Op. 13.  But Albanese is a foreign national who resides outside the United States, Op. 2; Dkt. 1, at 1, 6, and the speech for which Albanese was sanctioned occurred abroad too.  These facts alone establish that Albanese's speech is not protected by the Constitution and that plaintiffs will not prevail on their First Amendment claim.

The district court erred in thinking that a foreign national outside the United States may claim protection under the First Amendment if she has substantial-enough connections to the United States.  The court quoted *United States v. Verdugo-Urquidez*, which explained that "aliens receive constitutional protections when they have come within the territory of the United States *and* developed substantial connections with this country."  494 U.S. 259, 271 (1990) (emphasis added); *see* Op. 15.  But the use of the conjunctive "and" makes clear that presence in the United States is a necessary, but not sufficient, condition to receiving the protections of the Constitution.  In each of the cases that *Verdugo-Urquidez* was discussing that involved natural persons, the person was then present or residing in the United States.  *E.g.*, *Plyler v.*

16

*Doe*, 457 U.S. 202, 211-212 (1982) ("[T]he Fourteenth Amendment was designed to afford its protection *to all within the boundaries* of a State." (emphasis added)); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 & n.5 (1953) ("It is well established that if an alien is a lawful permanent resident of the United States *and remains physically present there*, he is a person within the protection of the Fifth Amendment." (emphasis added)); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (the protections of the Fourteenth Amendment "are universal in their application, *to all persons within the territorial jurisdiction*" (emphasis added)).  In short, "in extending constitutional protections beyond the citizenry" it is "the alien's presence within [the country's] territorial jurisdiction that g[i]ve[s] the Judiciary power to act."  *Johnson v. Eisentrager*, 339 U.S. 763, 771 (1950).[3]

---

[3] *Verdugo-Urquidez* also cited *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 489 (1931), in which a Russian corporation, as "an alien friend," was held to be entitled under the Fifth Amendment to just compensation for property confiscated in the United States.  But that case simply stands for the proposition that an alien's property interest in the United States may give them certain constitutional protections with respect to the property.  It does not support the proposition that all "alien friends" of the United States, or even all those owning property in the country, are entitled to the full range of constitutional protections for unrelated conduct occurring abroad.  In any event, determining the

*Continued on next page.*

*National Council of Resistance of Iran v. Department of State*, 251 F.3d 192 (D.C. Cir. 2001), *cited at* Op. 16-17, does not hold otherwise. The Court there held that the petitioners had "an overt presence within the National Press Building in Washington, D.C.," and other information confirmed that they had "come within the territory of the United States." *Id.* at 201-202.  In other words, they were present in the country.

Likewise, in *Ibrahim v. Department of Homeland Security*, 669 F.3d 983, 986-988, 997 (9th Cir. 2012), *cited at* Op. 17-18, the plaintiff was a resident in the United States for four years while she was a student at Stanford University, left the country to attend an academic conference abroad with the intent of returning to the United States and continuing her residence here, and was then prevented from returning, allegedly because of her inclusion on a watchlist.  *Ibrahim* thus involved a *resident* alien who had temporarily left the country before she was prevented from returning.  Albanese, by contrast, has not resided in the United States for over a decade and has her permanent domicile

---

presence of a corporation raises different and more complicated questions than determining the presence of a natural person.

18

elsewhere, and her claims do not relate to returning to the United States.  In any event, the government does not concede that *Ibrahim* was correctly decided.

2.  Even if a non-resident alien could obtain First Amendment protections by establishing "substantial connections" to this country, Albanese does not have such connections.  *Contra* Op. 16.  Albanese lived in the United States for three years while her husband was on temporary assignment, but that was more than a decade ago.  Dkt. 1, at 5-6.  Albanese and her husband own a condominium in D.C.; they also, not unexpectedly, obtained a mortgage from a U.S. bank (which they have since paid off) and pay property taxes here (as they must).  None of that distinguishes Albanese from millions of other foreign nationals who have temporarily lived in the United States—for example, while attending school here—or who own property in the country, as an investment or otherwise.  A foreign person cannot obtain indefinite First Amendment protections by buying an apartment in the United States or by living here for a few years.[4]

---

[4] Contrary to the district court's suggestion, Op. 18, the reference in *People's Mojahedin Organization of Iran v. Department of State*, 327

*Continued on next page.*

Likewise, the fact that Albanese was previously affiliated with U.S. universities and would sometimes travel to the United States for professional obligations, Op. 17, does not differentiate her from the millions of foreign persons who have tangential connections to, and occasionally visit, the United States as a hub of educational, cultural, and economic activity. The district court also noted that Albanese has a U.S. citizen daughter, *id.*, but the Constitution's protections are limited to "the People"—not "the People and their relatives." *Cf. Department of State v. Muñoz*, 602 U.S. 899, 908-909 (2024) (non-citizen husband could not invoke citizen wife's constitutional right of entry).

*TikTok* confirms that connections like Albanese's are insufficient to trigger First Amendment protections. One of the plaintiffs in that case was ByteDance Ltd., the ultimate parent of TikTok Inc., which is an American company incorporated and headquartered in California. 604 U.S. at 63. Despite ByteDance's ownership of an American

---

F.3d 1238, 1241 (D.C. Cir. 2003), to a foreign organization's "presence or property" does not suggest that owning property in the United States is sufficient to trigger First Amendment protections. That decision was describing *National Council of Resistance*, which (as explained) held that the foreign entities at issue there had an "overt presence"—in addition to a bank account—in the country. 251 F.3d at 201.

20

company and extensive cooperation, including data sharing, with that company, the Supreme Court made clear that "[t]o the extent that ByteDance Ltd.'s asserted expressive activity occurs abroad, that activity is not protected by the First Amendment." *Id.* at 69 n.2. Likewise, the Court in *Alliance for Open Society* rejected American organizations' argument that their foreign affiliates were entitled to the protections of the First Amendment. 591 U.S. at 432-433, 438. Owning property in the United States or having relationships with U.S. persons is therefore clearly not a sufficient basis to extend the protections of the First Amendment.

The district court's holding would greatly extend constitutional protections to foreign nationals in a way the Supreme Court has warned against. If any foreign person who has spent time in the United States or who owns property in the country could assert rights under the Constitution, "actions by American military, intelligence, and law enforcement personnel against … foreign citizens in foreign countries would be constrained by the foreign citizens' purported rights under the U.S. Constitution." *Alliance for Open Soc'y*, 591 U.S. at 434. Such a construction would mean that during military activity abroad, "enemy

21

elements … could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment." *Eisentrager*, 339 U.S. at 784.  The district court's rule is not the law, nor is it tenable.

### B.    The Injunction Is Also Grossly Overbroad

The government is also likely to prevail on the merits because the district court's injunction is overbroad.  It extends far beyond what is necessary to provide "complete relief to the plaintiffs before the court." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025) (emphasis omitted); *see, e.g.*, *Dickinson v. Trump*, __ F.4th __, No. 26-1609, 2026 WL 1133353, at *8 (9th Cir. Apr. 27, 2026) (staying preliminary injunction in part because it granted relief beyond the named plaintiffs).

