# ORAL ARGUMENT NOT YET SCHEDULED

## No. 26-5172

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

MASSIMILIANO CALI, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

On Appeal from the U.S. District Court for the District of Columbia

## APPELLEES' OPPOSITION TO APPELLANTS' EMERGENCY MOTION FOR A STAY PENDING APPEAL

Jason D. Wright
Patrick W. Fields*
Scott R. Johnston*
Erin B. Rausch*
STEPTOE LLP
1114 Avenue of the Americas
New York, New York, 10036
Telephone: (212) 506-3900
Facsimile: (202) 429-3902

*Application for admission
forthcoming

# CERTIFICATE AS TO PARTIES

The undersigned certifies the following pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1)(A): All parties appearing before the district court and in this court are listed in the Emergency Motion by Defendants-Appellants.


DATED: May 28, 2026                          /s/ Jason D. Wright
                                             Jason D. Wright

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ................................ 5

STANDARD OF REVIEW .................................................................. 7

ARGUMENT ................................................................................... 8

I.      Defendants are Unlikely to Succeed on the Merits. ........................ 9

      A.     Albanese's Designation Violated the First Amendment. ..... 10

      B.     The Injunction is Narrowly Tailored. ................................. 17

II.     Equity Favors the District Court's Injunction ............................. 23

CONCLUSION ............................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*32 Cnty. Sovereignty Comm. v. State,*
292 F.3d 797 (D.C. Cir. 2002) .......................................................... 13

*Agency for Int'l Dev. v. Alliance for Open Society,*
591 U.S. 430 (2020) ................................................ 1, 3, 11, 12, 14

*Bahlul v. United States,*
77 F.4th 918 (D.C. Cir. 2023) .......................................................... 14

*CREW v. FEC,*
904 F.3d 1014 (D.C. Cir. 2018) ................................................ 7, 8, 15

*Doe v. Blanche,*
172 F.4th 901 (D.C. Cir. 2026) ........................................................... 8

*FEA v. Trump,*
No. 25-5303, 2025 WL 2738626 (D.C. Cir. Sept. 25, 2025) ............... 24

*Harjo v. Andrus,*
581 F.2d 949 (D.C. Cir. 1978) .......................................................... 18

*Holcomb v. Powell,*
433 F.3d 889 (D.C. Cir. 2006) .......................................................... 13

*J.G.G. v. Trump,*
2025 WL 914682 (D.C. Cir. 2025) ....................................................... 8

*Jifry v. FAA,*
370 F.3d 1174 (D.C. Cir. 2004) ...................................................... 2, 13

*KalshiEX v. CFTC,*
119 F.4th 58 (D.C. Cir. 2024) .......................................................... 22

*Karem v. Trump,*
960 F.3d 656 (D.C. Cir. 2020) .......................................................... 26

*Lopez Bello v. Smith*,
651 F. Supp. 3d 20 (D.D.C. 2022) *aff'd sub nom. Bello v. Gacki*, 94 F.4th 1067 (D.C. Cir. 2024) ..................................... 14

*Make the Rd. New York v. Noem*,
2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) .................................... 23

*Maryland-Nat'l Cap. Park & Plan. Comm'n v. USPS*,
487 F.2d 1029 (D.C. Cir. 1973) ....................................................... 18

*Members of City Council v. Taxpayers for Vincent*,
466 U.S. 789 (1984) ........................................................................ 25

*Miot v. Trump*,
No. 26-5050, 2026 WL 659420 (D.C. Cir. Mar. 3, 2026)
(per curiam) .................................................................................... 25

*NCOR v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001) ......................................................... 14

*Nken v. Holder*,
556 U.S. 418 (2009) .......................................................... 1, 5, 7, 8, 9

*NRA v. Vullo*,
602 U.S. 175 (2024) ........................................................................ 10

*NTEU v. Trump*,
No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ........... 19, 20

*People's Mojahedin Org. of Iran v. State*,
182 F.3d 17 (D.C. Cir. 1999) ........................................................... 14

*People's Mojahedin Org. of Iran v. State*,
327 F.3d 1238 (D.C. Cir. 2003) ....................................................... 14

*Powers v. Ohio*,
499 U.S. 400 (1991) ........................................................................ 18

*Rasul v. Myers*,
563 F.3d 527 (D.C. Cir. 2009) ..................................................... 2, 15

*Rona v. Trump,*
797 F. Supp. 3d 278 (S.D.N.Y. 2025)..................................................24

*Smith v. Trump,*
791 F. Supp. 3d 90 (D. Me. 2025) ....................................................24

*TikTok Inc. v. Garland,*
122 F.4th 930 (D.C. Cir. 2024), *aff'd,* 604 U.S. 56 (2025) .................17

*Troxel v. Granville,*
530 U.S. 57 (2000).............................................................................27

*Trump v. Casa, Inc.,*
606 U.S. 831 (2025)................................................................ 17, 18, 21

*United States v. Microsoft,*
253 F.3d 34 (D.C. Cir. 2001) ............................................................19

*United States v. Verdugo-Urquidez,*
494 U.S. 259 (1990)............................................................................2

*Wisconsin Gas v. FERC,*
758 F.2d 669 (D.C. Cir. 1985) ..........................................................22

**Statutes**

22 U.S.C. § 7427(c) ...............................................................................26

**Rules & Regulations**

Executive Order 14203, 90 Fed. Reg. 9369..............................................6

**Other Authorities**

*Situation of human rights in the Palestinian territories
occupied since 1967* (New York, Oct. 1, 2024),
https://perma.cc/V2ZE-3MEE;...........................................................16

UN / HUMAN RIGHTS IN OPT (New York, Oct. 30, 2024),
https://media.un.org/unifeed/en/asset/d329/d3296735......................16

# GLOSSARY

| | |
|---|---|
| E.O. | Executive Order |
| IEEPA | International Emergency Economic Powers Act |
| ICC | International Criminal Court |
| OFAC | Office of Foreign Assets Control |
| SDN | Specially Designated National |
| U.N. | United Nations |

## INTRODUCTION

The District Court entered a preliminary injunction that affects *three* people: a mother, a father, and their American daughter. The District Court did not enjoin any government policy or program. It did not prohibit any imminent action the government sought to take. It did not direct relief at the President. All it did was temporarily enjoin subordinate government officials "from implementing or enforcing the designation of Francesca Albanese" under the International Emergency Economic Powers Act ("IEEPA") for the duration of the litigation below.

Appellants fail to demonstrate any of the four *Nken* factors required to justify a stay of that narrowly tailored interim relief. *Nken v. Holder*, 556 U.S. 418, 434 (2009). On the first and "most critical" factor, Appellants have not made a "strong showing" that they are likely to prevail on the merits. Appellants' principal argument rests on a citation to *Agency for International Development v. Alliance for Open Society*, 591 U.S. 430, 433 (2020), and the proposition that "foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Id.* But neither Appellees nor the District Court ignored this rule. To the

1

contrary, the District Court began its analysis of the merits below by citing that very case for this very proposition. Attachment 1 (Op.15).

That generic principle, however, does not resolve this case. One plaintiff is a citizen, and her Italian parents have substantial connections to the United States that stretch back longer than her lifetime. Those connections continue to this day and include residence in the district, U.S. visas, routine travel, employment, bank accounts, health insurance, the annual payment of taxes (including for this year), and the ownership of their family home less than three miles from this courthouse. Op.2, 16-17.

The law of the circuit holds that an alien's entitlement to the protections of the constitution turns on whether they have "presence or property in the United States," *Rasul v. Myers*, 563 F.3d 527, 531 (D.C. Cir. 2009), and "have come within the territory of the United States and established 'substantial connections' with this country, … *or* 'accepted some societal obligations'." *Jifry v. FAA*, 370 F.3d 1174, 1182-83 (D.C. Cir. 2004) (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990)). The District Court applied this circuit's substantial connections test, conducted a thorough review of the

record, and found that Appellees' substantial connections to the United States are more than sufficient to implicate the First Amendment.

Appellants have identified no clear error in the District Court's application of circuit precedent to that fact-specific question. Instead, Appellants argue for the first time on appeal that *Alliance for Open Society* abrogated the substantial connections test such that now an alien must be physically present in the United States while speaking for the First Amendment to apply. Mot.3.

Even if this argument has merit, Appellants' forfeiture of this argument below makes it inappropriate as a basis on which to now seek a stay. The parties did not brief this argument, and the District Court had no opportunity to evaluate its merits in the first instance.

This case is also a uniquely poor vehicle for deciding that argument. The legal clarity required to overturn the law of the circuit is exacting and Appellants' own motion acknowledges that at least some of the speech that led Appellants to sanction Albanese occurred in the United States and would therefore be protected by the First Amendment under their newly proposed rule. Mot.9 (noting Albanese's delivery of a report to the U.N. General Assembly in New York as sanctionable conduct).

A stay is also inappropriate because Appellants have not shown a single concrete injury they will suffer if the preliminary injunction remains in place until a final judgment is entered. They invoke "national security" and "foreign policy" generally. But they have offered no evidence or argument to explain how a temporary injunction against the implementation and enforcement of the SDN designation against this specific individual compromises those interests.

To the contrary, before the District Court, Appellants acknowledged that the only concrete harm this preliminary injunction imposes upon them is being frustrated in their ability to "discourage" Albanese's speech. Attachment 7 (Opp'n at 29). That is not a legitimate interest, and it does not outweigh the concrete economic, constitutional, and practical harms that Appellees incontestably suffer each day.

The District Court ordered narrowly tailored interim relief because doing so was both warranted and minimally sufficient to protect a 13-year-old American girl and her Italian father from being blocked from their family home, barred from travel to the United States, chilled in their own First Amendment rights of association and expression, and menaced by the threat of felony prosecution for engaging with their

mother and wife in the most ordinary family routines. That finding was based upon months of briefing, more than two dozen exhibits and pleadings, a hearing, six weeks of deliberation, and the application of settled circuit precedent to a detailed record that was developed through full adversarial presentation.

Given the preliminary posture of this appeal, the deferential standard of review this Court applies to the District Court's factfinding, and the unique fact pattern this case presents, Appellants have not satisfied the stringent requirements for a stay of that order pending appeal. *See Nken*, 556 U.S. at 434; *D.C. Circuit Handbook of Practice and Internal Procedures* 33 (2025).

## FACTUAL AND PROCEDURAL BACKGROUND

Francesca Albanese ("Albanese") is an Italian citizen and an international law scholar. Op.2. In 2022, she was appointed as the United Nations "Special Rapporteur on the situation of human rights in the Palestinian territory occupied since 1967." *Id.* She is the wife of Massimiliano Cali ("Cali"), an Italian citizen and economist with the World Bank, and the mother of her and Cali's 13-year-old, U.S.-citizen daughter ("L.C."). *Id.*

On February 6, 2025, President Trump issued Executive Order 14203, 90 Fed. Reg. 9369, which created a sanctions program under IEEPA targeting the International Criminal Court ("ICC"). On July 9, 2025, Secretary of State Marco Rubio designated Albanese as a Specially Designated National ("SDN") for having "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person." Op.5. Albanese has no official or unofficial role with the ICC, and the District Court found that her designation was intended to discourage her from rendering "a non-binding opinion that does not compel any action on the part of the ICC." Op.21.

To implement and enforce her designation, the Office of Foreign Assets Control ("OFAC") added Albanese to the SDN List. It also issued two limited licenses. Op.5-6, 11-12. The first licenses "U.S. Persons" to engage in transactions regarding the sale of Appellees' family home in Washington, so long as proceeds are deposited in a blocked account. Attachment 4 (License No. ICC-EO14203-2025 1405217-1). The second licenses "U.S. Persons" to engage in transactions "ordinarily incident and necessary" to L.C.'s parent-child relationship. Attachment 5 (License No. ICC-EO14203-2025-1408722-1).

Appellees filed a complaint challenging E.O. 14203 and Albanese's designation as violations of IEEPA and the First, Fourth, and Fifth Amendments. They moved for a preliminary injunction ordering Appellants to remove Albanese's designation and enjoin them from enforcing E.O. 14203 against their family. Op.8. The District Court granted a preliminary injunction enjoining Appellants (excluding the President) from "implementing or enforcing" Albanese's designation while the case was pending. Attachment 2 (Order at 1). To comply, OFAC posted a public notice of the injunction and temporarily removed Albanese's name from the SDN List.

**STANDARD OF REVIEW**

"A stay is an 'intrusion into the ordinary processes of administration and judicial review,'" *Nken*, 556 U.S. at 427 (citation omitted), and an "extraordinary" form of relief, *CREW v. FEC*, 904 F.3d 1014, 1017 (D.C. Cir. 2018). This "court considers four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the

public interest lies.'" *Nken*, 556 U.S. at 426 (cleaned up). The first two factors "are the most critical." *Id*. at 434. Lacking a strong showing of reversible error is "an arguably fatal flaw." *CREW*, 904 F.3d at 1019.

This standard is doubly strict in the preliminary injunction context. This Court "review[s] the district court's decision whether to grant the Plaintiffs' request for a preliminary injunction for abuse of discretion, its legal conclusions de novo, and its findings of fact for clear error." *Doe v. Blanche*, 172 F.4th 901, 911 (D.C. Cir. 2026) (cleaned up). "Although the plaintiffs must show irreparable injury to secure an injunction, it is now [Appellants] who — seeking relief from an injunction so obtained — must show irreparable injury absent a stay of the injunction." *J.G.G. v. Trump*, 2025 WL 914682, at *11 (D.C. Cir. 2025) (Henderson, J., concurring).

## ARGUMENT

The District Court issued a narrowly tailored preliminary injunction barring the implementation and enforcement of a single SDN designation, which Appellants do not dispute was made solely to suppress speech. The District Court found that this limited interim relief was necessary to protect the fundamental rights of three people: a 13-year-old American citizen and her parents who, though Italian

8

citizens, have had substantial connections to this country for over a decade. It applied settled circuit precedent that Appellants now ask this Court to upend. And it carefully weighed the equities based upon a full adversarial presentation of the facts and law.