Again, Albanese is not a plaintiff; only her husband and daughter sued.  The district court found that they demonstrated three injuries: (1) harm to Cali's property interest in his condominium in Washington, D.C., because the proceeds from any sale must be placed in an interest-bearing blocked account; (2) injury to L.C.'s right to travel to the United States because she is "effectively unable" to travel internationally without her parents; and (3) a burden on L.C.'s familial relations

22

because L.C. "faces potential criminal liability for any transactions with her mother." Op. 10-11, 22-24.

Plaintiffs did not substantiate these limited injuries; they filed no declarations with their preliminary-injunction motion, shared no plans to travel to the United States, and did not identify any transactions between L.C. and her mother that would not be exempt under the license OFAC issued or otherwise applicable exemptions. But even if plaintiffs had actually established these three injuries, it would have been easy to afford them complete relief through a narrow injunction that required defendants to permit the transfer of proceeds from the condominium, permitted Cali and/or Albanese to travel to the United States for the limited purpose of accompanying L.C., and prohibited the government from enforcing the sanctions against L.C.

Although the government urged the district court to limit any injunction, Dkt. 26, at 44-45, the court refused to do so, instead broadly prohibiting defendants from "implementing or enforcing the designation of Francesca Albanese as a designated foreign national," Dkt. 49, at 1. The court thus prohibited the government from implementing or enforcing the sanctions against Albanese *at all*, permitting persons

23

unrelated to plaintiffs to engage in any and all transactions with Albanese and giving Albanese access to the U.S. banking system for any purpose.  The court thus let the tail wag the dog, using a highly narrow challenge predicated on a few potential transactions to upend the entire designation.

The district court gave only a footnote of explanation, stating that "[i]t is unclear how defendants could limit the impact of Albanese's designation as to plaintiffs while otherwise enforcing the designation." Op. 25 n.5.  Actually, it is obvious—the court could have enjoined the government from enforcing the sanctions as to certain transactions (*e.g.*, regarding the condominium) or certain individuals (*e.g.*, L.C.).  The court further stated that because "Albanese's designation as an SDN is the source of plaintiffs' harm," the court "must enjoin Albanese's designation in full" to "provide 'compete relief to the plaintiffs.'"  *Id.* That non-sequitur runs directly contrary to *CASA*, imposing an injunction crafted to "offer[] complete relief to *everyone* potentially affected by an allegedly unlawful act" rather than one tailored to "offer complete relief *to the plaintiffs before the court*."  606 U.S. at 852. Furthermore, *CASA* makes clear that complete relief to the plaintiffs is

24

the "maximum a court can provide"; it "is not a guarantee." *Id*. at 854. This case is a good example of why that is so: Even if there were some harm to the plaintiffs from application of the sanctions beyond the circumstances identified above, that cannot justify enjoining the much broader set of important applications that indisputably impose no harm on plaintiffs at all.

## II.   THE EQUITABLE FACTORS FAVOR A STAY

Allowing the injunction to take effect threatens irreparable injury to the government and the public, whose interests "merge" here. *Nken*, 556 U.S. at 435. The President's judgment in the "sensitive" areas of "national security and foreign affairs" is "entitled to significant weight," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 36 (2010), and "preserving the President's autonomy under a statute" like IEEPA "that expressly recognizes his national-security expertise is within the public interest," *National Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 (D.C. Cir. May 16, 2025) (per curiam). "The interest in preserving national security is 'an urgent objective of the highest order,'" and to interfere with the government's national-security and foreign-affairs functions "would appreciably injure [the Nation's]

25

interests." *Trump v. International Refugee Assistance Project*, 582 U.S. 571, 581-582 (2017) (per curiam); *see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 33 (2008) (vacating a preliminary injunction, in part because there was "no basis for jeopardizing national security").

The government's interests here are concrete and substantial. The President determined that efforts by the ICC to investigate, arrest, detain, or prosecute protected persons, including U.S. persons, without the consent of their country of nationality constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. *See* 90 Fed. Reg. at 9369-9370. The President further found that the ICC had "engaged in illegitimate and baseless actions targeting America and our close ally Israel," that such actions "directly endanger[] current and former United States personnel," threaten "to infringe upon the sovereignty of the United States," and "undermine[] the critical national security and foreign policy work of the United States Government and our allies." *Id.* at 9369. Executive Order 14203 reflects the President's judgment regarding how best to address that threat—a judgment reflected in the designation at the center of this case. Review of that judgment, which lies "at the intersection of

26

national security[ and] foreign policy," must be "extremely deferential." *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007).

Conversely, plaintiffs would suffer little or no harm from a temporary stay. An OFAC license already permits Cali to maintain and sell the condominium in Washington, D.C., and to place the proceeds of any sale in an interest-bearing account. Any injury from that account being blocked could be easily remedied if plaintiffs prevail on appeal; Cali has not shown any immediate need to access such funds. Likewise, another OFAC license permits transactions between L.C. and her mother, and L.C. has not identified any anticipated transaction or concrete travel plans with which a temporary stay would interfere.

Even if plaintiffs could demonstrate that they would be injured by a temporary stay, any such injury is "plainly outweighed" by the public interest and the government's interest in preserving the Executive Branch's prerogatives in areas of national security and foreign affairs. *Winter*, 555 U.S. at 33. At a minimum, the Court should grant a partial stay of the injunction insofar as it reaches more broadly than necessary to prevent irreparable harm to plaintiffs.

27

## CONCLUSION

The Court should stay the preliminary injunction pending appeal and enter an immediate administrative stay until it does so.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
    *Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney*
    *General*

SHARON SWINGLE

 /s/ *Joshua M. Koppel*
JOSHUA M. KOPPEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7212*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4820*
  *joshua.m.koppel@usdoj.gov*

May 2026

28

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font, and that it complies with the type-volume limitation of Rule 27(d)(2)(A) because it contains 5,200 words, according to Microsoft Word.

*/s/ Joshua M. Koppel*
Joshua M. Koppel

**ADDENDUM**

# TABLE OF CONTENTS

Order Granting Preliminary Injunction, Dkt. 49............................ Add.1

Memorandum Opinion, Dkt. 48 ...................................................... Add.4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

L.C., *a minor child, by and through her father* MASSIMILIANO CALI, )
)
)
)
MASSIMILIANO CALI, )
)
Plaintiffs, ) Civil Case No. 26-688 (RJL)
)
v. )
)
DONALD J. TRUMP, *et al.*, )
)
Defendants. )
)

## ORDER
May 13, 2026 [Dkt. #3, 38, 40, 42, 43, 45, 47]

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiffs' Motion for Preliminary Injunction [Dkt. #3] is **GRANTED**; and it is further

**ORDERED** that Defendants Attorney General Pamela Bondi, Secretary of the Treasury Scott Bessent, and Secretary of State Marco Rubio (collectively, "Defendants"), along with their officers, agents, servants, employees, attorneys, and all other persons in active concert with Defendants, are enjoined from implementing or enforcing the designation of Francesca Albanese as a designated foreign national under Section 1(a)(ii)(A) of Executive Order 14203; and it is further