## I. Defendants are Unlikely to Succeed on the Merits.

Appellants represent the first *Nken* factor as "whether the stay applicant … is likely to succeed on the merits." Mot.14. But *Nken* states that this "most critical" factor is "whether the stay applicant *has made a strong showing that he* is likely to succeed on the merits." *Nken*, 556 U.S. at 434 (emphasis added). The omitted text is fundamental because it "is not enough that the chance of success on the merits be better than negligible." *Id*. (cleaned up).

This Court need not resolve the broad and novel legal questions Appellants raise, especially in the posture of an emergency stay motion. It is enough that, at this stage of the litigation, Appellants have failed to make a "strong showing" that the District Court departed from circuit precedent, relied on clearly erroneous findings of fact, or otherwise abused its discretion in crafting interim relief.

**A.  Albanese's Designation Violated the First Amendment.**

1.  The District Court found "that plaintiffs are likely to succeed on their First Amendment claim" Op.15; that "Secretary Rubio's designation of Albanese under E.O. 14203 plainly regulates Albanese's speech"; and that the "effect of Albanese's designation is to 'punish' and thereby 'suppress disfavored expression.'" Op.19-20 (citing *NRA v. Vullo*, 602 U.S. 175, 188 (2024)).

The District Court's conclusion is supported by Appellants' own pleadings in this Court. Appellants cite three documents as the basis of Albanese's designation: 1) an amicus brief she co-signed with six American legal scholars; 2) a report she delivered to the General Assembly in New York "'urg[ing] the ICC Prosecutor to investigate' alleged 'crimes' by Israel"; and 3) a report in which she "urged the ICC 'to investigate and prosecute corporate executives and/or corporate entities for their part in the commission of international crimes[.]'" Mot.9. All of this is speech. Indeed, Appellants' amicus candidly presses this Court to vindicate "the Secretary of State's determination that Francesca Albanese's advocacy warranted SDN status." ACLJ Amicus at 7.

10

Because Albanese's designation targeted speech, the District Court evaluated whether it was "narrowly tailored to serve compelling state interests." Op.21. The District Court concluded it was not because "even assuming the validity of defendants' stated [foreign policy] interests, the sanctioning of Albanese under E.O. 14203 is hardly 'narrowly tailored' to further those ends … defendants are punishing Albanese for merely *recommending* that the ICC prosecute certain individuals—a non-binding opinion that does not compel any action on the part of the ICC." *Id.* The District Court therefore held that where Appellants' "own statements demonstrate that independent advocacy is at the heart of the sanctions against Albanese," her designation "violates the First Amendment." Op.21-22.

2.     Appellants do not contend that the District Court erred in making any of these findings. Rather, citing *Alliance for Open Society*, Appellants assert that it erred at the threshold because aliens abroad do not possess rights under the constitution. Mot.15. No one disputes this general proposition, not least the District Court, which began its analysis of "whether the First Amendment protects the speech of Albanese, a non-citizen, while speaking outside the United States" with the very quote

11

from *Alliance for Open Society* that Appellants treat as dispositive. Op.15.

The District Court concluded that this general proposition did not decide this case, however, because under binding circuit precedent, "[t]hings change … when a foreign national 'come[s] within the territory of the United States and develop[s] substantial connections with this country.' … Whether a foreign national has sufficient connections to the United States to garner protection under our Constitution is, in the final analysis, a 'fact-dependent, case-by-case assessment.'" Op.15-16 (citations omitted).

Rather than show how the District Court misapplied this circuit's substantial connections test, Appellants ask this Court to grant a stay because they maintain — for the first time on appeal — that this Court should revisit the substantial connections test altogether. They ask this Court to hold that the "district court erred in thinking that a foreign national outside the United States may claim protection under the First Amendment if she has substantial-enough connections to the United States." Mot.16.

Appellants' novel argument is an improper basis on which to seek a stay. *First*, Appellants forfeited this argument below. Attachment 7 (Opp'n at 26) ("Although, in some cases, 'aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country,' … 'a foreign national is not entitled to constitutional protection absent substantial connections to the United States[.] … Albanese does not have the requisite 'substantial connections.'"). "An appellate court normally does not give consideration to issues that were neither raised nor decided below," *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006), making this argument an inappropriate ground on which to seek an emergency stay.

*Second*, even had Appellants preserved this argument, they cannot make a strong showing that this Court is likely to revisit the substantial connections test in this case. The law of this circuit for decades has been that when aliens "have come within the territory of the United States and established 'substantial connections' with this country, … *or* 'accepted some societal obligations' … aliens may be accorded protections under the Constitution." *Jifry*, 370 F.3d at 1182-83 (citation omitted); *see*

13

*also 32 Cnty. Sovereignty Comm. v. State,* 292 F.3d 797, 799 (D.C. Cir. 2002) (looking to whether the alien had "any controlling interest in property located within the United States" or "any other form of presence here"); *People's Mojahedin Org. of Iran v. State,* 327 F.3d 1238, 1241 (D.C. Cir. 2003); *NCOR v. Dep't of State*, 251 F.3d 192, 201-02 (D.C. Cir. 2001); *People's Mojahedin Org. of Iran v. State,*182 F.3d 17, 22 (D.C. Cir. 1999).

Appellants cite no court decision which has interpreted *Alliance for Open Society* as abrogating the substantial connections test. And a decision affirmed by this Court just last year rested upon it. *Lopez Bello v. Smith*, 651 F. Supp. 3d 20, 37-39 (D.D.C. 2022) *aff'd sub nom. Bello v. Gacki*, 94 F.4th 1067 (D.C. Cir. 2024).

This Court applies an exacting standard when a litigant claims that intervening Supreme Court precedent abrogates the law of the circuit. *See Bahlul v. United States*, 77 F.4th 918, 925-26 (D.C. Cir. 2023). Appellants have not demonstrated a strong showing that *Alliance for Open Society* "eviscerated" the substantial connections test, particularly where the Supreme Court itself stated that it was simply restating "long settled constitutional law." *Alliance for Open Society*, 591 U.S. at 433. When the "law is well-settled," and a party's likelihood of success depends

on this Court revisiting a constitutional rule of broad significance, a party, by definition, fails to meet the stringent standard for an emergency stay. *CREW*, 904 F.3d at 1018.

3. What constitutes "substantial connections" is a fact-bound inquiry that weighs the extent of an alien's voluntary "presence or property" in the United States. *Rasul*, 563 F.3d at 531. The District Court made a fact-bound conclusion about the unique combination of circumstances presented on this record, including more than a dozen pleadings and declarations from both sides, which demonstrated that Albanese (and her husband and American daughter) both had and continue to maintain substantial connections to the United States: Albanese resided in the United States, jointly owns the family home in the district, has raised a U.S.-citizen daughter, pays taxes, held a visa, routinely traveled to the United States, ran an internship program in coordination with Columbia University, held an academic position at Georgetown University, Op.16-17, maintained a bank account, carried U.S. health insurance, Op.6, and pays HOA fees, Attachment 9 (Mot. to Stay Resp. at 7 n.3).

Appellants identify no specific finding that they claim is clearly erroneous. And they have made no showing that the District Court abused its discretion in holding that these longstanding, voluntary ties to the United States meet or exceed the substantial connections that have sufficed in other cases.

4.     Should this Court wish to entertain Appellants' new argument in the first instance, they still have no likelihood of success on the merits. Appellants implicitly concede that at least some of the speech that precipitated Albanese's designation is protected by the First Amendment, even under the new rule they ask this Court to adopt.

To be sure, Appellants contend that "the speech for which Albanese was sanctioned occurred abroad." Mot.16. But that unsupported assertion is belied by the very statements Appellants themselves cite as the predicates for Albanese's designation. Mot.9. Albanese's "recommend[ation] that the ICC … issue arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Defense Minister Yoav Gallant," Op.5, was delivered in New York.[1] In other

---

[1] *Situation of human rights in the Palestinian territories occupied since 1967*, A/79/384 (New York, Oct. 1, 2024), https://perma.cc/V2ZE-3MEE;

words, even under Appellants' own rule, "at least some of the regulated speech" occurred within the United States and was thus protected by the First Amendment. *TikTok Inc. v. Garland*, 122 F.4th 930, 950 (D.C. Cir. 2024), *aff'd*, 604 U.S. 56 (2025).

## B.   The Injunction is Narrowly Tailored.

Appellants have not made a strong showing they are likely to prevail in showing the District Court's injunction is overbroad for two sufficient reasons.

*First,* Appellants' overbreadth argument rests on the false premise that the District Court lacked jurisdiction to order relief that benefits Albanese because, as Appellants put it, she "is not a plaintiff." Mot.22. Cali expressly asserted rights on his own behalf as well as on behalf of his wife. A whole subsection of the District Court's opinion is dedicated to whether Appellees established third-party standing, which was a major point of dispute below. Op.13-15. Yet, before this Court, Appellants neither challenge the District Court's ruling of third-party standing, nor

---

*see also* UN / HUMAN RIGHTS IN OPT (New York, Oct. 30, 2024), https://media.un.org/unifeed/en/asset/d329/d3296735.

even acknowledge it, save for a passing reference in their Procedural History. Mot.12.

*CASA*, on which Appellants principally rely, supports the District Court's approach to crafting the scope of relief. *CASA* held that "universal injunctions" that bind and benefit non-parties are generally inappropriate. But *CASA* distinguished "universal" relief from relief tailored to the individuals who are "actually or constructively before [the court]." *Trump v. Casa, Inc.*, 606 U.S. 831, 844 (2025). Third-party standing puts Albanese "constructively" before the court. *See Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (describing third-party standing as "the right of litigants to bring actions on behalf of third parties"). Having found, based upon the record before it, that Appellees "have standing in their own right and standing to assert the First Amendment rights of Albanese," Op.15, the District Court was not constrained by *CASA*, or common sense, to order relief that *only* benefited the named plaintiffs.

*Second*, Appellants have not made a strong showing that the District Court abused its discretion in crafting the scope of relief. *Harjo v. Andrus*, 581 F.2d 949, 952 (D.C. Cir. 1978). "It is traditional that appeals from the granting or denial of a temporary injunction generally

involve matters of discretion with which an appellate court should hesitate to interfere." *Maryland-Nat'l Cap. Park & Plan. Comm'n v. USPS*, 487 F.2d 1029, 1041 (D.C. Cir. 1973). This is because, "[a]s a general matter, a district court is afforded broad discretion to enter that relief it calculates will best remedy the conduct it has found to be unlawful." *United States v. Microsoft*, 253 F.3d 34, 105 (D.C. Cir. 2001).

Perhaps Appellants could clear this high hurdle if the District Court had actually entered a "sweeping injunction" that ordered "the wholesale invalidation of [Albanese's] sanctions designation and the enjoining of a presidential executive order," ACLJ Amicus at 5, or "enjoined the sanctions *in their entirety*" and "usurp[ed] the authority that the Constitution and Congress alike have conferred on the President," Mot.1. But the District Court did none of those things.

The District Court did not enjoin E.O. 14203 in its entirety. Nor did it "invalidate" Albanese's designation. Appellees, for their part, sought "a preliminary injunction ordering Defendants to remove Francesca Albanese as a Specially Designated National and Blocked Person." Attachment 6 (PI Mot. at 1). But the District Court confined the interim

relief it ordered to enjoining the "implementat[ion] or enforce[ment]" of that designation while the litigation below proceeds to final judgment.

The contrast between this limited relief and the relief stayed in *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) is informative. Unlike *NTEU*, the District Court below did not "enjoin[] the *entire* implementation process" of an Executive Order. *Id.* at \*2 It did not enjoin "preparatory work," "eliminate[] the President's control over the decision to pause implementation of the Executive Order," or restrict the President's "flexibility to respond to future developments." *Id.* Instead, it afforded relief to *three* people, all members of the same family, who were all before the court, and all of whom, the District Court found, would suffer irreparable harm in the absence of interim relief.

Appellants complain that the District Court did not narrowly tailor its injunction more finely still, and ask this Court for a "partial stay," because it is "obvious—the court could have enjoined the government from enforcing the sanctions as to certain transactions (*e.g.*, regarding the condominium) or certain individuals (*e.g.*, L.C.)." Mot. 24. But neither below, nor here, have Appellants proposed an alternative order or explained how such an injunction could workably offer complete relief as

20

a practical matter without forcing the District Court to assume the role of family monitor. *See* Op.12.

E.O. 14203 states its purpose to impose "tangible and significant consequences on those responsible for the ICC's transgressions … as well as their immediate family members." Attachment 3 (E.O. 14203, pmbl.) "Immediate family members" is defined as "a spouse or child." *Id.* § 8(f)). Albanese's designation is, therefore, intended to impose "significant consequences" on Appellees. The District Court did not abuse its discretion when it found that "Albanese's designation as an SDN is the source of plaintiffs' harm. So long as she is designated as such, the familial relationship between Albanese, Cali, and L.C. will be burdened. Thus, to provide 'complete relief to the plaintiffs before the court,' … I must enjoin Albanese's designation in full." Op.25 n.5 (quoting *CASA,* 606 U.S. at 852).

Below, all Appellants argued was that "[i]n the event the Court does grant relief, it must be tailored to the harms that the named Plaintiffs can establish." Attachment 7 (Opp'n at 44). Given only this general request for tailoring, the District Court did not abuse its discretion when it concluded that "[i]t is unclear how defendants could limit the impact of

Albanese's designation as to plaintiffs while otherwise enforcing the designation." Op.25 n.5.

Notwithstanding this finding, Appellants proposed no concrete amendments to the injunction once it was issued. They filed a motion for a stay below, but did not even suggest the general categories of tailoring that they now ask this Court to consider for the first time on appeal. Attachment 8 (Mot. to Stay at 7). The District Court did not abuse its discretion in declining to guess what relief Appellants would deem reasonably administrable and adequate to the harms alleged.

Nor should this Court attempt to do so on the expedited timetables of a stay motion. The world of OFAC administration and compliance is complex. As "defendants' own submissions demonstrate, obtaining guidance from OFAC regarding specific transactions is no simple process. … L.C. should not have to retain a lawyer to determine whether she can buy her mother a gift." Op.12 n.2. Whatever relief the District Court might ultimately enter in a final judgment, it did not abuse its discretion when it ordered interim relief that it determined was both necessary and sufficient to protect Appellees from demonstrated harms.