1

Add.1

**ORDERED** that Defendants, along with their officers, agents, servants, employees, attorneys, and all other persons in active concert with Defendants, are enjoined from taking any action against Plaintiffs L.C. or Massimiliano Cali, including the imposition of any civil or criminal penalties, pursuant to the designation of Francesca Albanese as a designated foreign national under Section 1(a)(ii)(A) of Executive Order 14203; and it is further

**ORDERED** that the parties shall file a status report apprising the Court of the status of Defendants' compliance with this Order and proposing next steps no later than thirty (30) days after the issuance of this Order; and it is further

**ORDERED** that the security requirement is hereby waived, *see* Fed. R. Civ. P. 65(c); and it is further

**ORDERED** that Plaintiffs' [Dkt. #38, 42] Motions to Supplement the Record are **GRANTED**; and it is further

**ORDERED** that Plaintiffs' [Dkt. #40] Unopposed Motion to Correct is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' [Dkt. #43] Sealed Motion for Leave to File Document Under Seal is **GRANTED**; and it is further

**ORDERED** that [Dkt. #40-1] Exhibit A to Plaintiffs' Unopposed Motion to Correct and [Dkt. #40-2] Exhibit B to Plaintiffs' Unopposed Motion to Correct shall be **SEALED**; and it is further

**ORDERED** that Plaintiffs' [Dkt. #45] Motion for Leave to File Reply is **GRANTED**; and it is further

2

Add.2

**ORDERED** that Defendants' [Dkt. #47] Unopposed Motion for Leave to File Sur-

Reply is **GRANTED.**

**SO ORDERED.**

_____
RICHARD J. LEON
United States District Judge

3

Add.3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| L.C., *a minor child, by and through her father* MASSIMILIANO CALI, <br><br> MASSIMILIANO CALI, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Case No. 26-688 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION
May _13_, 2026 [Dkt. #3]

Plaintiffs L.C., a minor, and her father Massimiliano Cali bring suit against various federal defendants challenging the designation and sanctioning of Francesca Albanese, their mother and wife, respectively. Albanese is a scholar and author who has published widely on human rights issues, including on the Israeli-Palestinian conflict. Plaintiffs allege that defendants are sanctioning Albanese because of her speech—namely, Albanese's non-binding recommendation to the International Criminal Court to pursue war-crimes prosecutions against Israeli and American nationals. Plaintiffs allege that they are harmed by defendants' sanctioning of Albanese and seek a preliminary injunction. For the following reasons, I will **GRANT** plaintiffs' motion.

1

Add.4

BACKGROUND

I.    **Factual Background**

A.    *Francesca Albanese and the Cali Family*

Plaintiffs L.C. and Massimiliano Cali are the daughter and husband, respectively, of Francesca Albanese, an Italian citizen. Compl. [Dkt. #1] ¶ 1. Albanese is an "international legal scholar and recognized expert in areas of human rights and the Middle East." *Id.* ¶ 17. Albanese's husband, Cali, is an economist with the World Bank and an Italian citizen. *Id.* Albanese's minor daughter, L.C., is a United States citizen. *Id.* ¶ 11.

The family lived in the United States from 2012 to 2015 while Cali was stationed at the World Bank headquarters in Washington, D.C. *Id.* ¶ 18. During that time, they purchased a home, opened a U.S. bank account, and took out a mortgage. *Id.* L.C. was born in Washington, D.C. in 2013. *Id.* ¶ 18. The family left the United States in 2015 when the World Bank relocated Cali outside the United States, but they kept their D.C. residence and routinely travel to the United States. *Id.* ¶ 20. The family currently resides in Tunisia. *Id.*

As a public intellectual and scholar, Albanese has written and spoken widely on controversial human rights issues, including most notably the Israeli-Palestinian conflict. Mem. in Supp. of Mot. for Prelim. Inj. ("P.I. Br.") [Dkt. #3-1] at 6–9. In April 2022, the United Nations Human Rights Council ("UNHRC") appointed Albanese as the "Special Rapporteur on the situation of human rights in the Palestinian territory occupied since 1967." *Id.* at 7; Compl. ¶ 21. In this position, Albanese reports to the UNHRC and the United Nations General Assembly on human rights issues in the Palestinian territory and

2

Add.5

engages in independent scholarship and advocacy. *Id.* at 7. She has spoken at universities in the United States and Europe and has appeared on a wide range of media outlets. Compl. ¶ 23. Since 2022, she has also published two books on the Israeli-Palestinian conflict. *Id.* ¶ 24. According to U.S. Secretary of State Marco Rubio, Albanese has "spewed unabashed antisemitism, expressed support for terrorism, and open contempt for the United States, Israel, and the West." Compl., Ex. B. ("Rubio Statement") [Dkt. #1-10] at 1.

In her role as a Special Rapporteur, Albanese has authored recommendations to the International Criminal Court ("ICC") regarding possible war crimes charges stemming from the Israeli-Palestinian conflict. The ICC is an international institution located in the Netherlands that provides its member states a forum for the prosecution of international crimes, including genocide, crimes against humanity, and war crimes. Compl. ¶¶ 26, 29. The ICC was created by the 1998 Rome Statute. *Id.* ¶ 26. The United States signed the Rome Statute, but the Senate never ratified it. *Id.* ¶ 28.

Albanese has *no* formal role with the ICC. *Id.* ¶ 31. However, the United Nations and the ICC have agreed to "cooperate closely . . . and consult each other on matters of mutual interest." Opp'n to Mot. for Prelim. Inj. ("Opp'n") [Dkt. #26] at 10 (quoting United Nations Office of Legal Affairs, "Negotiated Relationship Agreement between the International Criminal Court and the United Nations," https://perma.cc/23M4-DY4J). In July 2025, Albanese authored a report in which she "urge[d] the [ICC] and national judiciaries to investigate and prosecute corporate executives and/or corporate entities" for their role in alleged war crimes in the Middle East. *Id.* at 9 (quoting F. Albanese, *From economy of occupation to economy of genocide*, ¶ 96, U.N. Doc. A/HRC/59/23 (July 2,

3

Add.6

2025), https://docs.un.org/en/A/HRC/59/23). The report specifically mentions U.S. companies—including Lockheed Martin, Caterpillar Inc., and Chevron—and accuses them of furthering "apartheid" and "settler-colonial destruction." *Id.* at 9–10 (quoting Albanese, *From economy of occupation*, ¶¶ 32, 36, 43–45).