## II. Equity Favors the District Court's Injunction.

Appellants' "showing of irreparable harm is a necessary prerequisite for a stay." *KalshiEX v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024). "[T]he injury must be both certain and great; it must be actual and not theoretical. Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time." *Wisconsin Gas v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (cleaned up). Here, Appellants have not shown any harm, and certainly none so compelling as to outweigh the specific, concrete harms suffered by Appellees.

1. Appellants broadly invoke "national security" and "foreign affairs" interests. Mot.25–26. But neither the District Court nor Appellees second guess those interests. The problem is that Appellants have not identified a single concrete harm to either of those interests that will result if they are temporarily enjoined from implementing and enforcing the SDN designation of an international law scholar.

It is Appellants' burden to offer this Court evidence showing irreparable harms that are "certain and great," "actual and not theoretical," and "immin[ent]." *Make the Rd. New York v. Noem*, 2025 WL 3563313, at *32 (D.C. Cir. Nov. 22, 2025). Yet, neither below, nor

here, have Appellants proffered any evidence identifying, for instance, ICC proceedings that turn on the enforcement of Albanese's designation, or even a single transaction in which she is expected to engage that would compromise national security vis-à-vis the ICC. There is a reason: "Albanese has *no* formal role with the ICC." Op.3.

In place of actual, certain, and imminent harms, Appellants offer this Court general objections to the ICC and a plea for deference to "the President's judgment." Mot.26. Yet nothing in the injunction gainsays any judgment made by the President. The District Court directed the injunction only at subordinate officials, and only against the "implementing or enforcing" of a single SDN designation made by the Secretary of State.

The suggestion that Appellants are irreparably injured by any, even interim, judicial check on their implementation and enforcement of E.O. 14203 cannot be squared with their behavior in the two prior cases in which E.O. 14203 was enjoined on First Amendment grounds. *See Rona v. Trump*, 797 F. Supp. 3d 278 (S.D.N.Y. 2025) (permanent injunction); *Smith v. Trump*, 791 F. Supp. 3d 90 (D. Me. 2025) (preliminary injunction). In neither case did the government seek a stay

24

pending appeal, despite the injunctions being far broader than the injunction entered here. Indeed, the government did not even appeal. Appellants identify no harm that resulted from the injunctions there, and they can show no harms that have or likely will result here.

"[G]eneralized assertions of injury," even from the government, are insufficient to support a stay pending appeal. *FEA v. Trump*, No. 25-5303, 2025 WL 2738626, at *3 (D.C. Cir. Sept. 25, 2025) (per curiam). As this Court recently reiterated, "when faced with requests for emergency stays of considered lower-court orders, we have been appropriately skeptical of the idea that the government is irreparably injured 'any time' it is enjoined by a court." *Miot v. Trump*, No. 26-5050, 2026 WL 659420, at *2 (D.C. Cir. Mar. 3, 2026) (per curiam) (citation omitted).

2.     Before the District Court, Appellants were candid that the reason they designated Albanese was "to discourage" her and others from expressing viewpoints in favor of the ICC. Resp. Attachment 7 (Opp'n at 30). That is not a legitimate government interest. Regardless of who is speaking and whether they have a personal entitlement to invoke the First Amendment, the government has no legitimate interest in sanctioning "the expression of certain points of view from the

marketplace of ideas." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).

If Appellants find Albanese's viewpoints harmful or hurtful, the preliminary injunction leaves them free to contest her findings, challenge her conclusions, and use the full megaphone of the U.S. government to persuade the public to disregard her while the litigation below remains pending. Or they can use the tools Congress provided to counter the harms that would arise when U.S. persons and our non-consenting allies are "investigated" and "prosecuted" by the ICC. *See* 22 U.S.C. § 7427(c). All the preliminary injunction here bars them from doing is enforcing sanctions laws to suppress a single woman's speech while the case below is litigated.

3. Appellants claim that "plaintiffs would suffer little or no harm from a temporary stay." But this is plainly false, as the District Court found. As an initial matter, the "violation of a constitutional right, whether ongoing or prospective, constitutes irreparable injury for purposes of seeking equitable relief." *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (cleaned up). Appellants make no effort to counter the District Court's findings that a stay will cause Appellees to suffer myriad

economic, practical, and uncontested constitutional injuries to their family home and family unit. Op.6-7.

To the extent Appellants acknowledge those injuries at all, they claim that they are fully mitigated by OFAC's issuance of limited licenses regarding the family's home and L.C.'s "necessary" living expenses. The District Court considered these arguments carefully and Appellants have given this Court no reason to conclude that it abused its discretion in rejecting them. Op. 11-12 ("The existence of such a licensing scheme in the first place infringes the 'constitutionally protected' relationship between parent and child.") (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). The District Court considered these arguments again when Appellants moved for a stay below and rejected them again because Appellees "would face concrete, irreparable harms every day the injunction is stayed – including harms to their freedom of travel, property rights, and constitutionally protected familial relations." Attachment 10 (Order Denying Stay at 3). This Court should reject them too.

### CONCLUSION

Appellants' emergency motion for a stay should be DENIED.

Respectfully submitted,

/s/ Jason D. Wright
Jason D. Wright
Patrick W. Fields*
Scott R. Johnston*
Erin B. Rausch*
STEPTOE LLP
1114 Avenue of the Americas
New York, New York, 10036

*Application for admission
forthcoming

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I hereby certify under Fed. R. App. P. 32(g)(1), that this response complies with the type-volume limitations of Fed. R. App. P. 27(d)(2). It contains 5,200 words, not counting sections excluded by the Federal Rules and Local Rules (counted using Microsoft Word).

/s/ Jason D. Wright
Jason D. Wright

# CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2026, I caused a true and correct copy of the foregoing to be served via the court's ECF system upon all counsel of record. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Jason D. Wright
Jason D. Wright

ATTACHMENTS

# TABLE OF CONTENTS

| | |
|---|---|
| Attachment 1 | Memorandum Opinion Granting Motion for Preliminary Injunction, Dkt. 48 |
| Attachment 2 | Order Granting Motion for Preliminary Injunction, Dkt. 49 |
| Attachment 3 | Executive Order No. 14203 – Imposing Sanctions on the International Criminal Court, (Feb. 6, 2025) Dkt. 1-09 |
| Attachment 4 | Dep't of Treasury, International Criminal Court-Related Sanctions Regulations, License No. ICC-EO14203-2025 1405217-1, (Aug. 22, 2025), Dkt. 1-11 |
| Attachment 5 | Dep't of Treasury, International Criminal Court-Related Sanctions Regulations, License No. ICC-EO14203-2025-1408722-1, (August 22, 2025), Dkt. 1-12 |
| Attachment 6 | Motion for Preliminary Injunction, Dkt. 3 |
| Attachment 7 | Memorandum in Opposition to Motion for Preliminary Injunction (excerpt), Dkt. 26 |
| Attachment 8 | Motion to Stay Pending Appeal or, in the Alternative, for a Temporary Administrative Stay (excerpt), Dkt. 51 |
| Attachment 9 | Response to Motion to Stay (excerpt), Dkt. 52 |
| Attachment 10 | Order Denying Motion to Stay, Dkt. 55 |

**ATTACHMENT 1**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| L.C., *a minor child, by and through her father* MASSIMILIANO CALI,<br><br>MASSIMILIANO CALI,<br><br>        Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Case No. 26-688 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION**
May *13*, 2026 [Dkt. #3]

Plaintiffs L.C., a minor, and her father Massimiliano Cali bring suit against various federal defendants challenging the designation and sanctioning of Francesca Albanese, their mother and wife, respectively. Albanese is a scholar and author who has published widely on human rights issues, including on the Israeli-Palestinian conflict. Plaintiffs allege that defendants are sanctioning Albanese because of her speech—namely, Albanese's non-binding recommendation to the International Criminal Court to pursue war-crimes prosecutions against Israeli and American nationals. Plaintiffs allege that they are harmed by defendants' sanctioning of Albanese and seek a preliminary injunction. For the following reasons, I will **GRANT** plaintiffs' motion.

1

**BACKGROUND**

**I.     Factual Background**

**A.     *Francesca Albanese and the Cali Family***

Plaintiffs L.C. and Massimiliano Cali are the daughter and husband, respectively, of Francesca Albanese, an Italian citizen.  Compl. [Dkt. #1] ¶ 1.  Albanese is an "international legal scholar and recognized expert in areas of human rights and the Middle East."  *Id.* ¶ 17.  Albanese's husband, Cali, is an economist with the World Bank and an Italian citizen. *Id.*  Albanese's minor daughter, L.C., is a United States citizen.  *Id.* ¶ 11.

The family lived in the United States from 2012 to 2015 while Cali was stationed at the World Bank headquarters in Washington, D.C.  *Id.* ¶ 18.  During that time, they purchased a home, opened a U.S. bank account, and took out a mortgage.  *Id.*  L.C. was born in Washington, D.C. in 2013.  *Id.* ¶ 18.  The family left the United States in 2015 when the World Bank relocated Cali outside the United States, but they kept their D.C. residence and routinely travel to the United States.  *Id.* ¶ 20.  The family currently resides in Tunisia. *Id.*

As a public intellectual and scholar, Albanese has written and spoken widely on controversial human rights issues, including most notably the Israeli-Palestinian conflict. Mem. in Supp. of Mot. for Prelim. Inj. ("P.I. Br.") [Dkt. #3-1] at 6–9.  In April 2022, the United Nations Human Rights Council ("UNHRC") appointed Albanese as the "Special Rapporteur on the situation of human rights in the Palestinian territory occupied since 1967."  *Id.* at 7; Compl. ¶ 21.  In this position, Albanese reports to the UNHRC and the United Nations General Assembly on human rights issues in the Palestinian territory and

2

engages in independent scholarship and advocacy. *Id.* at 7. She has spoken at universities in the United States and Europe and has appeared on a wide range of media outlets. Compl. ¶ 23. Since 2022, she has also published two books on the Israeli-Palestinian conflict. *Id.* ¶ 24. According to U.S. Secretary of State Marco Rubio, Albanese has "spewed unabashed antisemitism, expressed support for terrorism, and open contempt for the United States, Israel, and the West." Compl., Ex. B. ("Rubio Statement") [Dkt. #1-10] at 1.

In her role as a Special Rapporteur, Albanese has authored recommendations to the International Criminal Court ("ICC") regarding possible war crimes charges stemming from the Israeli-Palestinian conflict. The ICC is an international institution located in the Netherlands that provides its member states a forum for the prosecution of international crimes, including genocide, crimes against humanity, and war crimes. Compl. ¶¶ 26, 29. The ICC was created by the 1998 Rome Statute. *Id.* ¶ 26. The United States signed the Rome Statute, but the Senate never ratified it. *Id.* ¶ 28.

Albanese has *no* formal role with the ICC. *Id.* ¶ 31. However, the United Nations and the ICC have agreed to "cooperate closely . . . and consult each other on matters of mutual interest." Opp'n to Mot. for Prelim. Inj. ("Opp'n") [Dkt. #26] at 10 (quoting United Nations Office of Legal Affairs, "Negotiated Relationship Agreement between the International Criminal Court and the United Nations," https://perma.cc/23M4-DY4J). In July 2025, Albanese authored a report in which she "urge[d] the [ICC] and national judiciaries to investigate and prosecute corporate executives and/or corporate entities" for their role in alleged war crimes in the Middle East. *Id.* at 9 (quoting F. Albanese, *From economy of occupation to economy of genocide*, ¶ 96, U.N. Doc. A/HRC/59/23 (July 2,

3

2025), https://docs.un.org/en/A/HRC/59/23).    The report specifically mentions U.S. companies—including Lockheed Martin, Caterpillar Inc., and Chevron—and accuses them of furthering "apartheid" and "settler-colonial destruction." *Id.* at 9–10 (quoting Albanese, *From economy of occupation*, ¶¶ 32, 36, 43–45).

**B.    *Executive Order 14203***

On February 6, 2025, President Donald J. Trump issued Executive Order No. 14203 ("E.O. 14203" or "the Order"), entitled "Imposing Sanctions on the International Criminal Court." 90 Fed. Reg. 9369 (Feb. 6, 2025); *see also* Compl., Ex. A [Dkt. #1-9].    Promulgated pursuant to the President's authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, E.O. 14203 declares that "any effort by the ICC to investigate, arrest, detain, or prosecute" nationals of the United States or other major allies "constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States." E.O. 14203 at 1.    The Order specifically references the ICC's actions against Israeli government officials over alleged war crimes in the Middle East. *Id.*

Pursuant to the President's authority under IEEPA, E.O. 14203 authorizes extensive sanctions against foreign persons who have "directly engaged in" or assisted the ICC in these efforts. *Id.* § 1(a)(ii)(A).    Absent an applicable exception, E.O. 14203 prohibits U.S. persons from providing "funds, goods, or services by, to, or for the benefit of" any foreign person designated under the Order. *Id.* §§ 3(a), (b).    Individuals who engage in transactions with designated persons are subject to civil fines and criminal penalties under IEEPA. *See* 50 U.S.C. § 1705; 31 C.F.R. § 510.701.

4

### C.    *The Designation of Albanese*

On July 9, 2025, Secretary of State Rubio designated Albanese, pursuant to E.O. 14203, as a foreign national who has "directly engaged with the [ICC] in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel, without the consent of those two countries." Rubio Statement.  Secretary Rubio cited Albanese's service as a U.N. Special Rapporteur, including her "recommend[ation] that the ICC, without a legitimate basis, issue arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Defense Minister Yoav Gallant," as well as her "writing threatening letters to dozens of entities worldwide, including major American companies" and "recommending the ICC pursue investigations and prosecutions of these companies and their executives." *Id.* at 1–2.

The U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") subsequently implemented the designation by adding Albanese to OFAC's Specially Designated National ("SDN") List.  Opp'n at 11 (citing U.S. Dep't of Treasury, Off. Of Foreign Assets Control, "International Criminal Court-related Designation," https://perma.cc/QEP3-VWB8).  As a result of her designation, U.S. persons may not, at risk of civil and criminal liability, engage in any transaction of funds, goods, or services with or for the benefit of Albanese.  E.O. 14203 § 3.  The Order also bars "immigrant [or] nonimmigrant entry into the United States" by Albanese and her "immediate family members." *Id.* § 4.