## B.    *Executive Order 14203*

On February 6, 2025, President Donald J. Trump issued Executive Order No. 14203 ("E.O. 14203" or "the Order"), entitled "Imposing Sanctions on the International Criminal Court." 90 Fed. Reg. 9369 (Feb. 6, 2025); *see also* Compl., Ex. A [Dkt. #1-9]. Promulgated pursuant to the President's authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, E.O. 14203 declares that "any effort by the ICC to investigate, arrest, detain, or prosecute" nationals of the United States or other major allies "constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States." E.O. 14203 at 1. The Order specifically references the ICC's actions against Israeli government officials over alleged war crimes in the Middle East. *Id.*

Pursuant to the President's authority under IEEPA, E.O. 14203 authorizes extensive sanctions against foreign persons who have "directly engaged in" or assisted the ICC in these efforts. *Id.* § 1(a)(ii)(A). Absent an applicable exception, E.O. 14203 prohibits U.S. persons from providing "funds, goods, or services by, to, or for the benefit of" any foreign person designated under the Order. *Id.* §§ 3(a), (b). Individuals who engage in transactions with designated persons are subject to civil fines and criminal penalties under IEEPA. *See* 50 U.S.C. § 1705; 31 C.F.R. § 510.701.

4

Add.7

C.   *The Designation of Albanese*

On July 9, 2025, Secretary of State Rubio designated Albanese, pursuant to E.O. 14203, as a foreign national who has "directly engaged with the [ICC] in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel, without the consent of those two countries." Rubio Statement. Secretary Rubio cited Albanese's service as a U.N. Special Rapporteur, including her "recommend[ation] that the ICC, without a legitimate basis, issue arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Defense Minister Yoav Gallant," as well as her "writing threatening letters to dozens of entities worldwide, including major American companies" and "recommending the ICC pursue investigations and prosecutions of these companies and their executives." *Id.* at 1–2.

The U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") subsequently implemented the designation by adding Albanese to OFAC's Specially Designated National ("SDN") List. Opp'n at 11 (citing U.S. Dep't of Treasury, Off. Of Foreign Assets Control, "International Criminal Court-related Designation," https://perma.cc/QEP3-VWB8). As a result of her designation, U.S. persons may not, at risk of civil and criminal liability, engage in any transaction of funds, goods, or services with or for the benefit of Albanese. E.O. 14203 § 3. The Order also bars "immigrant [or] nonimmigrant entry into the United States" by Albanese and her "immediate family members." *Id.* § 4.

On August 22, 2025, OFAC issued two licenses limiting the impact of Albanese's designation. The first permits certain transactions "ordinarily incident and necessary to"

5

Add.8

the upkeep or sale of the family's residence in the United States, while restricting all proceeds of any sale to an "interest-bearing blocked account." Compl., Ex. C ("Property License") [Dkt. #1-11] § I–II. The second permits transactions "ordinarily incident and necessary to . . . Albanese's role as the parent and legal guardian of [L.C.]" Compl., Ex. D ("Parental License") [Dkt. #1-12] § I; *see also* Decl. of M. Rasmussen [Dkt. #26-1] at ¶¶ 5–9 (discussing scope of Parental License).

### D.      *The Aftermath of Albanese's Designation*

As a result of her designation, Albanese has suffered severe ramifications. She is barred from entering the United States, which prevents her from traveling to the headquarters of the United Nations. Compl. ¶ 69. Albanese has also been "fully unbanked and cannot make or receive payments through the financial system." *Id.* ¶ 68. Soon after her designation, Albanese was removed from her joint U.S. bank account with her husband, Decl. of M. Cali [Dkt. #30-1] ¶ 7, and she has subsequently been denied bank accounts at several European banks, *Id.* ¶ 12. Moreover, due to Albanese's designation, her husband's employer-sponsored health insurer has "refused to pay [her] health expenses." *Id.* ¶ 23. Several U.S. universities severed their longstanding ties with Albanese, including Georgetown and Columbia. Compl. ¶ 70.

Plaintiffs allege they too have suffered harms because of Albanese's designation. As an "immediate family member[]" of an SDN, Cali is barred from entering the United States. E.O. 14203 § IV. He therefore cannot travel to the headquarters of his employer, the World Bank. Compl. ¶ 69. Indeed, due to his travel restrictions and "ongoing external pressure resulting from the sanctions," Cali Decl. ¶ 18, Cali has been suspended from

Add.9

existing positions at the World Bank and faces "severely constrained" options for future positions within the organization, *id.*  Cali also cannot travel to Washington, D.C. to supervise the upkeep or sale of his and his wife's property.  Compl. ¶ 71.  Prior to the issuance of the Property License, OFAC blocked an attempted sale of the residence.  Cali Decl. ¶ 10.  While Cali may now try to sell the residence, the proceeds of any sale will remain frozen.  Property License § II.

As to L.C., she is effectively barred from returning to her native country given the travel restrictions on her parents.  Compl. ¶ 69.  As a U.S. citizen, L.C. also faces per se civil or criminal liability under the Order for "any contribution or provision of funds, goods, or services by, to, or for the benefit of" her mother, *Id.* ¶ 72; E.O. 14203 § 3(a), subject to the exclusions listed in the Parental License.  Plaintiffs allege these restrictions "impose an enormous chilling effect on L.C.'s mental well-being and constitutional rights."  Compl. ¶ 73.

Following her designation in July 2025, Albanese and Cali sought assistance from the United Nations in challenging defendants' actions.  *See* Cali Decl. ¶¶ 5–6, 9.  Ultimately, however, the United Nations chose not to challenge Albanese's designation through administrative or judicial process.  *Id.* ¶ 25.  Albanese also requested authorization to litigate the designation in her personal capacity.  *Id.* ¶¶ 22, 25.  The United Nations responded on January 14, 2026 that it was "not in a position to authorize [Albanese] to file suit in a United States court contesting the imposition of those sanctions."  Compl., Ex. E ("U.N. Letter") [Dkt. #1-13].  One week later, plaintiffs authorized their attorneys to prepare this lawsuit.  Cali Decl. ¶ 30.

Add.10

## II.    This Lawsuit

On February 25, 2026, L.C., proceeding by and through her father, Cali, and Cali himself (collectively, "plaintiffs") filed this lawsuit against President Trump, Attorney General Pamela Bondi, Secretary of the Treasury Scott Bessent, and Secretary of State Rubio (collectively, "defendants").  Compl. ¶¶ 11–16.  Plaintiffs raise claims under the First Amendment, IEEPA, the Fourth Amendment, the Fifth Amendment, and the Administrative Procedure Act.  *Id.* ¶¶ 75–101.  The same day, plaintiffs filed a motion for a preliminary injunction.  *See* Mot. for Prelim. Inj. [Dkt. #3].  Plaintiffs moved for preliminary injunctive relief, however, on their First Amendment and IEEPA claims alone. P.I. Br. at 3–4.