On August 22, 2025, OFAC issued two licenses limiting the impact of Albanese's designation.  The first permits certain transactions "ordinarily incident and necessary to"

the upkeep or sale of the family's residence in the United States, while restricting all proceeds of any sale to an "interest-bearing blocked account." Compl., Ex. C ("Property License") [Dkt. #1-11] § I–II. The second permits transactions "ordinarily incident and necessary to . . . Albanese's role as the parent and legal guardian of [L.C.]" Compl., Ex. D ("Parental License") [Dkt. #1-12] § I; *see also* Decl. of M. Rasmussen [Dkt. #26-1] at ¶¶ 5–9 (discussing scope of Parental License).

### D.   *The Aftermath of Albanese's Designation*

As a result of her designation, Albanese has suffered severe ramifications. She is barred from entering the United States, which prevents her from traveling to the headquarters of the United Nations. Compl. ¶ 69. Albanese has also been "fully unbanked and cannot make or receive payments through the financial system." *Id.* ¶ 68. Soon after her designation, Albanese was removed from her joint U.S. bank account with her husband, Decl. of M. Cali [Dkt. #30-1] ¶ 7, and she has subsequently been denied bank accounts at several European banks, *Id.* ¶ 12. Moreover, due to Albanese's designation, her husband's employer-sponsored health insurer has "refused to pay [her] health expenses." *Id.* ¶ 23. Several U.S. universities severed their longstanding ties with Albanese, including Georgetown and Columbia. Compl. ¶ 70.

Plaintiffs allege they too have suffered harms because of Albanese's designation. As an "immediate family member[]" of an SDN, Cali is barred from entering the United States. E.O. 14203 § IV. He therefore cannot travel to the headquarters of his employer, the World Bank. Compl. ¶ 69. Indeed, due to his travel restrictions and "ongoing external pressure resulting from the sanctions," Cali Decl. ¶ 18, Cali has been suspended from

6

existing positions at the World Bank and faces "severely constrained" options for future positions within the organization, *id.*  Cali also cannot travel to Washington, D.C. to supervise the upkeep or sale of his and his wife's property.  Compl. ¶ 71.  Prior to the issuance of the Property License, OFAC blocked an attempted sale of the residence.  Cali Decl. ¶ 10.  While Cali may now try to sell the residence, the proceeds of any sale will remain frozen.  Property License § II.

As to L.C., she is effectively barred from returning to her native country given the travel restrictions on her parents.  Compl. ¶ 69.  As a U.S. citizen, L.C. also faces per se civil or criminal liability under the Order for "any contribution or provision of funds, goods, or services by, to, or for the benefit of" her mother, *Id.* ¶ 72; E.O. 14203 § 3(a), subject to the exclusions listed in the Parental License.  Plaintiffs allege these restrictions "impose an enormous chilling effect on L.C.'s mental well-being and constitutional rights." Compl. ¶ 73.

Following her designation in July 2025, Albanese and Cali sought assistance from the United Nations in challenging defendants' actions.  *See* Cali Decl. ¶¶ 5–6, 9. Ultimately, however, the United Nations chose not to challenge Albanese's designation through administrative or judicial process.  *Id.* ¶ 25.  Albanese also requested authorization to litigate the designation in her personal capacity.  *Id.* ¶¶ 22, 25.  The United Nations responded on January 14, 2026 that it was "not in a position to authorize [Albanese] to file suit in a United States court contesting the imposition of those sanctions."  Compl., Ex. E ("U.N. Letter") [Dkt. #1-13].  One week later, plaintiffs authorized their attorneys to prepare this lawsuit.  Cali Decl. ¶ 30.

## II.    This Lawsuit

On February 25, 2026, L.C., proceeding by and through her father, Cali, and Cali himself (collectively, "plaintiffs") filed this lawsuit against President Trump, Attorney General Pamela Bondi, Secretary of the Treasury Scott Bessent, and Secretary of State Rubio (collectively, "defendants"). Compl. ¶¶ 11–16. Plaintiffs raise claims under the First Amendment, IEEPA, the Fourth Amendment, the Fifth Amendment, and the Administrative Procedure Act. *Id.* ¶¶ 75–101. The same day, plaintiffs filed a motion for a preliminary injunction. *See* Mot. for Prelim. Inj. [Dkt. #3]. Plaintiffs moved for preliminary injunctive relief, however, on their First Amendment and IEEPA claims alone. P.I. Br. at 3–4.

Following entry of a briefing schedule, *see* Minute Order (Mar. 4, 2026), defendants filed their opposition to plaintiffs' motion on March 18, 2026, *see* Opp'n. Plaintiffs filed a motion for leave to file a supplemental declaration on March 24, 2026, *see* Mot. for Leave to File [Dkt. #30], which I granted, *see* Minute Order (Mar. 30, 2026). Plaintiffs filed their reply in support of their motion on March 25, 2026. *See* Reply in Supp. of Mot. for Prelim. Inj. ("Reply") [Dkt. #32]. I held a hearing on April 1, 2026. *See* Tr. of Prelim. Inj. H'rg ("H'rg Tr.") [Dkt. #35]. Plaintiffs' motion for preliminary injunction is now ripe for decision.[1]

---

[1] Following the hearing, plaintiffs sought to supplement the record with additional declarations, *see* Mot. to Suppl. Record [Dkt. #38]; Unopposed Mot. to Amend/Correct [Dkt. #40]; Consent Mot. to Suppl. Record [Dkt. #42], and later sought to file those supplemental declarations under seal, *see* Sealed Mot. for Leave to File Under Seal [Dkt. #43]. Defendants opposed the motion to supplement the record, *see* Mem. in Opp'n to Mot. to Suppl. Record [Dkt. #41], but consent to the sealing of the record, *see* Sealed Mot. for Leave to File Under Seal [Dkt. #43]. Both parties have sought leave to file replies and sur-replies in support

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

## ANALYSIS

### I.    Standing

Before addressing the merits of the preliminary injunction, I must first decide whether plaintiffs have standing to sue—a "threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Plaintiffs assert they have Article III standing and prudential standing to assert the First Amendment rights of Albanese. Defendants, not surprisingly, challenge plaintiffs' standing on both grounds. I will discuss each in turn.

### A.    *Article III Standing*

To establish standing to sue, plaintiffs must show they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of [defendants], and (3) that is

---

of their respective positions. *See* Mot. for Leave to File Reply in Supp. of Mot. to Suppl. Record [Dkt. #45]; Unopposed Mot. for Leave to File Sur-Reply in Opp'n to Mot. to Suppl. Record [Dkt. #47]. These filings chiefly relate to plaintiffs' efforts to clarify whether OFAC will permit plaintiffs to seek litigation funding from U.S. persons. Plaintiffs argue that OFAC's determination supports their theory of Article III injury and irreparable harm. Ultimately, I need not reach this theory of harm to find in plaintiffs' favor at this stage of the litigation. But in the interest of justice and for good cause shown, I will grant all motions to supplement and to file additional pleadings in support of or opposition to the same. I will also grant the motion to seal.

likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs must establish each element "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Accordingly, on a motion for a preliminary injunction, plaintiffs must show a "substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

As to injury in fact, both plaintiffs—Cali and L.C.—suffer "concrete and particularized" harms as a result of Albanese's designation under E.O. 14203. *Lujan*, 504 U.S. at 560. Common injuries sufficient for standing include "monetary injury," "an injury to one's property," and "an injury to one's constitutional rights." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Plaintiffs here, in one way or another, have demonstrated all three kinds of harm. How so?

For starters, Cali has suffered concrete harms to his property interest in his condominium in Washington, D.C. While OFAC has issued a narrow license permitting the upkeep and sale of the property, *see* Property License, the license allows only "U.S. persons" to care for the property—not Cali himself, *id.* § I. And the License requires all proceeds from any sale to be placed in an "interest-bearing blocked account," *id.* § II, barring Cali from realizing his property's economic value. These "impairment[s]" of Cali's "property rights" are tangible legal injuries. *Children's Health Def. v. FCC*, 25 F.4th 1045, 1049 (D.C. Cir. 2022).

L.C., an American citizen, has suffered "injury to [her] constitutional rights." *All. for Hippocratic Med.*, 602 U.S. at 381. Since Cali and Albanese are barred from entering

10

the United States, *see* E.O. 14203 § 4, L.C., a minor, is effectively unable to travel to the United States. Reply at 15–16 (citing "strict, near universal regulatory restrictions on international travel by an unaccompanied minor"). As an American citizen, L.C. also faces potential criminal liability for any transactions with her mother. *See* E.O. 14203 § 3. The designation of her mother thus burdens L.C.'s "freedom of travel" as an American citizen, *Aptheker v. Sec'y of State*, 378 U.S. 500, 517 (1964), and burdens L.C.'s constitutional liberty interest in her familial relations, *see Franz v. United States*, 707 F.2d 582, 595 (D.C. Cir. 1983) (recognizing that "the freedom of a parent and child to maintain, cultivate, and mold their ongoing relationship" is "[a]mong the most important of the liberties" protected by the Constitution).

Undaunted, defendants point to the two limited licenses—the Property License and the Parental License—to argue that Cali and L.C. remain unharmed! Opp'n at 18–21. But these licenses apply only to "U.S. persons," so they do not excuse Cali from the ramifications of Albanese's designation. And there is no dispute that the Property License acts to freeze all proceeds from the sale of Cali's property in Washington, DC by placing those proceeds in a "blocked account." Property License § II; Cali Decl. ¶ 13. Even apart from the burdening of Cali's property interests, that bare "economic harm is still an injury-in-fact for standing purposes." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017).

As for the Parental License, it is limited to transactions "ordinarily incident *and necessary to* [Albanese's] role" as L.C.'s parent and guardian. Parental License § I (emphasis added). Defendants say the License helps "ensure that sanctions do not impede

11

Albanese in her role as parent," Rasmussen Decl. ¶ 9, and OFAC claims it would "*generally* view" incidental activities like Christmas gift exchanges or family travel as "authorized" by the License, *id* (emphasis added). Please! The existence of such a licensing scheme in the first place infringes the "constitutionally protected" "relationship between parent and child." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (quoting *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978)). Further, the Parental License on its face prohibits transactions that are incident *but unnecessary to* the parent-child relationship, and it is not clear from the record before me how plaintiffs would distinguish between necessary and unnecessary transactions in the context of their family relationships. To say the least, such "'subtle . . . interference' with protected liberties" is a cognizable injury no less than a "heavy-handed frontal attack[]." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. ---, 2026 WL 1153029, at *11 (2026) (quoting *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960)).[2]

These concrete harms are all "traceable" to defendants' challenged action—the designation of Albanese under E.O. 14203—and "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. Defendants do not dispute these elements of

---

[2] Defendants point out, correctly, that plaintiffs have not sought clarification from OFAC as to the scope of the Parental License. *See* Opp'n at 19. But as defendants' own submissions demonstrate, obtaining guidance from OFAC regarding specific transactions is no simple process. *See* Rasmussen Decl. ¶¶ 4, 7. Plaintiffs' filings regarding their counsel's repeated requests for clarification from OFAC regarding litigation funding prove the point. *See* Decl. of B. Brooks-Rubin [Dkt. #38-1] at ¶¶ 5–10 (describing weeks-long process of seeking clarification from OFAC regarding scope of general license before preparing application for specific license). L.C. should not have to retain a lawyer to determine whether she can buy her mother a gift.

the standing analysis. Indeed, a court order enjoining the designation of Albanese would remedy plaintiffs' harms. Accordingly, both plaintiffs have Article III standing to sue.

## B.    *Third Party Standing*

Though they have Article III standing, plaintiffs ground their First Amendment claims in alleged violations of Albanese's rights, not their own. A plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004) (quoting *Warth*, 422 U.S. at 499). Under some circumstances, however, third parties may have "standing to assert the rights of another." *Id.* at 129–30.

Courts weigh three prudential considerations in assessing third-party standing: "1) the plaintiff 'must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute'; 2) the plaintiff 'must have a close relation to the third party'; and 3) 'there must exist some hindrance to the third party's ability to protect his or her own interests.'" *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 34 (D.D.C. 2020) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

Plaintiffs satisfy each requirement. First, plaintiffs themselves have suffered constitutional and economic injuries of their own, as described above. Second, there is a "close relation" and "identity of interests" between plaintiffs and Albanese such that plaintiffs can "act as . . . effective advocate[s]" for Albanese's rights. *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999). There can be no dispute as to the closeness of the relationship; Albanese is Cali's husband and L.C.'s mother. Indeed, defendants

13

acknowledge that "much of [plaintiffs'] requested relief would run directly to Albanese's benefit." Opp'n at 16.

Finally, Albanese is hindered in her ability to challenge her designation. To satisfy this requirement, plaintiffs "need only show that 'there is some impediment to [Albanese]'s ability to assert [her] own legal rights.'" *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 362 (D.D.C. 2020) (quoting *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 31 (D.D.C. 2010)). Already a "lenient standard," *id.*, the hindrance threshold is even more "relaxed" in First Amendment cases, *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 146 (D.D.C. 2025). Its purpose is merely "to ensure 'that the rightholder did not simply decline to bring the claim on his own behalf, but could not in fact do so.'" *Al-Aulaqi*, 727 F. Supp. 2d at 32 (quoting *Miller v. Albright*, 523 U.S. 420, 450 (1998) (O'Connor, J., concurring)).

Given her position as a U.N. Special Rapporteur and because she is subject to institutional immunity, Albanese must obtain explicit permission from the U.N. before bringing lawsuits in her own name. *See* Reply at 23; U.N. Letter at 2 (noting that the Secretary-General has the sole "right" to "waive the immunity" of U.N. experts like Albanese). Albanese sought permission from the U.N. to challenge her designation but was denied. Compl. ¶ 74; U.N. Letter at 2. Courts have found the hindrance requirement satisfied by far less concrete barriers, including a "financial disincentive to litigate" and "a party's desire to protect her personal privacy." *Al-Aulaqi*, 727 F. Supp. 2d at 31 (citing cases). In First Amendment cases especially, a "serious risk" to "career[s] and professional li[ves]" and a mere "danger of chilled speech" have been enough. *Turner*, 502 F. Supp. 3d

14

at 362 (citations omitted). This however is not, as defendants claim, a case where the party "could have brought suit on [her] own behalf, but . . . simply declined to do so." *Al-Aulaqi*, 727 F. Supp. 2d at 32. Instead, plaintiffs have demonstrated that Albanese's ability to assert her rights in court was sufficiently impeded.