Following entry of a briefing schedule, *see* Minute Order (Mar. 4, 2026), defendants filed their opposition to plaintiffs' motion on March 18, 2026, *see* Opp'n.  Plaintiffs filed a motion for leave to file a supplemental declaration on March 24, 2026, *see* Mot. for Leave to File [Dkt. #30], which I granted, *see* Minute Order (Mar. 30, 2026).  Plaintiffs filed their reply in support of their motion on March 25, 2026.  *See* Reply in Supp. of Mot. for Prelim. Inj. ("Reply") [Dkt. #32].  I held a hearing on April 1, 2026.  *See* Tr. of Prelim. Inj. H'rg ("H'rg Tr.") [Dkt. #35].  Plaintiffs' motion for preliminary injunction is now ripe for decision.[1]

---

[1] Following the hearing, plaintiffs sought to supplement the record with additional declarations, *see* Mot. to Suppl. Record [Dkt. #38]; Unopposed Mot. to Amend/Correct [Dkt. #40]; Consent Mot. to Suppl. Record [Dkt. #42], and later sought to file those supplemental declarations under seal, *see* Sealed Mot. for Leave to File Under Seal [Dkt. #43].  Defendants opposed the motion to supplement the record, *see* Mem. in Opp'n to Mot. to Suppl. Record [Dkt. #41], but consent to the sealing of the record, *see* Sealed Mot. for Leave to File Under Seal [Dkt. #43].  Both parties have sought leave to file replies and sur-replies in support

8

Add.11

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

## ANALYSIS

### I.   Standing

Before addressing the merits of the preliminary injunction, I must first decide whether plaintiffs have standing to sue—a "threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Plaintiffs assert they have Article III standing and prudential standing to assert the First Amendment rights of Albanese. Defendants, not surprisingly, challenge plaintiffs' standing on both grounds. I will discuss each in turn.

### A.   *Article III Standing*

To establish standing to sue, plaintiffs must show they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of [defendants], and (3) that is

---

of their respective positions. *See* Mot. for Leave to File Reply in Supp. of Mot. to Suppl. Record [Dkt. #45]; Unopposed Mot. for Leave to File Sur-Reply in Opp'n to Mot. to Suppl. Record [Dkt. #47]. These filings chiefly relate to plaintiffs' efforts to clarify whether OFAC will permit plaintiffs to seek litigation funding from U.S. persons. Plaintiffs argue that OFAC's determination supports their theory of Article III injury and irreparable harm. Ultimately, I need not reach this theory of harm to find in plaintiffs' favor at this stage of the litigation. But in the interest of justice and for good cause shown, I will grant all motions to supplement and to file additional pleadings in support of or opposition to the same. I will also grant the motion to seal.

Add.12

likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs must establish each element "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Accordingly, on a motion for a preliminary injunction, plaintiffs must show a "substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

As to injury in fact, both plaintiffs—Cali and L.C.—suffer "concrete and particularized" harms as a result of Albanese's designation under E.O. 14203. *Lujan*, 504 U.S. at 560. Common injuries sufficient for standing include "monetary injury," "an injury to one's property," and "an injury to one's constitutional rights." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Plaintiffs here, in one way or another, have demonstrated all three kinds of harm. How so?

For starters, Cali has suffered concrete harms to his property interest in his condominium in Washington, D.C. While OFAC has issued a narrow license permitting the upkeep and sale of the property, *see* Property License, the license allows only "U.S. persons" to care for the property—not Cali himself, *id.* § I. And the License requires all proceeds from any sale to be placed in an "interest-bearing blocked account," *id.* § II, barring Cali from realizing his property's economic value. These "impairment[s]" of Cali's "property rights" are tangible legal injuries. *Children's Health Def. v. FCC*, 25 F.4th 1045, 1049 (D.C. Cir. 2022).

L.C., an American citizen, has suffered "injury to [her] constitutional rights." *All. for Hippocratic Med.*, 602 U.S. at 381. Since Cali and Albanese are barred from entering

10

Add.13

the United States, *see* E.O. 14203 § 4, L.C., a minor, is effectively unable to travel to the United States. Reply at 15–16 (citing "strict, near universal regulatory restrictions on international travel by an unaccompanied minor"). As an American citizen, L.C. also faces potential criminal liability for any transactions with her mother. *See* E.O. 14203 § 3. The designation of her mother thus burdens L.C.'s "freedom of travel" as an American citizen, *Aptheker v. Sec'y of State*, 378 U.S. 500, 517 (1964), and burdens L.C.'s constitutional liberty interest in her familial relations, *see Franz v. United States*, 707 F.2d 582, 595 (D.C. Cir. 1983) (recognizing that "the freedom of a parent and child to maintain, cultivate, and mold their ongoing relationship" is "[a]mong the most important of the liberties" protected by the Constitution).

Undaunted, defendants point to the two limited licenses—the Property License and the Parental License—to argue that Cali and L.C. remain unharmed! Opp'n at 18–21. But these licenses apply only to "U.S. persons," so they do not excuse Cali from the ramifications of Albanese's designation. And there is no dispute that the Property License acts to freeze all proceeds from the sale of Cali's property in Washington, DC by placing those proceeds in a "blocked account." Property License § II; Cali Decl. ¶ 13. Even apart from the burdening of Cali's property interests, that bare "economic harm is still an injury-in-fact for standing purposes." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017).

As for the Parental License, it is limited to transactions "ordinarily incident *and necessary to* [Albanese's] role" as L.C.'s parent and guardian. Parental License § I (emphasis added). Defendants say the License helps "ensure that sanctions do not impede

11

Add.14

Albanese in her role as parent," Rasmussen Decl. ¶ 9, and OFAC claims it would "*generally view*" incidental activities like Christmas gift exchanges or family travel as "authorized" by the License, *id* (emphasis added). Please! The existence of such a licensing scheme in the first place infringes the "constitutionally protected" "relationship between parent and child." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (quoting *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978)). Further, the Parental License on its face prohibits transactions that are incident *but unnecessary to* the parent-child relationship, and it is not clear from the record before me how plaintiffs would distinguish between necessary and unnecessary transactions in the context of their family relationships. To say the least, such "'subtle . . . interference' with protected liberties" is a cognizable injury no less than a "heavy-handed frontal attack[]." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. ---, 2026 WL 1153029, at *11 (2026) (quoting *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960)).[2]

These concrete harms are all "traceable" to defendants' challenged action—the designation of Albanese under E.O. 14203—and "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. Defendants do not dispute these elements of

---

[2] Defendants point out, correctly, that plaintiffs have not sought clarification from OFAC as to the scope of the Parental License. *See* Opp'n at 19. But as defendants' own submissions demonstrate, obtaining guidance from OFAC regarding specific transactions is no simple process. *See* Rasmussen Decl. ¶¶ 4, 7. Plaintiffs' filings regarding their counsel's repeated requests for clarification from OFAC regarding litigation funding prove the point. *See* Decl. of B. Brooks-Rubin [Dkt. #38-1] at ¶¶ 5–10 (describing weeks-long process of seeking clarification from OFAC regarding scope of general license before preparing application for specific license). L.C. should not have to retain a lawyer to determine whether she can buy her mother a gift.

Add.15

the standing analysis. Indeed, a court order enjoining the designation of Albanese would remedy plaintiffs' harms. Accordingly, both plaintiffs have Article III standing to sue.

### B.    *Third Party Standing*

Though they have Article III standing, plaintiffs ground their First Amendment claims in alleged violations of Albanese's rights, not their own. A plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004) (quoting *Warth*, 422 U.S. at 499). Under some circumstances, however, third parties may have "standing to assert the rights of another." *Id.* at 129–30.