Accordingly, plaintiffs have standing in their own right and standing to assert the First Amendment rights of Albanese. I now turn to plaintiffs' arguments on the merits.

## II.    Likelihood of Success on the Merits

To obtain a preliminary injunction, plaintiffs must demonstrate a strong likelihood of success on the merits. Plaintiffs raise three grounds in their motion: (1) E.O. 14203 violates the First Amendment on its face and as applied to Albanese; (2) E.O. 14203 violates the Berman Amendments to IEEPA; and (3) E.O. 14203 violates IEEPA's statutory limits on the President's sanctions authority. P.I. Br. at 3–4. Because I find that plaintiffs are likely to succeed on their First Amendment claim, I need not reach their statutory claims.

### A.    *Applicability of the First Amendment*

I must first consider whether the First Amendment protects the speech of Albanese, a non-citizen, while speaking outside the United States. Foreign nationals outside the territory of the United States do not, as a general matter, "possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020). Things change, however, when a foreign national "come[s] within the territory of the United States and develop[s] substantial connections with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). Whether a foreign national has sufficient

15

connections to the United States to garner protection under our Constitution is, in the final analysis, a "fact-dependent, case-by-case assessment." *Olenga v. Gacki*, 507 F. Supp. 3d 260, 274 (D.D.C. 2020).

Though it has never articulated any "definitive" criteria, our Circuit has often "looked to the presence of property as the benchmark for satisfying the 'substantial connections' test." *Kadi v. Geithner*, 42 F. Supp. 3d 1, 25–26 (D.D.C. 2012). For example, our Circuit found sufficient connections when a foreign organization had an "overt presence" in a D.C. office building and a "small bank account" in the United States. *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 201 (D.C. Cir. 2001) ("*NCOR*") (citation omitted). Courts have also found substantial connections where a noncitizen held U.S. visas, maintained a residence in the United States, owned companies in the United States, and owned property in the United States that was blocked as a result of the challenged designation. *López Bello v. Smith*, 651 F. Supp. 3d 20, 38 (D.D.C. 2022), *aff'd sub nom.*, *Bello v. Gacki*, 94 F.4th 1067 (D.C. Cir. 2024). On the other hand, our Circuit found insufficient connections where two foreign organizations did not "possess[] any controlling interest in property located within the United States." *32 Cnty. Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002).

Here, Albanese has "substantial connections" to the United States. *Verdugo-Urquidez*, 494 U.S. at 271. From 2012 to 2015, Albanese lived in the United States. Compl. ¶¶ 18–20. During that time, she bought—and she still owns—property in the United States. *Id.*; *Kadi*, 42 F. Supp. 3d at 26 ("presence of property" is the "benchmark"). As a property owner, Albanese has a mortgage with a U.S. financial institution and pays

16

U.S. property taxes. Compl. ¶ 18; Reply at 7. In addition, Albanese has a U.S. citizen daughter, was affiliated with several U.S. universities before the imposition of sanctions, and frequently travels to the United States for professional obligations and speaking engagements—including professional engagements that were cancelled as a result of Albanese's designation. Reply at 7–8. These connections are substantial enough to grant Albanese "at least *some*" protections under our Constitution. *Kadi*, 42 F. Supp. 3d at 26.

Defendants' arguments to the contrary are, to say the least, unpersuasive! Defendants point out that Albanese is not physically present in the United States and that none of Albanese's "relevant expression took place in the United States." Opp'n at 26. Defendants chiefly rely on *NCOR*, which relied, in part, on a foreign organization's "overt presence" in a D.C. office building to conclude that the organization had substantial connections. 251 F.3d at 201–02. But the organization's physical presence was not the only factor considered by the *NCOR* court. *Id.*[3] And, as other cases teach, physical presence within the United States is *not* a necessary condition for constitutional protections. *See Russian Volunteer Fleet v. United States*, 282 U.S. 481, 489, 491 (1931) (foreign corporation with property in the United States was protected by Fifth Amendment); *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 994–97 (9th Cir. 2012) (foreign national

---

[3] The reasoning in *NCOR* was also based on "classified information" that confirmed the organization's substantial connections to the United States. 251 F.3d at 202. Moreover, *NCOR* did not purport to announce strict requirements for what counts as "substantial." *See id.* ("In any event, we are not undertaking to determine, as a general matter, how 'substantial' an alien's connections with this country must be to merit the protections of the Due Process Clause or any other part of the Constitution. Rather, we have reviewed the entire record including the classified information and determine that NCRI can rightly lay claim to having come within the territory of the United States and developed substantial connections with this country.").

17

with substantial connections could bring First Amendment challenge to No-Fly List designation despite not being physically present in United States).  Rather, our Circuit has looked to a foreign national's "presence *or property*" in the United States to determine the scope of that foreign national's rights.  *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1241 (D.C. Cir. 2003) (emphasis added) (citing *NCOR*, 251 F.3d at 201–02); *see also 32 Cnty. Sovereignty Comm.*, 292 F.3d at 799.

Here, while the speech at issue occurred outside the United States, defendants have responded by taking action against Albanese's extensive connections *to* the United States—including Albanese's property within the United States and her ability to maintain professional and personal connections within the United States—*because of* her speech. Accordingly, Albanese (or plaintiffs standing in her shoes) may claim the protection of the First Amendment to challenge defendants' actions.  *Kadi*, 42 F. Supp. 3d at 26.

## B.    *First Amendment Analysis*

The First Amendment forbids the Government from "abridging the freedom of speech."  U.S. Const. amend. I.  In evaluating whether a government regulation of speech violates the First Amendment, courts distinguish between regulations that are "content based" and those that are "content neutral."  *Reed v. Town of Gilbert*, 576 U.S. 155, 165–66 (2015).  A regulation of speech is "content based" if it targets speech "based on its communicative content" or "because of the topic discussed or the idea or message expressed."  *Id.* at 163.  Content-neutral regulations, by contrast, "serve[] purposes unrelated to the content of expression."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  Where a regulation targets speech based on its content, the regulation is

18

"presumptively unconstitutional" and will survive First Amendment scrutiny only if it is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

Plaintiffs challenge E.O. 14203 as unconstitutional on its face and as applied to Albanese. I will first consider whether the order is "valid as applied" to avoid addressing "an overbreadth issue unnecessarily." *Renne v. Geary*, 501 U.S. 312, 324 (1991) (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989)); *see also Sandvig v. Sessions*, 315 F. Supp. 3d 1, 28 (D.D.C. 2018) ("[F]acial challenges are disfavored when a case 'may be disposed of on narrower grounds.'" (quoting *Texas v. Johnson*, 491 U.S. 397, 403 n.3 (1989)).

To begin, Secretary Rubio's designation of Albanese under E.O. 14203 plainly regulates Albanese's speech. Secretary Rubio's statement asserts that Albanese "directly engaged with the [ICC] in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel" by "*recommending* that the ICC . . . issue arrest warrants targeting" Israeli officials and by "*recommending* the ICC pursue investigation and prosecutions" of American companies. Rubio Statement at 1–2 (emphasis added). Albanese does not work for the ICC, nor does she have any ability to direct action by the ICC. Compl. ¶ 31; Hr'g Tr. at 19:7–20. As such, the only way Albanese has engaged in any ICC effort to "investigate, arrest, detain, or prosecute a protected person," E.O. 14203 § I(a)(ii)(A), is by offering her non-binding *opinion* and *recommendation*—in other words, by speaking!

Not only do defendants seek to regulate Albanese's speech, they want to regulate her speech because of the "idea or message expressed," *Reed*, 576 U.S. at 163, as well as because of "its function or purpose," *TikTok Inc. v. Garland*, 604 U.S. 56, 71 (2025). As a

19

Southern District of New York colleague held in enjoining the predecessor to E.O. 14203, the Order restricts speech "if, and only if, it has the function or purpose of benefitting [the ICC]. This is content-based restriction." *Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198, 211 (S.D.N.Y. 2021).

Defendants argue that E.O. 14203 as applied to Albanese is a regulation of conduct, not speech. Opp'n at 32; Hr'g Tr. at 25:19–20 (Albanese designated as SDN "because of her conduct"). E.O. 14203 penalizes anyone who "directly engaged" in ICC efforts to "investigate, arrest, detain, or prosecute" protected persons. E.O. 14203 § I(a)(ii)(A). Even if E.O. 14203 "*generally* functions as a regulation of conduct," it "was directed at [Albanese] because of what [her] speech communicated." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 27–28 (2010) (citing *Cohen v. California*, 403 U.S. 15, 18–19 (1971)). Put differently, the "conduct triggering" the application of E.O. 14203 to Albanese was her nonbinding recommendation that the ICC take action against U.S. and Israeli nationals— nothing more than "communicating a message" with which defendants disagree. *Id.* at 28.

Nor can it be argued that E.O. 14203 as applied to Albanese has a mere "incidental effect on speech." Opp'n at 32. Albanese's designation does not "serve[] purposes unrelated to the content of expression." *Ward*, 491 U.S. at 791. Rather, the "principle justification" for her designation, *id.* at 791, is to "respond" to the expression of opinions that defendants think "extreme," Rubio Statement at 2. If Albanese instead *opposed* ICC action against U.S. and Israeli nationals, she would not have been designated under E.O. 14203. Thus, the effect of Albanese's designation is to "punish" and thereby "suppress disfavored expression." *NRA v. Vullo*, 602 U.S. 175, 188 (2024).

20

Because E.O. 14203 as applied to Albanese is a content-based regulation of speech, it is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. To be narrowly tailored, defendants must "demonstrate that [their actions] do[] not 'unnecessarily circumscrib[e] protected expression.'" *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002) (third alteration in original) (quoting *Brown v. Hartlage*, 456 U.S. 45, 54 (1982)).

Defendants' asserted compelling interest is "upholding the sovereignty of the United States" and safeguarding the foreign policy interests of the United States and its allies by protecting them from "investigation, arrest, detention, and prosecution by the ICC." Opp'n at 29. Of course, "concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder*, 561 U.S. at 34. But even assuming the validity of defendants' stated interests, the sanctioning of Albanese under E.O. 14203 is hardly "narrowly tailored" to further those ends. *Reed*, 576 U.S. at 163.

By sanctioning Albanese under E.O. 14203, defendants are punishing Albanese for merely *recommending* that the ICC prosecute certain individuals—a non-binding opinion that does not compel any action on the part of the ICC. As the Supreme Court put it when distinguishing speech from non-speech, "independently advocating for a cause is different from providing a service." *Holder*, 561 U.S. at 24. Defendants' own statements demonstrate that independent advocacy is at the heart of the sanctions against Albanese! Because Albanese's designation under E.O. 14203 "unnecessarily circumscribe[es]" her

21

"protected expression," it violates the First Amendment. *White*, 536 U.S. at 775 (quoting *Brown*, 456 U.S. at 54).

## III.    Irreparable Harm

Plaintiffs must also demonstrate irreparable harm.  To warrant a preliminary injunction, the risk of injury must be "both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up).  Though sufficient to convey standing, "economic loss does not, in and of itself, constitute irreparable harm" because it may be remedied by compensatory relief at a later date. *Id.* (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  But the "violation of a constitutional right," whether ongoing or prospective, "constitutes irreparable injury for purposes of seeking equitable relief." *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (cleaned up) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).

As a result of Defendants' actions, Plaintiffs are and will be irreparably harmed in the absence of an injunction.  To begin, defendants' actions burden L.C.'s "freedom of travel" as an American citizen, a constitutionally protected liberty interest. *Aptheker*, 378 U.S. at 517. E.O. 14203 bars "immigrant and nonimmigrant entry" to the United States by "immediate family members" of SDNs, E.O. 14203 § 4, including a "spouse or child" of an SDN, *id.* § 8(f).  That restriction plainly applies to Cali, who is not a U.S. citizen. And while not expressly forbidden by E.O. 14203, L.C. is effectively barred from entering her country of citizenship and native birth because of the strict travel restrictions on her father

22

and mother. Such restrictions irreparably burden her constitutional rights as an American! *Aptheker*, 378 U.S. at 517.

Further, the designation impairs the Cali family's property rights in their D.C. home, as described above. *See supra* part I.A. While purely monetary harms are compensable by damages and typically not irreparable, "unauthorized interference with a real property interest constitutes irreparable harm as a matter of law" since real property is a "unique commodity for which a monetary remedy for injury is an inherently inadequate substitute." *Watson v. Perdue*, 410 F. Supp. 3d 122, 131 (D.D.C. 2019) (quoting *Shvartser v. Lekser*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018)). As such, defendants' interference with Cali's rights in real property also inflicts irreparable harm.

Further still, defendants' actions burden L.C.'s constitutionally protected interests in familial relations. *See supra* part I.A; *Franz*, 707 F.2d at 595. Cali and L.C. face potential felony liability for interacting with or transacting business with Albanese, in violation of the "constitutional protection" afforded the "creation and sustenance of a family," including "the raising and education of children." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984); *see also Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018) (discussing "fundamental liberty interest in family integrity"). The existence of a limited license does not cure that harm. The Parental License applies only to "U.S. Persons," not Albanese herself, and covers only transactions "ordinarily incident and necessary" to Albanese's role as "parent and legal guardian" of L.C, *see* Parental License § I, not all interactions between Albanese and her daughter. The

23

burdening of L.C.'s constitutional right to "maintain, cultivate, and mold [her] ongoing relationship" with her mother is irreparable harm. *Franz*, 707 F.2d at 595.