Courts weigh three prudential considerations in assessing third-party standing: "1) the plaintiff 'must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute'; 2) the plaintiff 'must have a close relation to the third party'; and 3) 'there must exist some hindrance to the third party's ability to protect his or her own interests.'" *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 34 (D.D.C. 2020) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

Plaintiffs satisfy each requirement. First, plaintiffs themselves have suffered constitutional and economic injuries of their own, as described above. Second, there is a "close relation" and "identity of interests" between plaintiffs and Albanese such that plaintiffs can "act as . . . effective advocate[s]" for Albanese's rights. *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999). There can be no dispute as to the closeness of the relationship; Albanese is Cali's husband and L.C.'s mother. Indeed, defendants

13

Add.16

acknowledge that "much of [plaintiffs'] requested relief would run directly to Albanese's benefit." Opp'n at 16.

Finally, Albanese is hindered in her ability to challenge her designation. To satisfy this requirement, plaintiffs "need only show that 'there is some impediment to [Albanese]'s ability to assert [her] own legal rights.'" *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 362 (D.D.C. 2020) (quoting *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 31 (D.D.C. 2010)). Already a "lenient standard," *id.*, the hindrance threshold is even more "relaxed" in First Amendment cases, *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 146 (D.D.C. 2025). Its purpose is merely "to ensure 'that the rightholder did not simply decline to bring the claim on his own behalf, but could not in fact do so.'" *Al-Aulaqi*, 727 F. Supp. 2d at 32 (quoting *Miller v. Albright*, 523 U.S. 420, 450 (1998) (O'Connor, J., concurring)).

Given her position as a U.N. Special Rapporteur and because she is subject to institutional immunity, Albanese must obtain explicit permission from the U.N. before bringing lawsuits in her own name. *See* Reply at 23; U.N. Letter at 2 (noting that the Secretary-General has the sole "right" to "waive the immunity" of U.N. experts like Albanese). Albanese sought permission from the U.N. to challenge her designation but was denied. Compl. ¶ 74; U.N. Letter at 2. Courts have found the hindrance requirement satisfied by far less concrete barriers, including a "financial disincentive to litigate" and "a party's desire to protect her personal privacy." *Al-Aulaqi*, 727 F. Supp. 2d at 31 (citing cases). In First Amendment cases especially, a "serious risk" to "career[s] and professional li[ves]" and a mere "danger of chilled speech" have been enough. *Turner*, 502 F. Supp. 3d

14

Add.17

at 362 (citations omitted).  This however is not, as defendants claim, a case where the party "could have brought suit on [her] own behalf, but . . . simply declined to do so." *Al-Aulaqi*, 727 F. Supp. 2d at 32.  Instead, plaintiffs have demonstrated that Albanese's ability to assert her rights in court was sufficiently impeded.

Accordingly, plaintiffs have standing in their own right and standing to assert the First Amendment rights of Albanese.  I now turn to plaintiffs' arguments on the merits.

## II.      Likelihood of Success on the Merits

To obtain a preliminary injunction, plaintiffs must demonstrate a strong likelihood of success on the merits.  Plaintiffs raise three grounds in their motion: (1) E.O. 14203 violates the First Amendment on its face and as applied to Albanese; (2) E.O. 14203 violates the Berman Amendments to IEEPA; and (3) E.O. 14203 violates IEEPA's statutory limits on the President's sanctions authority.  P.I. Br. at 3–4.  Because I find that plaintiffs are likely to succeed on their First Amendment claim, I need not reach their statutory claims.

### A.      *Applicability of the First Amendment*

I must first consider whether the First Amendment protects the speech of Albanese, a non-citizen, while speaking outside the United States.  Foreign nationals outside the territory of the United States do not, as a general matter, "possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020).  Things change, however, when a foreign national "come[s] within the territory of the United States and develop[s] substantial connections with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).  Whether a foreign national has sufficient

15

Add.18

connections to the United States to garner protection under our Constitution is, in the final analysis, a "fact-dependent, case-by-case assessment." *Olenga v. Gacki*, 507 F. Supp. 3d 260, 274 (D.D.C. 2020).

Though it has never articulated any "definitive" criteria, our Circuit has often "looked to the presence of property as the benchmark for satisfying the 'substantial connections' test." *Kadi v. Geithner*, 42 F. Supp. 3d 1, 25–26 (D.D.C. 2012). For example, our Circuit found sufficient connections when a foreign organization had an "overt presence" in a D.C. office building and a "small bank account" in the United States. *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 201 (D.C. Cir. 2001) ("*NCOR*") (citation omitted). Courts have also found substantial connections where a noncitizen held U.S. visas, maintained a residence in the United States, owned companies in the United States, and owned property in the United States that was blocked as a result of the challenged designation. *López Bello v. Smith*, 651 F. Supp. 3d 20, 38 (D.D.C. 2022), *aff'd sub nom.*, *Bello v. Gacki*, 94 F.4th 1067 (D.C. Cir. 2024). On the other hand, our Circuit found insufficient connections where two foreign organizations did not "possess[] any controlling interest in property located within the United States." *32 Cnty. Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002).

Here, Albanese has "substantial connections" to the United States. *Verdugo-Urquidez*, 494 U.S. at 271. From 2012 to 2015, Albanese lived in the United States. Compl. ¶¶ 18–20. During that time, she bought—and she still owns—property in the United States. *Id.*; *Kadi*, 42 F. Supp. 3d at 26 ("presence of property" is the "benchmark"). As a property owner, Albanese has a mortgage with a U.S. financial institution and pays

16

Add.19

U.S. property taxes. Compl. ¶ 18; Reply at 7. In addition, Albanese has a U.S. citizen daughter, was affiliated with several U.S. universities before the imposition of sanctions, and frequently travels to the United States for professional obligations and speaking engagements—including professional engagements that were cancelled as a result of Albanese's designation. Reply at 7–8. These connections are substantial enough to grant Albanese "at least *some*" protections under our Constitution. *Kadi*, 42 F. Supp. 3d at 26.

Defendants' arguments to the contrary are, to say the least, unpersuasive! Defendants point out that Albanese is not physically present in the United States and that none of Albanese's "relevant expression took place in the United States." Opp'n at 26. Defendants chiefly rely on *NCOR*, which relied, in part, on a foreign organization's "overt presence" in a D.C. office building to conclude that the organization had substantial connections. 251 F.3d at 201–02. But the organization's physical presence was not the only factor considered by the *NCOR* court. *Id.*[3] And, as other cases teach, physical presence within the United States is *not* a necessary condition for constitutional protections. *See Russian Volunteer Fleet v. United States*, 282 U.S. 481, 489, 491 (1931) (foreign corporation with property in the United States was protected by Fifth Amendment); *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 994–97 (9th Cir. 2012) (foreign national

---

[3] The reasoning in *NCOR* was also based on "classified information" that confirmed the organization's substantial connections to the United States. 251 F.3d at 202. Moreover, *NCOR* did not purport to announce strict requirements for what counts as "substantial." *See id.* ("In any event, we are not undertaking to determine, as a general matter, how 'substantial' an alien's connections with this country must be to merit the protections of the Due Process Clause or any other part of the Constitution. Rather, we have reviewed the entire record including the classified information and determine that NCRI can rightly lay claim to having come within the territory of the United States and developed substantial connections with this country.").