Defendants argue that plaintiffs cannot satisfy this element because they have not submitted any evidence to support their alleged harms. *See* Opp'n at 13, 23. While the movant for a preliminary injunction bears the burden of establishing each element by a "clear showing," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004), the Court may accept as true any "factual averments" that defendants "do not contest," *Pantoja v. Martinez*, 567 F. Supp. 3d 76, 78 n.1 (D.D.C. 2021). And as to plaintiffs' allegations about how E.O. 14203 and Albanese's designation affects them—by burdening L.C.'s entry into the United States, freezing the family's property assets, and chilling their familial relations—defendants do not contest a thing. Defendants offer differing interpretations of how OFAC may "generally view" certain hypothetical scenarios, *see* Rasmussen Decl. ¶ 9, but they offer no response to plaintiffs' specific factual allegations of harm, *see* Cali Decl. ¶¶ 10, 13 18 (alleging harms due to property and travel restrictions). I will not deny plaintiffs' motion on the sole basis that they did not submit an affidavit in support of their asserted harms.[4]

Defendants further argue that plaintiffs' delay in seeking a preliminary injunction undermines their claims of irreparable harm. Opp'n at 13–15. To be sure, a plaintiff's lengthy delay in seeking court intervention may "undercut[] its asserted harms." *Fla. EB5*

---

[4] Defendants also point out that the asserted First Amendment injuries are harms to Albanese, not to plaintiffs. *See* Opp'n at 22. Because, as described above, plaintiffs show other irreparable harms to themselves, I need not consider the alleged First Amendment harms to Albanese to grant plaintiffs' motion.

24

*Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020). But a delay in filing, standing alone, "is not a proper basis" for denying a preliminary injunction. *Gordon*, 632 F.3d at 724. Here, any delay is minimal and excusable! Defendants designated Albanese in July 2025, *see* Rubio Statement, and plaintiffs immediately sought assistance from the United Nations in challenging the designation, *see* Cali Decl. ¶¶ 4–6. In January 2026, the United Nations advised that it would not permit Albanese to file suit individually. U.N. Letter. Plaintiffs filed this lawsuit roughly a month later. Cali Decl. ¶ 33; Compl. (filed on February 25, 2026). Since plaintiffs were in "diligent pursuit" of other avenues of redress, *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014), their modest delay in turning to the federal courts does not undercut their asserted harms.[5]

## IV.   The Balance of the Equities and the Public Interest

The balance of the equities and the public interest cut in plaintiffs' favor. Where the Government is the opposing party, these factors merge and the court "weigh[s] the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Doe v. Mattis*, 928 F.3d 1, 23 (D.C. Cir. 2019).

On one side of the ledger, plaintiffs face real, tangible harms as a result of Albanese's designation. *See supra* part III. On the other hand, defendants' sanctioning of Albanese for her speech is overbroad. The stated purpose of E.O. 14207 is to meet the "extraordinary

---

[5] Defendants argue that any injunction should not enjoin Albanese's designation in general but only as applied to plaintiffs. *See* Opp'n at 44–45. I disagree. It is unclear how defendants could limit the impact of Albanese's designation as to plaintiffs while otherwise enforcing the designation. More fundamentally, Albanese's designation as an SDN is the source of plaintiffs' harm. So long as she is designated as such, the familial relationship between Albanese, Cali, and L.C. will be burdened. Thus, to provide "complete relief to the plaintiffs before the court," *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025), I must enjoin Albanese's designation in full.

threat" posed by the ICC's efforts to "investigate, arrest, detain, or prosecute protected persons" by sanctioning foreign nationals who have "directly engaged" in those efforts. E.O. 14207 § 1(a)(ii)(A). But Albanese has done nothing more than *speak*! It is undisputed that her recommendations have no binding effect on the ICC's actions—they are nothing more than her opinion. Enjoining such a "vastly overinclusive" sanctions policy does defendants no harm. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804 (2011).

Finally, protecting the freedom of speech is "always" in the public interest. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). That is so even when an individual's views are "hurtful," "caustic," or "even outrageous," *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (citations omitted), as defendants clearly believe Albanese's speech to be, *see* Rubio Statement at 1–2 (labeling Albanese's speech as "biased and malicious," "antisemiti[c]," and "extreme"). Indeed, the "proudest boast" of our First Amendment is that it protects the freedom to express even "the thought that we hate." *Matal v. Tam*, 582 U.S. 218, 246 (2017) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)). Enough said.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs' Motion for a Preliminary Injunction [Dkt. #3] is **GRANTED**. An accompanying order will issue contemporaneously with this opinion.

RICHARD J. LEON
United States District Judge

26



**ATTACHMENT 2**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| L.C., *a minor child, by and through her father* MASSIMILIANO CALI,<br><br>MASSIMILIANO CALI,<br><br>        Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Case No. 26-688 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER**

May  13 , 2026 [Dkt. #3, 38, 40, 42, 43, 45, 47]

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiffs' Motion for Preliminary Injunction [Dkt. #3] is **GRANTED**; and it is further

**ORDERED** that Defendants Attorney General Pamela Bondi, Secretary of the Treasury Scott Bessent, and Secretary of State Marco Rubio (collectively, "Defendants"), along with their officers, agents, servants, employees, attorneys, and all other persons in active concert with Defendants, are enjoined from implementing or enforcing the designation of Francesca Albanese as a designated foreign national under Section 1(a)(ii)(A) of Executive Order 14203; and it is further

1

**ORDERED** that Defendants, along with their officers, agents, servants, employees, attorneys, and all other persons in active concert with Defendants, are enjoined from taking any action against Plaintiffs L.C. or Massimiliano Cali, including the imposition of any civil or criminal penalties, pursuant to the designation of Francesca Albanese as a designated foreign national under Section 1(a)(ii)(A) of Executive Order 14203; and it is further

**ORDERED** that the parties shall file a status report apprising the Court of the status of Defendants' compliance with this Order and proposing next steps no later than thirty (30) days after the issuance of this Order; and it is further

**ORDERED** that the security requirement is hereby waived, *see* Fed. R. Civ. P. 65(c); and it is further

**ORDERED** that Plaintiffs' [Dkt. #38, 42] Motions to Supplement the Record are **GRANTED**; and it is further

**ORDERED** that Plaintiffs' [Dkt. #40] Unopposed Motion to Correct is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' [Dkt. #43] Sealed Motion for Leave to File Document Under Seal is **GRANTED**; and it is further

**ORDERED** that [Dkt. #40-1] Exhibit A to Plaintiffs' Unopposed Motion to Correct and [Dkt. #40-2] Exhibit B to Plaintiffs' Unopposed Motion to Correct shall be **SEALED**; and it is further

**ORDERED** that Plaintiffs' [Dkt. #45] Motion for Leave to File Reply is **GRANTED**; and it is further

2

**ORDERED** that Defendants' [Dkt. #47] Unopposed Motion for Leave to File Sur-Reply is **GRANTED.**

**SO ORDERED.**

RICHARD J. LEON
United States District Judge



ATTACHMENT 3

*Administration of Donald J. Trump, 2025*

**Executive Order 14203—Imposing Sanctions on the International Criminal Court**
*February 6, 2025*

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq*.) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq*.) (NEA), section 212(f) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1182(f)), and section 301 of title 3, United States Code,

*I, Donald J. Trump*, President of the United States of America, find that the International Criminal Court (ICC), as established by the Rome Statute, has engaged in illegitimate and baseless actions targeting America and our close ally Israel. The ICC has, without a legitimate basis, asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel, and has further abused its power by issuing baseless arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and Former Minister of Defense Yoav Gallant. The ICC has no jurisdiction over the United States or Israel, as neither country is party to the Rome Statute or a member of the ICC. Neither country has ever recognized the ICC's jurisdiction, and both nations are thriving democracies with militaries that strictly adhere to the laws of war. The ICC's recent actions against Israel and the United States set a dangerous precedent, directly endangering current and former United States personnel, including active service members of the Armed Forces, by exposing them to harassment, abuse, and possible arrest. This malign conduct in turn threatens to infringe upon the sovereignty of the United States and undermines the critical national security and foreign policy work of the United States Government and our allies, including Israel. Furthermore, in 2002, the Congress enacted the American Servicemembers' Protection Act of 2002 (22 U.S.C. 7421 *et seq*.) to protect United States military personnel, United States officials, and officials and military personnel of certain allied countries against criminal prosecution by an international criminal court to which the United States is not party, stating, "In addition to exposing members of the Armed Forces of the United States to the risk of international criminal prosecution, the Rome Statute creates a risk that the President and other senior elected and appointed officials of the United States Government may be prosecuted by the International Criminal Court." (22 U.S.C. 7421(9)).

The United States unequivocally opposes and expects our allies to oppose any ICC actions against the United States, Israel, or any other ally of the United States that has not consented to ICC jurisdiction. The United States remains committed to accountability and to the peaceful cultivation of international order, but the ICC and parties to the Rome Statute must respect the decisions of the United States and other countries not to subject their personnel to the ICC's jurisdiction, consistent with their respective sovereign prerogatives.

The United States will impose tangible and significant consequences on those responsible for the ICC's transgressions, some of which may include the blocking of property and assets, as well as the suspension of entry into the United States of ICC officials, employees, and agents, as well as their immediate family members, as their entry into our Nation would be detrimental to the interests of the United States.

I therefore determine that any effort by the ICC to investigate, arrest, detain, or prosecute protected persons, as defined in section 8(d) of this order, constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States, and I hereby declare a national emergency to address that threat. I hereby determine and order:

1

*Section 1*. (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in:

(i) the person listed in the Annex to this order; and

(ii) any foreign person determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General:

(A) to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality;

(B) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity in subsection (a)(ii)(A) of this section or any person whose property or interests in property are blocked pursuant to this order; or

(C) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property or interests in property are blocked pursuant to this order.

(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the date of this order.

*Sec. 2*. I hereby determine that the making of donations of the types of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order would seriously impair my ability to address the national emergency declared in this order, and I hereby prohibit such donations as provided by section 1 of this order.

*Sec. 3*. The prohibitions in section 1(a) of this order include:

(a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order; and

(b) the receipt of any contribution or provision of funds, goods, or services from any such person.

*Sec. 4*. The unrestricted immigrant and nonimmigrant entry into the United States of aliens determined to meet one or more of the criteria in section 1 of this order, as well as immediate family members of such aliens, or aliens determined by the Secretary of State to be employed by, or acting as an agent of, the ICC, would be detrimental to the interests of the United States, and the entry of such persons into the United States, as immigrants or nonimmigrants, is hereby suspended, except where the Secretary of State determines that the entry of the person into the United States would not be contrary to the interests of the United States, including when the Secretary of State so determines, based on a recommendation of the Attorney General, that the person's entry would further important United States law enforcement objectives. In exercising this responsibility, the Secretary of State shall consult with the Secretary of Homeland Security on matters related to admissibility or inadmissibility within the authority of the Secretary of Homeland Security. Such persons shall be treated as persons covered by section 1 of Proclamation 8693 of July 24, 2011 (Suspension of Entry of Aliens Subject to United Nations Security Council Travel Bans and International Emergency Economic Powers Act Sanctions).

2

The Secretary of State shall have the responsibility for implementing this section pursuant to such conditions and procedures as the Secretary of State has established or may establish pursuant to Proclamation 8693.

*Sec. 5*. Within 60 days of the date of this order, the Secretary of the Treasury, in consultation with the Secretary of State, shall submit to the President a report on additional persons that should be included within the scope of section 1 of this order.

*Sec. 6*. (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

*Sec. 7*. Nothing in this order shall prohibit transactions for the conduct of the official business of the Federal Government by employees, grantees, or contractors thereof.

*Sec. 8*. For the purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a government or instrumentality of such government, partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including a foreign branch, subsidiary, or employee of such entity), or any person lawfully in the United States;

(d) the term "protected person" means:

(i) any United States person, unless the United States provides formal consent to ICC jurisdiction over that person or becomes a state party to the Rome Statute, including:

(A) current or former members of the Armed Forces of the United States;

(B) current or former elected or appointed officials of the United States Government; and

(C) any other person currently or formerly employed by or working on behalf of the United States Government; and

(ii) any foreign person that is a citizen or lawful resident of an ally of the United States that has not consented to ICC jurisdiction over that person or is not a state party to the Rome Statute, including:

(A) current or former members of the armed forces of such ally of the United States;

(B) current or former elected or appointed government officials of such ally of the United States; and

(C) any other person currently or formerly employed by or working on behalf of such a government;

(e) the term "ally of the United States" means:

(i) a government of a member country of the North Atlantic Treaty Organization; or

3

(ii) a government of a "major non-NATO ally," as that term is defined by section 2013(7) of the American Servicemembers' Protection Act of 2002 (22 U.S.C. 7432(7));

(f) the term "immediate family member" means a spouse or child;

(g) the term "alien" has the meanings given to the term in section 101(a)(3) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1101(a)(3)); and

(h) the term "foreign person" means a person that is not a United States person.

*Sec. 9*. For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to section 1 of this order would render those measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of a listing or determination made pursuant to section 1 of this order.

*Sec. 10*. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including adopting rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to implement this order. The Secretary of the Treasury may, consistent with applicable law, redelegate any of these functions within the Department of the Treasury. All executive departments and agencies of the United States shall take all appropriate measures within their authority to implement this order.

*Sec. 11*. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to submit recurring and final reports to the Congress on the national emergency declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

*Sec. 12*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

The White House,
February 6, 2025.

[Filed with the Office of the Federal Register, 8:45 a.m., February 11, 2025]

NOTE: This Executive order and its attached annex were published in the *Federal Register* on February 12.

*Categories:* Executive Orders : International Criminal Court, U.S. sanctions.

*Names:* Gallant, Yoav; Netanyahu, Benjamin.

4

*Subjects:* Attorney General; International Criminal Court; Israel, Prime Minister; Secretary of Homeland Security; Secretary of State; Secretary of the Treasury.

*DCPD Number:* DCPD202500234.

**ATTACHMENT 4**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

**LICENSE No.  ICC-EO14203-2025-1405217-1**

**INTERNATIONAL CRIMINAL COURT-RELATED SANCTIONS REGULATIONS**

**LICENSE**

**Issued under the authority of one or more of 50 U.S.C. §§ 1601-51, 1701-06, Pub. L. 113-278,  Executive Order 14203, and 31 CFR part 528.**

**To:    Massimilliano Cali**
**c/o Arktouros pllc**
**1717 N St NW, Ste 1**
**Washington, DC 20036**
**Attn:  Brad Brooks-Rubin**

**1.** Based on information received July 29, 2025 to the Office of Foreign Assets Control (OFAC) and information otherwise available to OFAC, the transactions described herein are hereby authorized.

**2.** This License is subject to the condition, among others, that the Licensee(s) comply with its terms and with all regulations, rulings, orders, and instructions issued under any of the authorities cited above.