Add.20

with substantial connections could bring First Amendment challenge to No-Fly List designation despite not being physically present in United States). Rather, our Circuit has looked to a foreign national's "presence *or property*" in the United States to determine the scope of that foreign national's rights. *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1241 (D.C. Cir. 2003) (emphasis added) (citing *NCOR*, 251 F.3d at 201–02); *see also 32 Cnty. Sovereignty Comm.*, 292 F.3d at 799.

Here, while the speech at issue occurred outside the United States, defendants have responded by taking action against Albanese's extensive connections *to* the United States— including Albanese's property within the United States and her ability to maintain professional and personal connections within the United States—*because of* her speech. Accordingly, Albanese (or plaintiffs standing in her shoes) may claim the protection of the First Amendment to challenge defendants' actions. *Kadi*, 42 F. Supp. 3d at 26.

## B.   *First Amendment Analysis*

The First Amendment forbids the Government from "abridging the freedom of speech." U.S. Const. amend. I. In evaluating whether a government regulation of speech violates the First Amendment, courts distinguish between regulations that are "content based" and those that are "content neutral." *Reed v. Town of Gilbert*, 576 U.S. 155, 165–66 (2015). A regulation of speech is "content based" if it targets speech "based on its communicative content" or "because of the topic discussed or the idea or message expressed." *Id.* at 163. Content-neutral regulations, by contrast, "serve[] purposes unrelated to the content of expression." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Where a regulation targets speech based on its content, the regulation is

"presumptively unconstitutional" and will survive First Amendment scrutiny only if it is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

Plaintiffs challenge E.O. 14203 as unconstitutional on its face and as applied to Albanese. I will first consider whether the order is "valid as applied" to avoid addressing "an overbreadth issue unnecessarily." *Renne v. Geary*, 501 U.S. 312, 324 (1991) (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989)); *see also Sandvig v. Sessions*, 315 F. Supp. 3d 1, 28 (D.D.C. 2018) ("[F]acial challenges are disfavored when a case 'may be disposed of on narrower grounds.'" (quoting *Texas v. Johnson*, 491 U.S. 397, 403 n.3 (1989)).

To begin, Secretary Rubio's designation of Albanese under E.O. 14203 plainly regulates Albanese's speech. Secretary Rubio's statement asserts that Albanese "directly engaged with the [ICC] in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel" by "*recommending* that the ICC . . . issue arrest warrants targeting" Israeli officials and by "*recommending* the ICC pursue investigation and prosecutions" of American companies. Rubio Statement at 1–2 (emphasis added). Albanese does not work for the ICC, nor does she have any ability to direct action by the ICC. Compl. ¶ 31; Hr'g Tr. at 19:7–20. As such, the only way Albanese has engaged in any ICC effort to "investigate, arrest, detain, or prosecute a protected person," E.O. 14203 § I(a)(ii)(A), is by offering her non-binding *opinion* and *recommendation*—in other words, by speaking!

Not only do defendants seek to regulate Albanese's speech, they want to regulate her speech because of the "idea or message expressed," *Reed*, 576 U.S. at 163, as well as because of "its function or purpose," *TikTok Inc. v. Garland*, 604 U.S. 56, 71 (2025). As a

19

Add.22

Southern District of New York colleague held in enjoining the predecessor to E.O. 14203, the Order restricts speech "if, and only if, it has the function or purpose of benefitting [the ICC]. This is content-based restriction." *Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198, 211 (S.D.N.Y. 2021).

Defendants argue that E.O. 14203 as applied to Albanese is a regulation of conduct, not speech. Opp'n at 32; Hr'g Tr. at 25:19–20 (Albanese designated as SDN "because of her conduct"). E.O. 14203 penalizes anyone who "directly engaged" in ICC efforts to "investigate, arrest, detain, or prosecute" protected persons. E.O. 14203 § I(a)(ii)(A). Even if E.O. 14203 "*generally* functions as a regulation of conduct," it "was directed at [Albanese] because of what [her] speech communicated." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 27–28 (2010) (citing *Cohen v. California*, 403 U.S. 15, 18–19 (1971)). Put differently, the "conduct triggering" the application of E.O. 14203 to Albanese was her nonbinding recommendation that the ICC take action against U.S. and Israeli nationals— nothing more than "communicating a message" with which defendants disagree. *Id.* at 28.

Nor can it be argued that E.O. 14203 as applied to Albanese has a mere "incidental effect on speech." Opp'n at 32. Albanese's designation does not "serve[] purposes unrelated to the content of expression." *Ward*, 491 U.S. at 791. Rather, the "principle justification" for her designation, *id.* at 791, is to "respond" to the expression of opinions that defendants think "extreme," Rubio Statement at 2. If Albanese instead *opposed* ICC action against U.S. and Israeli nationals, she would not have been designated under E.O. 14203. Thus, the effect of Albanese's designation is to "punish" and thereby "suppress disfavored expression." *NRA v. Vullo*, 602 U.S. 175, 188 (2024).

20

Add.23

Because E.O. 14203 as applied to Albanese is a content-based regulation of speech, it is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. To be narrowly tailored, defendants must "demonstrate that [their actions] do[] not 'unnecessarily circumscrib[e] protected expression.'" *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002) (third alteration in original) (quoting *Brown v. Hartlage*, 456 U.S. 45, 54 (1982)).

Defendants' asserted compelling interest is "upholding the sovereignty of the United States" and safeguarding the foreign policy interests of the United States and its allies by protecting them from "investigation, arrest, detention, and prosecution by the ICC." Opp'n at 29. Of course, "concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder*, 561 U.S. at 34. But even assuming the validity of defendants' stated interests, the sanctioning of Albanese under E.O. 14203 is hardly "narrowly tailored" to further those ends. *Reed*, 576 U.S. at 163.

By sanctioning Albanese under E.O. 14203, defendants are punishing Albanese for merely *recommending* that the ICC prosecute certain individuals—a non-binding opinion that does not compel any action on the part of the ICC. As the Supreme Court put it when distinguishing speech from non-speech, "independently advocating for a cause is different from providing a service." *Holder*, 561 U.S. at 24. Defendants' own statements demonstrate that independent advocacy is at the heart of the sanctions against Albanese! Because Albanese's designation under E.O. 14203 "unnecessarily circumscribe[es]" her

21

Add.24

"protected expression," it violates the First Amendment. *White*, 536 U.S. at 775 (quoting *Brown*, 456 U.S. at 54).

### III.  Irreparable Harm

Plaintiffs must also demonstrate irreparable harm. To warrant a preliminary injunction, the risk of injury must be "both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up). Though sufficient to convey standing, "economic loss does not, in and of itself, constitute irreparable harm" because it may be remedied by compensatory relief at a later date. *Id.* (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). But the "violation of a constitutional right," whether ongoing or prospective, "constitutes irreparable injury for purposes of seeking equitable relief." *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (cleaned up) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).