**3.** This License expires on **August 31, 2027,** and is not transferable.  The transactions described in this License are subject to the authorities cited above and any regulations and rulings issued pursuant thereto. This License may be revoked or modified at any time.  If this License was issued as a result of willful misrepresentation, it may be declared void from the date of its issuance or from any other date.

**4.** This License does not authorize transactions prohibited by any law or regulation administered by the Office of Foreign Assets Control other than those listed above.

**5.** This License does not excuse the Licensee(s) from the need to comply with any law or regulation (including reporting requirements) administered by any other agency or the need to obtain any required authorization(s) from any other agency.

Issued on behalf of the Secretary of the Treasury:

**OFFICE OF FOREIGN ASSETS CONTROL**

Mary P. Rasmussen    Digitally signed by Mary P. Rasmussen
                     Date: 2025.08.22 16:57:07 -04'00'
**By**_____
**Mary Patricia Rasmussen**
**Deputy Assistant Director for Licensing**

**Attention is directed to, *inter alia*, 18 U.S.C. § 1001, 50 U.S.C. § 1705, and Pub. L. 113-278, § 5(b)(2), and 31 C.F.R. § 528.701 for provisions relating to penalties.**

**LICENSE No. ICC-EO14203-2025-1405217-1**                          **Page 2 of 2**

**SECTION I – AUTHORIZATION:** Subject to the conditions and limitations stated herein, all U.S. persons, including but not limited to Universal Title Office, U.S. financial institutions, contractors, prospective buyers, real estate agents, legal services providers, and local and federal regulatory bodies(the "Licensees"), are hereby authorized to:

> **(a)** engage in all transactions, and receive payment for the aforementioned transactions, that would otherwise be prohibited pursuant to Executive Order (E.O.) 14203 that are ordinarily incident and necessary to the sale of the condominium located at ████████████████████ ████████ (the "Property"), a property in which Francesca Paola Albanese, a person designated pursuant to E.O. 14203, has an interest.

> **(b)** engage in all transactions necessary that would otherwise be prohibited pursuant to Executive Order (E.O.) 14203 that are ordinarily incident and necessary to maintain and upkeep the Property, including transactions related to mortgage payments, payments for property taxes, insurance, or other fees, as well as contracts and payments to vendors and contractors associated with the Condominium's upkeep and maintenance.

**SECTION II – CONDITIONS: (a)** All proceeds from the sale of the Property, after the applicable payments and costs related to the sale, including closing costs, fees, attorneys fees, tax withholdings, and other expenses incident to finalizing the sale are paid, must be placed into an interest-bearing blocked account in accordance with Chapter V of Title 31 of the C.F.R.

**SECTION III – WARNINGS: (a)** Except as authorized in **SECTION I,** this License does not authorize the transfer of any blocked property, the debiting of any blocked account, the entry of any judgment or order that effects a transfer of blocked property, or the execution of any judgment against property blocked pursuant to any Executive order or Chapter V of Title 31 of the C.F.R.

**(b)** Except as authorized in **SECTION I,** this License does not authorize the transfer to or receipt of funds or other property, directly or indirectly, from any entity or individual whose property or interests in property are blocked pursuant to any Executive Order or Chapter V of Title 31 of the C.F.R, other than Francesca Paola Albanese.

**(c)** Any transfer of funds through the U.S. financial system pursuant to the authorization set forth above should reference the number of this License to avoid the rejection of the transfer.

**SECTION III – RECORDKEEPING & REPORTING REQUIREMENTS:** The Licensee(s) are subject to the recordkeeping and reporting requirements of, inter alia, 31 C.F.R. §§ 501.601 and 501.602, including the requirement to maintain full and accurate records concerning the transactions undertaken pursuant to this License for a period of ten years from the date of each transaction. These records should be available upon demand and submitted to ofacreport@treasury.gov. Such records shall clearly demonstrate the applicability of the authorization set forth in **SECTION I** hereof.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***



**ATTACHMENT 5**



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

LICENSE No.  ICC-EO14203-2025-1408722-1

**INTERNATIONAL CRIMINAL COURT-RELATED SANCTIONS REGULATIONS**

**LICENSE**

Issued under the authority of one or more of 50 U.S.C. §§ 1601-51, 1701-06, Pub. L. 113-278, Executive Order 14203, and 31 CFR part 528.

**To:**     **Arktouros pllc**
         **1717 N St. NW, Ste 1**
         **Washington, DC 20036**
         **Attn:  Brad Brooks-Rubin**

**1.** This is to inform you that the transactions described herein are hereby authorized.

**2.** This License is subject to the condition, among others, that the Licensee(s) comply with its terms and with all regulations, rulings, orders, and instructions issued under any of the authorities cited above.

**3.** This License expires on **August 31, 2027,** and is not transferable.  The transactions described in this License are subject to the authorities cited above and any regulations and rulings issued pursuant thereto. This License may be revoked or modified at any time.  If this License was issued as a result of willful misrepresentation, it may be declared void from the date of its issuance or from any other date.

**4.** This License does not authorize transactions prohibited by any law or regulation administered by the Office of Foreign Assets Control other than those listed above.

**5.** This License does not excuse the Licensee(s) from the need to comply with any law or regulation (including reporting requirements) administered by any other agency or the need to obtain any required authorization(s) from any other agency.

Issued on behalf of the Secretary of the Treasury:

**OFFICE OF FOREIGN ASSETS CONTROL**

By  Mary P. Rasmussen
Digitally signed by Mary P. Rasmussen
Date: 2025.08.22 17:17:01 -04'00'

**Mary Patricia Rasmussen**
**Deputy Assistant Director for Licensing**

Attention is directed to, *inter alia*, 18 U.S.C. § 1001, 50 U.S.C. § 1705, and Pub. L. 113-278, § 5(b)(2), and 31 C.F.R. § 528.701 for provisions relating to penalties.

**SECTION I – AUTHORIZATION:** Subject to the conditions and limitations stated herein, U.S. persons (the "Licensees") are hereby authorized to engage in all transactions that would otherwise be prohibited pursuant to Executive Order (E.O.) 14203 involving Francesca Paola Albanese, a person designated pursuant to E.O. 14203, that are ordinarily incident and necessary to Francesca Paolo Albanese's role as the parent and legal guardian of ██████, the U.S. person minor child of Francesca Paola Albanese and Massimilliano Cali.  This authorization includes the purchasing, making payment for, and receiving goods, services, and funds essential to the maintenance of ██████, including, but not limited to, health and medical expenses, transportation, telecommunication costs, housing costs, food, clothing, insurance, and legal fees and expenses.

**SECTION II – WARNINGS: (a)** Except as authorized in **SECTION I,** this License does not authorize the transfer of any blocked property, the debiting of any blocked account, the entry of any judgment or order that effects a transfer of blocked property, or the execution of any judgment against property blocked pursuant to any Executive order or Chapter V of Title 31 of the C.F.R.

**(b)** Except as authorized in **SECTION I,** this License does not authorize the transfer to or receipt of funds or other property, directly or indirectly, from any entity or individual whose property or interests in property are blocked pursuant to any Executive order or Chapter V of Title 31 of the C.F.R., other than Francesca Paola Albanese.

**(c)** Any transfer of funds through the U.S. financial system pursuant to the authorization set forth above should reference the number of this License to avoid the rejection of the transfer.

**SECTION III – RECORDKEEPING & REPORTING REQUIREMENTS:**  The Licensee(s) are subject to the recordkeeping and reporting requirements of, inter alia, 31 C.F.R. §§ 501.601 and 501.602, including the requirement to maintain full and accurate records concerning the transactions undertaken pursuant to this License for a period of ten years from the date of each transaction.  These records should be available upon demand and submitted to ofacreport@treasury.gov.  Such records shall clearly demonstrate the applicability of the authorization set forth in **SECTION I** hereof.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**ATTACHMENT 6**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| L.C., a minor child, by and through her father MASSIMILIANO CALI, | ) | CIVIL ACTION |
| | ) | |
| | ) | |
| MASSIMILIANO CALI, | ) | No. 1:26-cv-00688 |
| *Plaintiffs*, | ) | |
| | ) | |
| *v.* | ) | |
| | ) | DATE: February 25, 2026 |
| DONALD J. TRUMP, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |

**MOTION FOR A PRELIMINARY INJUNCTION**

COMES NOW, pursuant to Federal Rule of Civil Procedure 65 and LCvR 65.1, and Plaintiffs move this honorable Court to enter a preliminary injunction ordering Defendants to remove Francesca Albanese as a Specially Designated National and Blocked Person and enjoin Defendants from enforcing Executive Order 14203, Imposing Sanctions on the International Criminal Court, 90 Fed. Reg. 9369 (February 6, 2025) ("EO 14203"), against Plaintiffs and Francesca Albanese. In support of this motion, Plaintiffs rely upon the attached memorandum of points and authorities and declaration.  A proposed order is attached.

Pursuant to LCvR 65.1(d), Plaintiffs request a hearing and argument on why this preliminary injunction should be granted.

Respectfully submitted,

Dated: February 25, 2026
Washington, D.C.

/s/ *Michel Paradis*
Michel Paradis (D.C. Bar No. 499690)

Jason Wright (D.C. Bar No. 1029983)
Patrick Fields (*PHV forthcoming*)
Scott Johnston (*PHV forthcoming*)
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
mparadis@steptoe.com
jwright@steptoe.com
pfields@steptoe.com
scjohnston@steptoe.com
Telephone: (212) 506-3900
Facsimile: (202) 429-3902

*Attorneys for Plaintiffs*



**ATTACHMENT 7**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| L.C., a minor child, by and through her father MASSIMILIANO CALI,<br><br>MASSIMILIANO CALI,<br><br>         *Plaintiffs*,<br><br>      v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*<br><br>         *Defendants.* | Civil Action No. 1:26-cv-00688-RJL |

**DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION**

American constitutional rights"); *Karadzic v. Gacki*, 602 F. Supp. 3d 103, 111 (D.D.C. 2022) (holding that Serbian national's challenge to OFAC sanctions did "not implicate First Amendment principles because" he had "no constitutional rights"); *Keyhanpoor v. Blinken*, 633 F. Supp. 3d 88, 94 (D.D.C. 2022) (holding that noncitizen plaintiffs lacked standing for Fifth Amendment challenge to visa denials because they did not have constitutional rights). Although, in some cases, "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country," *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990), "a foreign national is not entitled to constitutional protection absent substantial connections to the United States," *Fulmen Co. v. Off. of Foreign Assets Control*, 547 F. Supp. 3d 13, 22 n.1 (D.D.C. 2020) (Leon, J.).

Albanese does not have the requisite "substantial connections." First, she is not "within the territory of the United States" at all. Plaintiffs' complaint indicates that she still lives in Tunisia (and they have put forth no evidence to the contrary). ECF No. 1, Compl. ¶ 20. According to Plaintiffs' own telling, Albanese has not lived in the United States in *more than 10 years*. PI Br. at 9. Plaintiffs also neither allege nor show through evidence that any of Albanese's relevant expression took place in the United States. Those facts alone should defeat Plaintiffs' First Amendment theory because "foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev.*, 591 U.S. at 433.

Even if "substantial connections" to the United States could exist in some cases for a noncitizen living and speaking outside the United States, Albanese still lacks such connections on the record before the Court. Being "married to a U.S. citizen" (which Albanese is not) would not be enough to establish "substantial connections." *See Bautista-Rosario v. Mnuchin*, 568 F. Supp. 3d 1, 8 (D.D.C. 2021). Having a U.S. citizen child—who does not live in the United States and has not done so in more than ten years—surely is not enough either. *See Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 60 n.17 (D.D.C. 1998) (holding that allegation that plaintiff "regularly [came] to the United

## B.     The E.O. and Designation Satisfy Strict Scrutiny.

Even if Albanese had "substantial connections" to the United States, Plaintiffs' First Amendment claim would fail. That is because the E.O. and Albanese's designation survive the highest level of First Amendment scrutiny. Under strict scrutiny, which applies if a regulation is content- or viewpoint-based, the regulation survives if it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (citation omitted). Both the E.O. on its face and Albanese's designation satisfy that test (assuming, without conceding, that it applies).

Although "concerns of national security and foreign relations do not warrant abdication of the judicial role," the "evaluation of the facts" relating to national security "by the Executive . . . is entitled to deference." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010). Here, upholding the sovereignty of the United States and the critical national security and foreign policy interests of the United States and its allies by protecting the citizens of the United States and its allies from investigation, arrest, detention, and prosecution by the ICC without the consent of the United States or its allies, respectively, is a compelling interest. *See id.* at 33–34; *Bank Markazi v. Peterson*, 578 U.S. 212, 217 (2016) (noting that IEEPA blocking regime allows President to "best further[ ] the United States' foreign-relations and national-security interests" (citation omitted)); *Haig v. Agee*, 453 U.S. 280, 307 (1981) (stating that "no governmental interest is more compelling than the security of the Nation"); *cf. Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (stating that "any policy toward aliens" is "interwoven with" issues "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference").

In this case, the Executive has determined that the sanctions imposed on Albanese are necessary to discourage her activities that are endangering the United States' interests. *See supra* Background § V. The "Executive [is] uniquely positioned to make principled distinctions between

29

activities that will further" a threat to the United States' national security interest "and undermine United States foreign policy, and those that will not." *Humanitarian L. Project*, 561 U.S. at 35. And this is a proper use of sanctions authority: orders such as E.O. 14203 uniquely allow the President to address a threat by, among other things, discouraging certain types of conduct and preventing transactions with specified persons, or in areas that may create leverage on those responsible for the activities of concern. *See Zarmach Oil Servs. v. U.S. Dep't of Treasury*, 750 F. Supp. 2d 150, 157–58 (D.C. Cir. 2010). No other, equally effective means of addressing problems in this area has been developed.