As a result of Defendants' actions, Plaintiffs are and will be irreparably harmed in the absence of an injunction. To begin, defendants' actions burden L.C.'s "freedom of travel" as an American citizen, a constitutionally protected liberty interest. *Aptheker*, 378 U.S. at 517. E.O. 14203 bars "immigrant and nonimmigrant entry" to the United States by "immediate family members" of SDNs, E.O. 14203 § 4, including a "spouse or child" of an SDN, *id.* § 8(f). That restriction plainly applies to Cali, who is not a U.S. citizen. And while not expressly forbidden by E.O. 14203, L.C. is effectively barred from entering her country of citizenship and native birth because of the strict travel restrictions on her father

Add.25

and mother. Such restrictions irreparably burden her constitutional rights as an American!

*Aptheker*, 378 U.S. at 517.

Further, the designation impairs the Cali family's property rights in their D.C. home, as described above. *See supra* part I.A. While purely monetary harms are compensable by damages and typically not irreparable, "unauthorized interference with a real property interest constitutes irreparable harm as a matter of law" since real property is a "unique commodity for which a monetary remedy for injury is an inherently inadequate substitute." *Watson v. Perdue*, 410 F. Supp. 3d 122, 131 (D.D.C. 2019) (quoting *Shvartser v. Lekser*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018)). As such, defendants' interference with Cali's rights in real property also inflicts irreparable harm.

Further still, defendants' actions burden L.C.'s constitutionally protected interests in familial relations. *See supra* part I.A; *Franz*, 707 F.2d at 595. Cali and L.C. face potential felony liability for interacting with or transacting business with Albanese, in violation of the "constitutional protection" afforded the "creation and sustenance of a family," including "the raising and education of children." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984); *see also Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018) (discussing "fundamental liberty interest in family integrity"). The existence of a limited license does not cure that harm. The Parental License applies only to "U.S. Persons," not Albanese herself, and covers only transactions "ordinarily incident and necessary" to Albanese's role as "parent and legal guardian" of L.C, *see* Parental License § I, not all interactions between Albanese and her daughter. The

23

Add.26

burdening of L.C.'s constitutional right to "maintain, cultivate, and mold [her] ongoing relationship" with her mother is irreparable harm. *Franz*, 707 F.2d at 595.

Defendants argue that plaintiffs cannot satisfy this element because they have not submitted any evidence to support their alleged harms. *See* Opp'n at 13, 23. While the movant for a preliminary injunction bears the burden of establishing each element by a "clear showing," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004), the Court may accept as true any "factual averments" that defendants "do not contest," *Pantoja v. Martinez*, 567 F. Supp. 3d 76, 78 n.1 (D.D.C. 2021). And as to plaintiffs' allegations about how E.O. 14203 and Albanese's designation affects them—by burdening L.C.'s entry into the United States, freezing the family's property assets, and chilling their familial relations—defendants do not contest a thing. Defendants offer differing interpretations of how OFAC may "generally view" certain hypothetical scenarios, *see* Rasmussen Decl. ¶ 9, but they offer no response to plaintiffs' specific factual allegations of harm, *see* Cali Decl. ¶¶ 10, 13 18 (alleging harms due to property and travel restrictions). I will not deny plaintiffs' motion on the sole basis that they did not submit an affidavit in support of their asserted harms.[4]

Defendants further argue that plaintiffs' delay in seeking a preliminary injunction undermines their claims of irreparable harm. Opp'n at 13–15. To be sure, a plaintiff's lengthy delay in seeking court intervention may "undercut[] its asserted harms." *Fla. EB5*

---

[4] Defendants also point out that the asserted First Amendment injuries are harms to Albanese, not to plaintiffs. *See* Opp'n at 22. Because, as described above, plaintiffs show other irreparable harms to themselves, I need not consider the alleged First Amendment harms to Albanese to grant plaintiffs' motion.

24

*Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020).  But a delay in filing, standing alone, "is not a proper basis" for denying a preliminary injunction.  *Gordon*, 632 F.3d at 724.  Here, any delay is minimal and excusable!  Defendants designated Albanese in July 2025, *see* Rubio Statement, and plaintiffs immediately sought assistance from the United Nations in challenging the designation, *see* Cali Decl. ¶¶ 4–6.  In January 2026, the United Nations advised that it would not permit Albanese to file suit individually.  U.N. Letter.  Plaintiffs filed this lawsuit roughly a month later.  Cali Decl. ¶ 33; Compl. (filed on February 25, 2026).  Since plaintiffs were in "diligent pursuit" of other avenues of redress, *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014), their modest delay in turning to the federal courts does not undercut their asserted harms.[5]

## IV.    The Balance of the Equities and the Public Interest

The balance of the equities and the public interest cut in plaintiffs' favor.  Where the Government is the opposing party, these factors merge and the court "weigh[s] the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Doe v. Mattis*, 928 F.3d 1, 23 (D.C. Cir. 2019).

On one side of the ledger, plaintiffs face real, tangible harms as a result of Albanese's designation.  *See supra* part III.  On the other hand, defendants' sanctioning of Albanese for her speech is overbroad.  The stated purpose of E.O. 14207 is to meet the "extraordinary

---

[5] Defendants argue that any injunction should not enjoin Albanese's designation in general but only as applied to plaintiffs. *See* Opp'n at 44–45.  I disagree.  It is unclear how defendants could limit the impact of Albanese's designation as to plaintiffs while otherwise enforcing the designation.  More fundamentally, Albanese's designation as an SDN is the source of plaintiffs' harm.  So long as she is designated as such, the familial relationship between Albanese, Cali, and L.C. will be burdened.  Thus, to provide "complete relief to the plaintiffs before the court," *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025), I must enjoin Albanese's designation in full.

Add.28

threat" posed by the ICC's efforts to "investigate, arrest, detain, or prosecute protected persons" by sanctioning foreign nationals who have "directly engaged" in those efforts. E.O. 14207 § 1(a)(ii)(A). But Albanese has done nothing more than *speak*! It is undisputed that her recommendations have no binding effect on the ICC's actions—they are nothing more than her opinion. Enjoining such a "vastly overinclusive" sanctions policy does defendants no harm. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804 (2011).

Finally, protecting the freedom of speech is "always" in the public interest. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). That is so even when an individual's views are "hurtful," "caustic," or "even outrageous," *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (citations omitted), as defendants clearly believe Albanese's speech to be, *see* Rubio Statement at 1–2 (labeling Albanese's speech as "biased and malicious," "antisemiti[c]," and "extreme"). Indeed, the "proudest boast" of our First Amendment is that it protects the freedom to express even "the thought that we hate." *Matal v. Tam*, 582 U.S. 218, 246 (2017) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)). Enough said.

### CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs' Motion for a Preliminary Injunction [Dkt. #3] is **GRANTED**. An accompanying order will issue contemporaneously with this opinion.

_____
RICHARD J. LEON
United States District Judge

26

Add.29