Thus, the Court should conclude that the E.O. on its face is narrowly tailored. *See Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57 (D.D.C. 2002) (concluding that restrictions created by an Executive Order promulgated under IEEPA prohibiting the provision of funds to a blocked entity were "narrowly enough tailored" to serve the government's national security and foreign policy interest), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003). The Court should reach the same decision with respect to Albanese's designation—even if it concludes that her designation was content-based with reference to her speech. By designating Albanese, the government took action against a person who—in her official role in a position of influence with the United Nations—has participated in demanding, and purporting to provide factual and legal support for, ICC actions against Americans and a close U.S. ally, Israel. As the Secretary of State stated when announcing Albanese's designation, she "directly engaged with the International Criminal Court (ICC) in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel, without the consent of those two countries." *Supra* Background § V. She also recommended investigations and prosecutions of U.S. companies. *See id.* Only sanctions of the sort imposed here can reasonably be expected to discourage such conduct with any effectiveness. Where the political branches have concluded that particular restrictions are necessary to achieve foreign policy and national security goals, the First Amendment does not require courts to reject that "considered judgment." *Humanitarian L. Project*, 561 U.S. at 36.

determination that the ICC's efforts to investigate, arrest, detain, or prosecute "protected persons," as stated in E.O. 14203, threaten the national security and foreign policy of the United States. Nor can Plaintiffs plausibly maintain that the government "will not face any harm if a preliminary injunction is granted." *See TikTok*, 490 F. Supp. 3d at 85 (emphasis omitted).

Finally, the extraordinary breadth of the relief Plaintiffs request further confirms that the balance of equities and the public interest do not favor a preliminary injunction. *See Regan*, 468 U.S. at 242. Plaintiffs do not merely seek relief for injuries allegedly suffered by themselves. PI Br. at 1, 17, 40. Rather, they ask the Court to order the government to remove Albanese from the SDN List and broadly restrict the enforcement of sanctions against her even though she is not a plaintiff in this case. *Id.* at 1, 17, 40. Granting such sweeping relief would substantially intrude on the executive branch's administration of a sanctions program in an area at the core of foreign affairs and national security. *See Regan*, 468 U.S. at 242.

For those reasons, the balance of equities and the public interest weigh strongly against preliminary relief.

## VII.    If Granting Relief, the Court Should Limit It Appropriately.

In the event the Court does grant relief, it must be tailored to harms that the named Plaintiffs can establish. *See Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (holding that plaintiffs "must demonstrate standing . . . for each form of relief that they seek" (citation omitted)). Even if the Court finds that Plaintiffs have standing to assert Albanese's alleged First Amendment rights, for example, the fact remains that she is not a party to this action. Thus, there is *no basis for enjoining the sanctions against her. See Gill v. Whitford*, 585 U.S. 48, 73 (2018) (holding that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury"). At most, if Plaintiffs carried their burden on the four *Winter* factors, the Court's authority would extend to enjoining the sanctions' effects on the named Plaintiffs. Defendants maintain that no basis exists for granting any part of Plaintiffs' requested relief—especially

**ATTACHMENT 8**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

L.C., a minor child, by and through her father
MASSIMILIANO CALI,

MASSIMILIANO CALI,

       *Plaintiffs*,

       v.

DONALD J. TRUMP, *in his official capacity as*
*President of the United States, et al.*

       *Defendants.*

Civil Action No. 1:26-cv-00688-RJL

**DEFENDANTS' MOTION FOR STAY PENDING APPEAL OR, IN THE**
**ALTERNATIVE, FOR A TEMPORARY ADMINISTRATIVE STAY**

**INTRODUCTION**

Defendants respectfully move, pursuant to Federal Rule of Appellate Procedure 8(a), for a stay pending appeal of the Court's May 13, 2026 preliminary injunction order. The preliminary injunction bars the Executive Branch from implementing and enforcing sanctions imposed pursuant to Executive Order 14203 against Francesca Albanese, a foreign national residing abroad whom the U.S. Secretary of State designated pursuant to authorities delegated by the President under the International Emergency Economic Powers Act ("IEEPA"). In doing so, the preliminary injunction restrains the Executive Branch's administration of a sanctions regime grounded in national security and foreign policy determinations expressly authorized by Congress.

A stay is warranted because Defendants are likely to succeed on appeal and will suffer immediate and irreparable harm absent relief. Defendants are likely to succeed on appeal because the injunction extends First Amendment protection to a foreign national residing abroad and grants relief exceeding what is necessary to redress Plaintiffs' alleged injuries, thereby restraining the Executive

security inflict irreparable sovereign harm because they impede the President's ability to respond to evolving circumstances and improperly transfer decision making authority "from the Executive to the Judiciary." *Nat'l Treasury Emps. Union*, 2025 WL 1441563, at *2. Further, the Supreme Court recently reiterated similar principles in *CASA*, explaining that injunctions preventing the Government from enforcing federal policies against nonparties improperly intrude upon "a coordinate branch of the Government." 606 U.S. at 859-60 (quoting *Immigr. & Naturalization Serv.*, 510 U.S. at 1306). The Court explained that the Government suffers irreparable harm when injunctions likely exceed the proper scope of equitable relief and prevent the Executive Branch from implementing federal policy against persons who are not parties before the Court. *Id.* at 859-61.

The Court's order broadly restrains implementation and enforcement of sanctions imposed pursuant to Executive Order 14203, notwithstanding the Executive Branch's determination that such measures are necessary to address threats to the national security and foreign policy interests of the United States. That relief substantially interferes with the Executive Branch's administration of sanctions policy and foreign affairs authorities delegated by Congress under IEEPA. *See Regan v. Wald*, 468 U.S. 222, 223, 242 (1984) (emphasizing the "traditional deference to executive judgment in the realm of foreign policy").

### C. The Preliminary Injunction Is Overbroad and Extends Beyond Any Injuries Alleged by Plaintiffs.

Defendants are also likely to succeed because the preliminary injunction exceeds the permissible scope of equitable relief. Even assuming Plaintiffs could establish a likelihood of success on some portion of their claims, the relief entered extends well beyond what would be necessary to redress the alleged injuries of the named Plaintiffs. The Supreme Court recently reaffirmed that equitable relief must be tailored to remedy the injuries of the parties before the Court. *See, e.g., CASA*, 606 U.S. at 852, 859-61; *Gill v. Whitford*, 585 U.S. 48, 73 (2018) ("A plaintiff's remedy must be tailored

7



**ATTACHMENT 9**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| L.C., a minor child, by and through her father MASSIMILIANO CALI, | ) ) ) | CIVIL ACTION |
| | ) | |
| MASSIMILIANO CALI, | ) | No. 1:26-cv-00688-RJL |
| *Plaintiffs*, | ) ) | |
| *v.* | ) ) | DATE: May 19, 2026 |
| DONALD J. TRUMP, *et al.*, | ) | |
| *Defendants*. | ) ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR STAY
PENDING APPEAL OR, IN THE ALTERNATIVE, FOR A TEMPORARY
ADMINISTRATIVE STAY**

International Emergency Economic Powers Act ("IEEPA") to sanction foreign persons the Administration decides have "directly engaged in" or assisted "any effort by the [International Criminal Court ("ICC")] to investigate, arrest, detain, or prosecute" nationals of the United States or its allies, including Israel. Mem. Op. at 4 (citing EO 14203). As Defendant Rubio publicly acknowledged, the putative bases for the designation of Francesca were her public recommendations to the ICC and written correspondence to entities that included American companies. *Id.* at 5. Notably, Francesca, a United Nations special rapporteur, does not work for the ICC or have any ability to direct its activity. *Id.* at 3, 19. Nonetheless, Defendants sanctioned her for, as this Court noted, "offering her non-binding *opinion and recommendation*." *Id.* at 19.

The effects of the sanctions on Plaintiffs and Francesca have been severe and include the blocking of their home, which is located in this district; the inability, either legally or practically, to enter the United States (including for U.S. citizen L.C.); the total severance or severe degradation of deep, standing professional ties and opportunities at institutions such as Georgetown and Columbia; the barring of Max from his employer's headquarters and his suspension from existing positions due to pressures brought on by the sanctions; the debanking of Francesca and the revocation of her health care coverage; and perhaps most damningly, the full invasion of the family's relationships under the sweeping scope of the sanctions and their threat of civil or criminal liability. *See id.* at 6-7. The reason for this? As this Court put it in its May 13 order: "Albanese has done nothing more than speak!" *Id.* at 26.

On May 13, this Court enjoined Defendants "from implementing or enforcing the designation," May 13, 2026 Order (Dkt. 49), and in support of its conclusions, issued a 26-page opinion thoroughly assessing all the legal issues and objections raised by the parties, Mem. Op.. This Court did not grant a temporary stay of its order, or grant Defendants' request to deny

2

64, 70 (D.D.C. 2008); and even having "an interest in a small bank account," *NCOR*, 251 F.3d at 201.

In the case of Francesca and Max, this Court found that they had "substantial connections" because they own a home in this district, pay their taxes,[3] have a U.S.-citizen daughter born in this district, and maintain ongoing professional and academic ties to U.S. institutions in this district, among other lifelong community ties. Mem. Op. 16–17. These connections meet and exceed the connections that have sufficed in other cases. *See NCOR*, 251 F.3d at 201; *Lopez Bello*, 651 F. Supp. 3d at 38; *Kadi v. Geithner*, 42 F. Supp. 3d 1, 25–26 (D.D.C. 2012).

Defendants' argument to the contrary depends on a misreading of *NCOR* as requiring contemporaneous physical presence. Mot. at 5–6. But the D.C. Circuit in *NCOR* expressly declined to set per se thresholds for "substantial connections," 251 F.3d at 202, and subsequent cases have made clear that property and other voluntary ties to the United States suffice, *see People's Mojahedin*, 327 F.3d at 1241. *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491–92 (1931) and *Ibrahim v. DHS*, 669 F.3d 983, 994–97 (9th Cir. 2012) further confirm that physical presence is not a prerequisite where the government has reached out to burden a foreign national's interests in U.S. property. This Court's holding is therefore well within settled precedent, and

---

[3] This Court also stated that Francesca is continuing to pay a mortgage on this home. Mem. Op. at 16–17. While it is true that Max and Francesca had a mortgage with a U.S. bank on this home, that mortgage has since been fully paid and they are the 100% owners of their property. Counsel can further represent that they continue to pay the HOA fees on their home, and their continued payment of property taxes (most recently a few months ago) is a matter of public record.

7



**ATTACHMENT 10**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

L.C., *a minor child, by and through her father* MASSIMILIANO CALI,

MASSIMILIANO CALI,

      Plaintiffs,

      v.

DONALD J. TRUMP, *et al.*,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Case No. 26-688 (RJL)

## MEMORANDUM ORDER
May **20**, 2026 [Dkt. #51]

On May 13, 2026, I granted plaintiff's motion for a preliminary injunction. *See* Mem. Op. [Dkt. #48]; Order [Dkt. #49]. Defendants now seek a stay of my order pending appeal or, in the alternative, a fourteen-day administrative stay. Defs.' Mot. for Stay [Dkt. #51]. Plaintiffs oppose the motion. Pls.' Opp'n to Mot. for Stay [Dkt. #52]. Having considered defendants' arguments, I conclude that a stay is not warranted. Defendants' motion is therefore **DENIED**.

Courts consider the following four factors when considering whether to stay an order pending appeal: "(1) whether the applicant has made a 'strong showing that [it] is likely to succeed on the merits' of its appeal; (2) whether the applicant will be irreparably harmed without the requested stay; (3) whether the stay 'will substantially injure other

1

parties interested in the proceeding'; and (4) 'where the public interest lies.'" *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 263 F. Supp. 3d 144, 147 (D.D.C. 2017) (alteration in original) (quoting *Nken v. Holder*, 556 U.S. 418, 425–26 (2009)). The party seeking the stay "bears the burden of 'justify[ing] the exercise of such an extraordinary remedy.'" *Id.* (alteration in original) (quoting *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985)).

Defendants argue they are likely to succeed on appeal for three reasons: (1) the First Amendment does not apply to foreign nationals living abroad; (2) the injunction interferes with the Executive Branch's exercise of foreign affairs authority; and (3) the injunction is overbroad. Unfortunately for defendants, all three arguments fail. How so?

As to defendants' First Amendment argument, I disagree for the reasons articulated in my prior opinion. *See* Mem. Op. at 15–22.[1] Regarding defendants' separation-of-powers concerns, there is no question that the Executive Branch enjoys broad discretion and deference in the realm of foreign policy. *See Dames & Moore v. Regan*, 453 U.S. 654, 660–62 (1981). But, as I previously noted, even legitimate national security concerns "do not warrant abdication of the judicial role." Mem. Op. at 21 (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010)). The President's broad authority in foreign affairs must be exercised in harmony with other constitutional limitations,

---

[1] Plaintiffs clarify that while Albanese and Cali once took out a mortgage on their Washington, D.C. home with a U.S. bank, they have now paid off the mortgage and fully own the home. Opp'n at 7 n.3. My opinion suggested, incorrectly, that Albanese and Cali continue to pay off the mortgage. *See* Mem. Op. at 16. However, they continue to pay HOA fees and property taxes on the home. Opp'n at 7 n.3. In any event, this clarification does not alter my conclusion that Albanese has "substantial connections" to the United States to warrant First Amendment protection for the speech at issue in this case. Mem. Op. at 16–18.

2

including the First Amendment. As to whether the injunction is overbroad, I again disagree. Plaintiffs' injuries stem from Albanese's designation as such, not just from defendants' enforcement of Albanese's designation against plaintiffs. *See* Mem. Op. at 6 (describing injuries due to "ongoing external pressure resulting from the sanctions"). As I have already explained, *see* Mem. Op. at 25 n.5, enjoining Albanese's designation in its entirety is therefore necessary to afford plaintiffs complete relief.

The equitable factors—irreparable harm, balance of the equities, and public interest—also do not warrant a stay pending appeal. Defendants are not harmed by "an injunction that merely ends an unlawful practice." *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020). Plaintiffs, meanwhile, would face concrete, irreparable harms every day the injunction is stayed—including harms to their freedom of travel, property rights, and constitutionally protected familial relations. *See* Mem. Op. at 22–23.

Defendants argue, in the alternative, that a fourteen-day administrative stay is warranted. Whether to issue an administrative stay pending appeal is "not a matter of right" but "an exercise of judicial discretion." *Nken*, 556 U.S. at 433 (citation omitted). For the same reasons articulated above, I will not issue an administrative stay here.

Accordingly, it is hereby **ORDERED** that Defendants' [Dkt. #51] Motion to Stay Pending Appeal or, in the Alternative, for a Temporary Administrative Stay is **DENIED.**

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

3