**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 26-5172**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

MASSIMILIANO CALI and L.C., a minor child, by and through her father Massimiliano Cali,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Columbia

---

# BRIEF FOR APPELLANTS

---


BRETT A. SHUMATE
*Assistant Attorney General*

SHARON SWINGLE
JOSHUA M. KOPPEL
*Attorneys, Appellate Staff*
*Civil Division, Room 7212*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4820*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

Defendants-appellants are Donald J. Trump, Todd Blanche (substituted for Pamela Bondi), Scott Bessent, and Marco Rubio. Plaintiffs-appellees are L.C., a minor child, by and through her father Massimiliano Cali, and Massimiliano Cali. Nancy Hollander, United Nations Watch, Susan M. Akram, Sandra L. Babcock, Asli U. Bali, Thomas Becker, James Cavallaro, Lawyers for the Rule of Law, Inc., Democracy for the Arab World Now, Inc., Foundation for Middle East Peace, American Center for Law and Justice, and JVP Action filed amicus briefs in district court. American Center for Law and Justice also filed an amicus brief in this Court. No other parties, intervenors, or amici curiae appeared before the district court or have entered appearances in this Court.

### B. Rulings Under Review

Defendants seek review of the May 13, 2026, memorandum opinion and order of the district court (Leon, J.) granting plaintiffs a

preliminary injunction. *See* JA153-181 (Dkt. Nos. 48, 49). The district court's opinion has not been assigned a citation in the Federal Supplement but is available on Westlaw at 2026 WL 1329750.

**C. Related Cases**

This case has not previously been before the Court. Defendants-appellants are not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Joshua M. Koppel*
Joshua M. Koppel

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ v

GLOSSARY ........ xi

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 4

STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

A. Statutory And Regulatory Background ........ 5

B. Factual Background ........ 8

C. Prior Proceedings ........ 15

SUMMARY OF ARGUMENT ........ 19

STANDARD OF REVIEW ........ 22

ARGUMENT ........ 22

I. THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS BECAUSE THE FIRST AMENDMENT DOES NOT PROTECT ALBANESE ........ 23

A. The First Amendment Does Not Protect Non-Resident Aliens Abroad ........ 23

B. Substantial Connections To The United States Alone Do Not Entitle A Non-Resident Alien To The Protections Of The First Amendment ........ 26

C. Plaintiffs' New Arguments Fail To Support The Injunction ........ 37

II. PLAINTIFFS DID NOT ESTABLISH THAT THEY WOULD SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION .................................. 38

III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN DEFENDANTS' FAVOR ..................................................................... 46

IV. THE DISTRICT COURT FAILED TO TAILOR THE INJUNCTION TO REMEDY PLAINTIFFS' INJURY ............................................................ 48

CONCLUSION ........................................................................................ 52

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*
591 U.S. 430 (2020) .......... 2-3, 24, 36

*American Foreign Serv. Ass'n v. Trump*,
No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) .......... 47

*Bridges v. Wixon*,
326 U.S. 135 (1945) .......... 27

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .......... 48

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .......... 38, 39, 45

*Clevinger v. Advocacy Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025) .......... 22

*Department of State v. Muñoz*,
602 U.S. 899 (2024) .......... 35

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*,
887 F.2d 275 (D.C. Cir. 1989) .......... 25

*Franz v. United States*,
707 F.2d 582 (D.C. Cir. 1983) .......... 45

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) .......... 39, 41

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) .......... 46

*Ibrahim v. Department of Homeland Sec.*,
669 F.3d 983 (9th Cir. 2012) .......... 31

*Islamic Am. Relief Agency v. Gonzales*,
477 F.3d 728 (D.C. Cir. 2007) .......... 48

*Johnson v. Eisentrager*,
339 U.S. 763 (1950) .................................................... 25, 26, 28, 29, 37

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) .................................................................... 24

*Kwong Hai Chew v. Colding*,
344 U.S. 590 (1953) .................................................................... 27

*Landon v. Plasencia*,
459 U.S. 21 (1982) ...................................................................... 31

*Los Angeles Press Club v. Noem*,
171 F.4th 1179 (9th Cir. 2026) ...................................................... 49

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .................................................................... 41

*López Bello v. Smith*,
651 F. Supp. 3d 20 (D.D.C. 2022) ................................................. 32

*Maritime Int'l Nominees Establishment v. Republic of Guinea*,
693 F.2d 1094 (D.C. Cir. 1982) ..................................................... 38

*Mexichem Specialty Resins, Inc. v. EPA*,
787 F.3d 544 (D.C. Cir. 2015) ...................................................... 43

*National Council of Resistance of Iran v. Department of State*,
251 F.3d 192 (D.C. Cir. 2001) ................................................. 29, 30

*National Treasury Emps. Union v. Trump*,
No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ................ 46

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................... 46

*People's Mojahedin Org. of Iran v. Department of State*,
327 F.3d 1238 (D.C. Cir. 2003) ..................................................... 30

*Plyler v. Doe*,
457 U.S. 202 (1982) .................................................................... 27

*Russian Volunteer Fleet v. United States*,
282 U.S. 481 (1931) ........................................................ 28, 32

*Shaughnessy v. United States ex rel. Mezei*,
345 U.S. 206 (1953) ........................................................ 33

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ........................................................ 37

*32 Cnty. Sovereignty Comm. v. Department of State*,
292 F.3d 797 (D.C. Cir. 2002) ........................................................ 30

*TikTok Inc. v. Garland,*
604 U.S. 56 (2025) ........................................................ 24, 35, 36

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................................ 22, 48, 51

*Trump v. International Refugee Assistance Project*,
582 U.S. 571 (2017) ........................................................ 46

*United States ex rel. Turner v. Williams*,
194 U.S. 279 (1904) ........................................................ 24

*United States v. Mahoney*,
247 F.3d 279 (D.C. Cir. 2001) ........................................................ 49

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990) ........................................................ 25, 27

*Watson v. Perdue*,
410 F. Supp. 3d 122 (D.D.C. 2019) ........................................................ 42

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................................ 22, 46, 48

*Wong Wing v. United States*,
163 U.S. 228 (1896) ........................................................ 27

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) ........................................................ 27

**Treaty:**

Negotiated Relationship Agreement Between the International Criminal Court and the United Nations art. 3, Oct. 4, 2004, https://perma.cc/3H6J-E4QV ........ 13

**Statutes:**

American Servicemembers' Protection Act of 2002, Pub. L. No. 107-206, tit. II, 116 Stat. 820 (codified at 22 U.S.C. § 7421 *et seq.*) ........ 6-7
22 U.S.C. § 7421(9) ........ 7
22 U.S.C. § 7421(11) ........ 7
22 U.S.C. §§ 7423-7425 ........ 8

International Emergency Economic Powers Act (IEEPA):
50 U.S.C. § 1701(a) ........ 5
50 U.S.C. § 1702(a)(1)(B) ........ 5, 6

8 U.S.C. § 1182(f) ........ 9, 40

28 U.S.C. § 1292(a) ........ 4

28 U.S.C. § 1331 ........ 4

**Regulatory Materials:**

Exec. Order No. 13382, 70 Fed. Reg. 38,567 (July 1, 2005) ........ 6

Exec. Order No. 13694, 80 Fed. Reg. 18,077 (Apr. 2, 2015) ........ 5

Exec. Order No. 14203, 90 Fed. Reg. 9369 (Feb. 12, 2025) ........ 8, 9, 40, 47

**Other Authorities:**

Francesca Albanese (Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967), *Arbitrary Deprivation of Liberty in the Occupied Palestinian Territory: The Palestinian Experience Behind and Beyond Bars* 22, U.N. Doc. A/HRC/53/59 (Aug. 28, 2023), https://perma.cc/9RNS-G3YP .......... 11

Francesca Albanese (Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967), *From Economy of Occupation to Economy of Genocide*, U.N. Doc. A/HRC/59/23 (July 2, 2025), https://perma.cc/JM8R-SM5Y .......... 12, 13

Francesca Albanese (Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967), *Genocide as Colonial Erasure*, U.N. Doc. A/79/384 (Oct. 1, 2024), https://perma.cc/BF5P-WZ3M .......... 12

D.C. Dep't of Hous. & Cmty. Dev., *Rent Registry: registrations*, https://rentregistry.dc.gov/data-exports/ (last visited September 11, 2026) .......... 43

Jennifer Elsea, Cong. Rsch. Serv., RL31437, *International Criminal Court: Overview and Selected Legal Issues* (2002) .......... 6

OFAC, General License No. 8, *Authorizing the Wind Down of Transactions Involving Francesca Paola Albanese* (July 9, 2025), https://perma.cc/Q6DN-Z23S .......... 14

OFAC, *International Criminal Court-Related Designation; Issuance of International Criminal Court-Related General License* (July 9, 2025), https://perma.cc/U9H3-MAPM .......... 14

Press Release, Off. of the High Comm'r for Hum. Rts., United Nations, *'ICC Arrest Warrants Can Help Save Lives, Must Be Respected and Complied with': UN Experts* (Nov. 26, 2024), https://perma.cc/6ZFF-X59V ........................ 12

*Situation in the State of Palestine*, ICC-01/18, *Amicus Curiae* Submission by the United Nations Mandate Holders of the Human Rights Council (Aug. 6, 2024), https://perma.cc/5TRU-3JQH ........................................................ 10-11

U.S. Dep't of State, *Table XV(A): Classes of Nonimmigrants Issued Visas (Including Border Crossing Cards) Fiscal Years 2020-2024*, https://perma.cc/EP3K-347P ............................................................... 34

## GLOSSARY

| | |
|---|---|
| ICC | International Criminal Court |
| IEEPA | International Emergency Economic Powers Act |
| OFAC | Office of Foreign Assets Control |
| SDN List | List of Specially Designated Nationals and Blocked Persons |
| U.N. | United Nations |

## INTRODUCTION

The district court issued a sweeping injunction that categorically blocks the sanctions that the President and Secretary of State imposed on Francesca Albanese, a United Nations "Special Rapporteur" who has threatened U.S. national security and foreign policy by pushing the International Criminal Court (ICC) to investigate and prosecute officials of a close U.S. ally. The court ruled that the sanctions likely violate Albanese's First Amendment rights—even though she is a foreign national who has not lived in the United States for over a decade and her speech occurred abroad. And the court enjoined the sanctions in their entirety—even though the only plaintiffs in this action are Albanese's husband and minor child, whose injuries (if cognizable at all) could easily be redressed by a narrow injunction exempting only them from the sanctions. The injunction is thus both legally indefensible and grossly overbroad.

Congress and the Executive Branch have long recognized the threat that the ICC poses to the United States and its allies by exposing servicemembers and officials to the risk of criminal prosecution for decisions and conduct necessary to national security. In February 2025,

President Trump issued an executive order declaring a national emergency to address that threat after the ICC targeted Israel. Exercising his authority under the International Emergency Economic Powers Act (IEEPA), the President authorized the Secretary of State to impose sanctions on foreign persons determined to have directly engaged in an effort by the ICC to investigate, arrest, detain, or prosecute certain protected persons.

In July 2025, the Secretary of State designated Albanese—who has, in her position at the United Nations, urged the ICC to investigate and issue arrest warrants for Israeli officials—for sanctions under that executive order. Albanese's husband and daughter (but not Albanese herself) sued to challenge those sanctions. The district court entered a preliminary injunction facially barring enforcement of the sanctions because it concluded that they violated Albanese's supposed First Amendment rights.

The district court erred in concluding that plaintiffs are likely to prevail on the merits of their First Amendment claim. The law is clear that "foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. Alliance for Open Soc'y*

*Int'l, Inc.* (*AOSI*), 591 U.S. 430, 433 (2020). Albanese is a foreign citizen living outside the United States, and her allegedly protected speech occurred outside the United States. Albanese is thus not protected by the First Amendment, and plaintiffs' claim must fail.

The district court also erred in balancing the equities. Plaintiffs have not identified any concrete, irreparable harm that they will incur during the pendency of this litigation. The Office of Foreign Assets Control (OFAC) has already issued licenses that address most of plaintiffs' concerns. And even if plaintiffs would suffer some harm in the absence of an injunction, that harm is plainly outweighed by the government's and public's interest in preserving the President's ability to act to protect our national security and foreign policy. The court erred in disregarding the President's judgment that the sanctions at issue are necessary to address an extraordinary threat to the Nation.

Finally, the preliminary injunction sweeps far broader than necessary to remedy any injury to plaintiffs. Again, Albanese herself is not a party; plaintiffs are Albanese's husband and daughter. A tailored injunction exempting them from the impacts of the sanctions could have prevented the harm the district court found they had established.

Instead, the district court blocked any and all applications of the sanctions on Albanese, leveraging plaintiffs' marginal and limited harms into unlimited relief. That overbroad remedy violates the most basic equitable principles and independently warrants reversal.

The preliminary injunction should be vacated.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. JA20. The district court granted plaintiffs' motion for a preliminary injunction on May 13, 2026. JA179-181. Defendants filed a timely notice of appeal on May 15, 2026. JA182-183. This Court has jurisdiction under 28 U.S.C. § 1292(a).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in finding that a non-resident alien speaking outside the United States is entitled to the protections of the First Amendment.

2. Whether the district court erred in finding that equitable factors support a preliminary injunction.

3. Whether the preliminary injunction was overbroad insofar as it extends beyond what is necessary to provide complete relief to plaintiffs.

## STATEMENT OF THE CASE

### A. Statutory And Regulatory Background

1. For nearly its entire history, the United States has used economic sanctions as a critical means to protect national security and achieve foreign-policy goals. Through IEEPA, Congress gave the President broad authority to impose sanctions in response to "any unusual and extraordinary threat" originating outside the United States. 50 U.S.C. § 1701(a). Upon declaring a national emergency with respect to such a threat, the President may "regulate … or prohibit" any "transactions involving[] any property" in which any foreign national "has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B).

Presidents have invoked IEEPA to block the property of designated persons under a variety of sanctions programs responding to declared national emergencies. *See, e.g.*, Exec. Order No. 13694, 80 Fed. Reg. 18,077 (Apr. 2, 2015) (blocking the property of persons

determined to be responsible for malicious cyber activities); Exec. Order No. 13382, 70 Fed. Reg. 38,567 (July 1, 2005) (blocking the property of persons determined to have materially contributed to the proliferation of weapons of mass destruction). In general, persons designated under an IEEPA-based sanctions program are added to the List of Specially Designated Nationals and Blocked Persons (SDN List), which is administered by the U.S. Department of the Treasury's Office of Foreign Assets Control. Persons placed on the SDN List generally have their property within U.S. jurisdiction "blocked" (*i.e.*, frozen), and U.S. persons are generally prohibited from transacting with them absent authorization from OFAC or an applicable exemption. *See* 50 U.S.C. § 1702(a)(1)(B).

2. The Rome Statute established the International Criminal Court in 2002. *See* Jennifer Elsea, Cong. Rsch. Serv., RL31437, *International Criminal Court: Overview and Selected Legal Issues* 1 (2002). The United States is not a party to the Rome Statute, and it has consistently declined to accept the ICC's jurisdiction over U.S. nationals. As Congress found in the American Servicemembers' Protection Act of 2002, Pub. L. No. 107-206, tit. II, 116 Stat. 820, 899-

909 (codified at 22 U.S.C. § 7421 *et seq*.), the Rome Statute exposes members of the U.S. Armed Forces and senior government officials, including the President, to the "risk of criminal prosecution for national security decisions involving such matters as responding to acts of terrorism, preventing the proliferation of weapons of mass destruction, and deterring aggression," 22 U.S.C. § 7421(9). Congress declared that members of the U.S. Armed Forces and senior government officials "should be free from the risk of prosecution by the International Criminal Court, especially with respect to official actions taken by them to protect the national interests of the United States." *Id.*

Congress observed that "[i]t is a fundamental principle of international law that a treaty is binding upon its parties only and that it does not create obligations for nonparties without their consent to be bound." 22 U.S.C. § 7421(11). But Congress recognized the danger that, although "[t]he United States is not a party to the Rome Statute," *id.*, the ICC would nonetheless attempt to assert jurisdiction over U.S. servicemembers and officials. It therefore prohibited certain forms of cooperation with the ICC and restricted U.S. participation in certain

U.N. operations that could expose military personnel and officials to prosecution before the ICC. *Id.* §§ 7423-7425.

### B. Factual Background

1. On February 6, 2025, President Trump issued Executive Order No. 14203, finding that the ICC has "engaged in illegitimate and baseless actions targeting America and our close ally Israel." 90 Fed. Reg. 9369, 9369 (Feb. 12, 2025). Israel is also not a party to the Rome Statute and has not recognized the ICC's jurisdiction. *Id.* The ICC has nonetheless asserted jurisdiction over and opened investigations into U.S. and Israeli personnel and has issued arrest warrants for Israeli Prime Minister Benjamin Netanyahu and former Defense Minister Yoav Gallant. *Id.* President Trump found that these actions "set a dangerous precedent, directly endangering current and former United States personnel, including active service members of the Armed Forces, by exposing them to harassment, abuse, and possible arrest"; "threaten[] to infringe upon the sovereignty of the United States"; and "undermine[]" U.S. "national security and foreign policy." *Id.*

President Trump determined that "any effort by the ICC to investigate, arrest, detain, or prosecute" protected persons—defined as

U.S. persons or foreign citizens of a U.S. ally that is not a party to the Rome Statute, unless the country of the person's nationality has consented to ICC jurisdiction over that person—"constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States," and declared a national emergency to address that threat. 90 Fed. Reg. at 9370-9371. The executive order blocks the property of, and prohibits certain transactions with, Karim Khan, the now-dismissed prosecutor of the ICC, and, *inter alia*, any foreign person determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to have "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality." *Id.* at 9370. Absent an applicable exemption or OFAC authorization, U.S. persons may not provide funds, goods, or services to, or for the benefit of, a blocked person. *Id.* Invoking the President's authority under 8 U.S.C. § 1182(f), the order also prohibits the travel to the United States of any designated person or "immediate family members." *Id.*

2. Francesca Albanese and her husband, plaintiff Massimiliano Cali, are Italian citizens. JA17. Albanese and Cali lived in the United States from 2012 to 2015 while Cali worked at the World Bank's headquarters, and their daughter, plaintiff L.C., was born in the United States in 2013. JA21-22. In 2012, Albanese and Cali opened a U.S. bank account with Bank Fund Staff Federal Credit Union and purchased a condominium in Washington, D.C., with a mortgage from the same credit union. JA21. The World Bank relocated Cali to Indonesia in 2015, and then to Tunisia in 2021. JA22. He, Albanese, and L.C. have not lived in the United States since 2015.

In 2022, the U.N. Human Rights Council appointed Albanese as a Special Rapporteur on the Palestinian Territory. JA22. In that position, Albanese has urged the ICC to prosecute Israel's prime minister and former defense minister. *See* JA157. Albanese joined an amicus brief submitted to the ICC arguing that the court has jurisdiction to issue arrest warrants for Israeli officials and urging that the ICC prosecutor's request for arrest warrants "be processed expeditiously." *Situation in the State of Palestine*, ICC-01/18, *Amicus*

*Curiae* Submission by the United Nations Mandate Holders of the Human Rights Council (Aug. 6, 2024), https://perma.cc/5TRU-3JQH.

Albanese also published a report, which was delivered to the U.N. Human Rights Council, in which she accused Israel of violating international law and recommended that "[i]ndependent and thorough investigations into the possible commission of international crimes arising from the systematic arbitrary detention of Palestinians should be opened, including through universal jurisdiction." Francesca Albanese (Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967), *Arbitrary Deprivation of Liberty in the Occupied Palestinian Territory: The Palestinian Experience Behind and Beyond Bars* 22, U.N. Doc. A/HRC/53/59 (Aug. 28, 2023), https://perma.cc/9RNS-G3YP. Albanese recommended that, "[i]n particular, the Prosecutor of the International Criminal Court should examine … the possible commission of [certain] international crimes." *Id.* Albanese further submitted a report to the U.N. General Assembly "urg[ing] the ICC Prosecutor to investigate" alleged "crimes" committed by Israel and to "investigate … prominent individuals," including Prime Minister Benjamin Netanyahu and then-Defense

Minister Yoav Gallant. Francesca Albanese (Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967), *Genocide as Colonial Erasure* 10, 32, U.N. Doc. A/79/384 (Oct. 1, 2024), https://perma.cc/BF5P-WZ3M. And Albanese has urged countries to carry out arrest warrants issued by the ICC against Israeli officials. *See*, *e.g.*, Press Release, Off. of the High Comm'r for Hum. Rts., United Nations, *'ICC Arrest Warrants Can Help Save Lives, Must Be Respected and Complied with': UN Experts* (Nov. 26, 2024), https://perma.cc/6ZFF-X59V.

Albanese has also advocated for punitive action against U.S. individuals and entities. In July 2025, she authored a report urging the ICC "to investigate and prosecute corporate executives and/or corporate entities for their part in the commission of international crimes and laundering of the proceeds from those crimes." Francesca Albanese (Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967), *From Economy of Occupation to Economy of Genocide* 27, U.N. Doc. A/HRC/59/23 (July 2, 2025), https://perma.cc/JM8R-SM5Y. She specifically accused U.S. companies including Lockheed Martin, Caterpillar Inc., and Chevron of,

among other things, providing "heavy machinery in service of settler-colonial destruction." *Id.* at 7, 12, 17. Albanese also alleged that "[f]aith-based charities" in the United States have been "financial enablers of illegal projects" and that U.S. universities partner with Israeli institutions "in areas directly harming Palestinians." *Id.* at 23-24.

Albanese's recommendations as Special Rapporteur may carry weight with the ICC because of its relationship with the United Nations. *See* Negotiated Relationship Agreement Between the International Criminal Court and the United Nations art. 3, Oct. 4, 2004, https://perma.cc/3H6J-E4QV (providing that the United Nations and ICC "shall cooperate closely" and "consult each other").

3. On July 9, 2025, Secretary of State Marco Rubio designated Albanese for sanctions pursuant to Executive Order No. 14203. *See* JA58-59. Secretary Rubio explained that "Albanese has directly engaged with the [ICC] in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel, without the consent of those two countries." JA58. The Secretary specifically observed that Albanese had "recommend[ed] that the ICC … issue arrest warrants

targeting Israeli Prime Minister Benjamin Netanyahu and former Defense Minister Yoav Gallant" and "pursue investigations and prosecutions" of major U.S. companies. JA58-59. He warned that "these campaigns of political and economic warfare … threaten our national interests and sovereignty." JA59.

OFAC implemented the designation by adding Albanese to the SDN List. OFAC, *International Criminal Court-Related Designation; Issuance of International Criminal Court-Related General License* (July 9, 2025), https://perma.cc/U9H3-MAPM. OFAC issued a general license authorizing the wind down of certain transactions involving Albanese before August 8, 2025. OFAC, General License No. 8, *Authorizing the Wind Down of Transactions Involving Francesca Paola Albanese* (July 9, 2025), https://perma.cc/Q6DN-Z23S. OFAC also issued two specific licenses permitting certain transactions incidental and necessary to the care of Albanese's minor child, L.C., and related to the upkeep and sale of Albanese's and Cali's condominium in the United States. JA38; JA62-63; JA65-66.

### C. Prior Proceedings

1. Cali and L.C. sued on February 25, 2026—nearly eight months after Albanese's designation—challenging that action on statutory and constitutional grounds. JA41-47. On May 13, the district court granted a preliminary injunction. JA179.

The district court concluded that Cali has Article III standing because he has suffered harms to his property interests in the U.S. condominium. JA162. The court also concluded that L.C., a U.S. citizen, has suffered injuries to her constitutional right to travel because, as a minor, she is "effectively" unable to travel internationally without her parents, who are barred from the United States; and to her constitutional liberty interest in "familial relations" because she supposedly faces potential liability for transactions with her mother notwithstanding the specific license that OFAC granted. JA162-163.

The district court further declared that plaintiffs have third-party standing to bring claims alleging the violation of Albanese's supposed First Amendment rights. JA165-167. Among other things, the court determined that Albanese is hindered in her ability to challenge her designation on the SDN List, citing a letter from the United Nations

stating that it had "asserted [Albanese's] immunity from the imposition of sanctions by the United States" and that it was "not in a position to authorize [Albanese] to file suit in a United States court contesting the imposition of those sanctions." JA69; *see* JA166-167.

On the merits, the district court held that plaintiffs are likely to prevail on their claim invoking Albanese's First Amendment rights, and it did not reach their remaining claims. JA167. The court ruled that the First Amendment protects Albanese, a non-citizen, in speaking outside the United States. JA167. The court recognized that foreign nationals generally do not possess rights under the Constitution, but it opined that a foreign national can obtain such rights by developing substantial connections with the country. JA167-168. The court determined that Albanese has such substantial connections based on her prior residence in the United States; the fact that she owns property in the country, has a mortgage, and pays property taxes; her U.S.-citizen daughter; and her previous affiliation with U.S. universities and occasional travel to the United States prior to the imposition of

sanctions. JA168-169.[1] The court further held that the designation of Albanese was a content-based regulation of her speech, JA171-172, and that the sanctions are not narrowly tailored to further the foreign-policy interests of the United States, JA173.

The district court next reasoned that Albanese's designation would cause plaintiffs irreparable harm "by burdening L.C.'s entry into the United States, freezing the family's property assets, and chilling their familial relations." JA174-176. The court opined that the OFAC licenses relative to the condominium and to care of L.C. "do[] not cure that harm." JA175. The court further rejected the government's argument that any injunction should be limited to enjoining Albanese's designation "as applied to plaintiffs," and it instead broadly enjoined Albanese's designation on the SDN List "in full." JA177 n.5; *see* JA179-180.

2. Defendants moved to stay the injunction pending appeal, which this Court granted in part. *See* Order (June 15, 2026) (per curiam) (Stay Order). The Court ordered that defendants "may implement and

---

[1] Plaintiffs have since clarified that Cali and Albanese no longer have a U.S. mortgage. *See* JA185 n.1.

enforce the designation of Francesca Albanese as a designated foreign national under" Executive Order No. 14203, "except that [defendants] may not take any action that violates the licenses regarding Massimiliano Cali and L.C. issued by [OFAC]." Stay Order 2.

In a concurring opinion joined by Judge Henderson, Judge Katsas explained that the First Amendment "does not extend to the speech of aliens abroad." Stay Order 1 (Katsas, J., concurring). Judge Katsas first rejected plaintiffs' argument that Albanese was sanctioned for speech that occurred *inside* the United States, explaining that plaintiffs had not made this argument in district court and that the district court's preliminary injunction rested on the premise that Albanese's relevant speech occurred abroad. *Id.* at 5. Judge Katsas also explained that "even if the designation rested in part on speech inside the United States, the record makes clear that Albanese's speech abroad more than sufficed to support the designation." *Id.* at 6. Judge Katsas next explained that "the First Amendment does not apply to the speech of non-resident aliens abroad," *id.* at 7, and therefore does not protect Albanese's speech abroad.

Turning to the equities, Judge Katsas explained that the executive order targets a "significan[t] … foreign-policy problem" and that enjoining the sanctions would cause "irreparable injury to the government." Stay Order 9 (Katsas, J., concurring). Meanwhile, "any interim harms to the plaintiffs and Albanese are modest" because the family has "expressed no concrete plans or desire to travel to the United States" and L.C.'s interest in support from her mother has been "largely accommodated" by the existing OFAC license. *Id.* at 10.

## SUMMARY OF ARGUMENT

1. Plaintiffs are unlikely to succeed on the merits of their First Amendment claim. The Supreme Court has repeatedly affirmed that foreign citizens outside U.S. territory do not possess rights under the Constitution. Because Albanese is a foreign national residing outside the United States and the speech for which she was sanctioned occurred abroad, that speech was not protected by the Constitution.

The district court erred in concluding that Albanese would be entitled to First Amendment protections if she had substantial connections to the United States. The Supreme Court has explained that an alien may receive constitutional protections when they come

within the territory of the United States *and* develop substantial connections with the country; substantial connections alone are not enough. Furthermore, even if a non-resident alien could obtain First Amendment protection by establishing substantial connections with this country, Albanese has no such connections. Her past residence in the country, her U.S.-citizen daughter, her ownership of a condominium in the country, and her occasional travel to the United States all fail to distinguish Albanese from the millions of other foreign nationals living abroad with incidental connections to the country.

2. Plaintiffs also failed to establish irreparable harm. As an initial matter, plaintiffs' assertion of harm is undermined by their delay of more than seven months before filing suit. In any event, plaintiffs' allegations of harm are unsubstantiated. The district court thought that plaintiff L.C. would be irreparably harmed because, as a minor, it is difficult for her to travel to the United States without her parents. But plaintiffs did not identify any concrete plans or intentions for L.C. to travel to the country before the district court enters final judgment. The court also erred in thinking there would be irreparable harm to Cali's property interest in his U.S. condominium. The sanctions do not

prevent Cali from continuing to own and maintain that property; if he chooses to sell the property, the proceeds will be placed in a blocked account, but that is a classically reparable injury because the court can grant him access to those funds if he ultimately prevails in this litigation. Finally, plaintiffs have not demonstrated interference with familial relations because they have not identified any interactions that L.C. wants to engage in with Albanese for which there is a credible threat of enforcement.

3. The balance of equities and public interest weigh in defendants' favor. The preliminary injunction intrudes on the President's discharge of his duties under IEEPA in the sensitive areas of national security and foreign affairs. The Executive Branch has determined that the sanctions against Albanese are necessary to address an unusual and extraordinary threat to the United States, and the district court erred by not deferring to that judgment.

4. Even if an injunction was proper, the district court erred by issuing an injunction that is far broader in scope than necessary to provide complete relief to plaintiffs. Plaintiffs' interests could have been protected by a limited injunction barring the government from

enforcing the sanctions as to certain transactions (*e.g.*, regarding the condominium) or certain individuals (*e.g.*, L.C.). The court exceeded its equitable authority by issuing a blanket injunction barring the government from enforcing the sanctions on Albanese against anyone.

## STANDARD OF REVIEW

The Court reviews the district court's factual findings for clear error, its legal conclusions de novo, and its weighing of the preliminary-injunction factors for an abuse of discretion. *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1233-1234 (D.C. Cir. 2025).

## ARGUMENT

Plaintiffs seeking a preliminary injunction "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where an injunction is warranted, it should be no more burdensome than necessary to provide complete relief to the plaintiffs. *Trump v. CASA, Inc.*, 606 U.S. 831, 852-854 (2025).

The district court erred in this case because each of the preliminary-injunction factors weighed against granting a preliminary injunction. And even if a preliminary injunction was warranted, the court exceeded its equitable authority by entering an injunction that extends far beyond what is necessary to provide complete relief to plaintiffs.

## I. THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS BECAUSE THE FIRST AMENDMENT DOES NOT PROTECT ALBANESE

The district court erred in ruling that plaintiffs are likely to prevail on the merits of their claim that Albanese's designation for sanctions violates her First Amendment rights. As a foreign non-resident alien speaking abroad, Albanese has no rights under the First Amendment. The court erred in thinking that a foreign national's substantial connections to the United States could be sufficient to grant that individual constitutional rights, and, in any event, Albanese lacks such connections.

### A. The First Amendment Does Not Protect Non-Resident Aliens Abroad

The injunction rests on the district court's incorrect ruling that Albanese's speech abroad is protected by the First Amendment. "[I]t is

long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. AOSI*, 591 U.S. 430, 433 (2020). In *AOSI*, the Supreme Court held that foreign organizations operating abroad "possess no rights under the First Amendment" to challenge funding conditions that require explicit opposition to prostitution. *Id.* at 431-436. And the foreign organizations' U.S. affiliates could not "export their own First Amendment rights to shield foreign organizations from Congress's funding conditions." *Id.* at 438.

Just last year, the Supreme Court again affirmed that "[t]o the extent that" a foreign entity's "asserted expressive activity occurs abroad, that activity is not protected by the First Amendment." *TikTok Inc. v. Garland*, 604 U.S. 56, 69 n.2 (2025) (per curiam); *see also Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) (finding it "clear" that "an unadmitted and nonresident alien" who had been denied admission based on his political expression "had no constitutional right of entry to this country as a nonimmigrant or otherwise"); *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904) (rejecting the First Amendment claim of an alien seeking to enter the United States

because such an alien is not "one of the people to whom" the First Amendment freedoms of "worshipping or speaking or publishing or petitioning … are secured by our Constitution"). This Court, too, has recognized that "aliens beyond the territorial jurisdiction of the United States are generally unable to claim the protection of the First Amendment." *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 284 (D.C. Cir. 1989).

These holdings in the First Amendment context are in accord with holdings that non-citizens abroad are not entitled to other constitutional rights, either. For example, in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264-275 (1990), the Supreme Court held that the Fourth Amendment does not apply to searches and seizures of the foreign property of non-resident aliens. And in *Johnson v. Eisentrager*, 339 U.S. 763, 777-785 (1950), the Court held that neither the Suspension Clause nor the Fifth Amendment applies to alien enemy combatants detained abroad. "These cases reflect the principle that 'extraterritorial application of organic law' is presumptively disfavored, and nothing in our constitutional text, history, or tradition suggests that the First, Second, Fourth, Fifth, or Sixth Amendments apply

extraterritorially to protect the conduct of aliens abroad." Stay Order 7-8 (Katsas, J., concurring) (quoting *Eisentrager*, 339 U.S. at 784).

As the district court acknowledged, plaintiffs allege a violation of Albanese's First Amendment rights, not their own. JA165. But Albanese is a foreign national who resides outside the United States, JA17; JA22; JA154, and the speech for which Albanese was sanctioned "occurred outside the United States," JA170. Albanese's speech was thus not protected by the Constitution, and plaintiffs therefore cannot prevail on their First Amendment claim.

### B. Substantial Connections To The United States Alone Do Not Entitle A Non-Resident Alien To The Protections Of The First Amendment

1. The district court erred in thinking that Albanese would be entitled to the protections of the First Amendment if she had "substantial connections" to the United States. JA167-168. Such connections have never been sufficient to invest a non-resident alien with such protections. The case on which the court primarily relied, *Verdugo-Urquidez*, explained that "aliens receive constitutional protections when they have come within the territory of the United States *and* developed substantial connections with this country."

*Verdugo-Urquidez*, 494 U.S. at 271 (emphasis added); *see* JA167. The use of the conjunctive "and" makes clear that presence in the United States is a necessary, if not sufficient, condition to receiving the protections of the United States. *See* Stay Order 8 (Katsas, J., concurring).

The several cases that *Verdugo-Urquidez* relied upon in reaching that proposition involved persons then present or residing in the United States. *See Plyler v. Doe*, 457 U.S. 202, 211-212 (1982) (Equal Protection Clause of the Fourteenth Amendment protects illegal aliens "within the boundaries" of a State); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 & n.5 (1953) (Due Process Clause of the Fifth Amendment applies to a lawful permanent resident who "remains physically present" in the United States); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (First Amendment's freedom of speech and of press "is accorded aliens residing in this country"); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (Fifth and Sixth Amendments apply to "all persons within the territory of the United States"); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (Fourteenth Amendment's Due Process and Equal Protection Clauses apply "to all persons within the territorial

jurisdiction" of the United States). These cases, which address the extent of constitutional protections for aliens within the United States, do not suggest that the First Amendment applies extraterritorially to protect the speech of aliens outside the United States.[2]

The substantial-connections inquiry referenced in *Verdugo-Urquidez* recognizes that presence in the country is not sufficient to endow an alien with the full panoply of constitutional protections, a proposition that follows from the insight expressed in *Eisentrager* that a non-citizen present in the country is "accorded a generous and ascending scale of rights as he increases his identity with our society." *Eisentrager*, 339 U.S. at 770. Mere presence in the United States grants the non-citizen certain basic rights, and those rights increase as the non-citizen establishes residence and then "makes [a] preliminary declaration of intention to become a citizen." *Id.* at 770-771. "But, in extending constitutional protections beyond the citizenry," it has always been "the alien's presence within its territorial jurisdiction that gave

---

[2] *Verdugo-Urquidez* also cited *Russian Volunteer Fleet v. United States*, 282 U.S. 481 (1931), but that case does not support the district court's decision for the reasons explained below. *See infra* pp. 32-33.

the Judiciary power to act." *Id.* at 771. A non-resident alien outside the United States is not entitled to the protections of the Constitution, notwithstanding any connections they may have to the country.

The other cases that the district court relied upon, *see* JA169-170, do not establish that substantial connections can be a substitute for presence in the United States when it comes to determining a non-resident alien's entitlement to constitutional protections. In *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192 (D.C. Cir. 2001), *cited at* JA168-169, this Court held that two foreign entities designated as foreign terrorist organizations were entitled to due-process protection because they had "entered the territory of the United States *and* established substantial connections with this country." *Id.* at 203 (emphasis added). The discussion in that case focused on whether the entities had established substantial connections because the government had already "admit[ted] that the record before [the Court] reflects that [they] 'ha[d] an overt presence within the National Press Building in Washington, D.C.'" *Id.* at 201; *see also id.* at 202 (finding, based on "the entire record," that the petitioners could "rightly lay claim to having come within the territory of the United States").

Indeed, the relevant section of this Court's decision was titled "The Presence of Petitioners." *Id.* at 200. The district court's observation that the petitioners' physical presence in the United States was not the "only factor" considered by this Court, JA169, thus does not undermine the fact that their presence was necessary to the Court's holding.[3]

Likewise, in *32 County Sovereignty Committee v. Department of State*, 292 F.3d 797 (D.C. Cir. 2002), *cited at* JA168 *and* JA170, the Court held that foreign entities designated as foreign terrorist organizations were not entitled to due process because they "demonstrated neither a property interest nor a presence in this country." *Id.* at 799. The Court was explaining that the organizations could not satisfy either part of the conjunctive standard. *See id.* (explaining that the organizations "cannot 'rightly lay claim to having come within the United States *and* developed substantial connections with this country.'" (emphasis added)). Nothing in the Court's holding

---

[3] The district court also relied upon *People's Mojahedin Organization of Iran v. Department of State*, 327 F.3d 1238, 1241 (D.C. Cir. 2003). *See* JA170. But the relevant part of that opinion simply described the holding in *National Council of Resistance* and did not establish a different test.

suggested that a property interest alone would have sufficed to grant the organizations constitutional rights.

The district court's reliance on *Ibrahim v. Department of Homeland Security*, 669 F.3d 983 (9th Cir. 2012), *cited at* JA169-170, is also unavailing. The plaintiff in *Ibrahim* was a resident in the United States for four years while she was a student at Stanford University, left the country to attend an academic conference abroad with the intent of returning to the United States and continuing her residence here, and was then prevented from returning, allegedly because of her inclusion on a watchlist. *See id.* at 986-988, 997. Even if *Ibrahim* was correctly decided, it establishes only that a "resident alien who voluntarily leaves the United States on a brief trip with an intent to return is constitutionally entitled to a due process hearing if the government seeks to exclude her upon return." *Id.* at 995. Albanese, however, has not resided in the United States for over a decade and has her permanent domicile elsewhere, and her claims do not relate to returning to the United States after a brief trip abroad. *See Landon v. Plasencia*, 459 U.S. 21, 33-34 (1982) (explaining that a resident alien who takes a "brief trip" abroad may retain her right to due process in a

hearing to determine her entitlement to admission upon return, but an alien whose "absence is extended" will lose that right).[4]

Finally, the district court relied on *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 489 (1931), *cited at* JA169, in which a Russian corporation, as "an alien friend," was held to be entitled under the Fifth Amendment to just compensation for property confiscated in the United States. But that case simply stands for the proposition that an alien's property interest in the United States may entitle them to Fifth Amendment rights with respect to that property. *See* Stay Order 8-9 (Katsas, J., concurring). It does not support the proposition that all "alien friends" of the United States, or even all those owning property in the country, are entitled to the full range of constitutional protections for unrelated conduct occurring abroad. It would be an extraordinary and unprecedented proposition to permit aliens abroad to purchase constitutional rights by acquiring a small piece of property or opening a

---

[4] The district court also relied on *López Bello v. Smith*, 651 F. Supp. 3d 20 (D.D.C. 2022), *cited at* JA168, but the plaintiff in that case "resided in Coral Gables, Florida," at the time of the alleged deprivation of his constitutional rights. *Id.* at 28 (alterations and quotation marks omitted).

bank account in the United States. In any event, determining the presence of a corporation raises different and more complicated questions than determining the presence of a natural person.

2. Even if a non-resident alien could obtain First Amendment protections by establishing "substantial connections" to this country, the district court erred in concluding that Albanese has such connections, *see* JA168. Albanese lived in the United States for three years while her husband was on temporary assignment working for an international organization, but that was more than a decade ago. JA21-22. There is no suggestion that when Albanese and her family left the United States, that departure was meant to be temporary. To the contrary, Cali's work reassigned and relocated him first to Jakarta and then to Tunisia. JA22. And Albanese has not lived in the United States since the relocation in 2015. The Supreme Court has recognized that an absence of a much shorter time is sufficient to divest an alien of constitutional protections they may have previously had. *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 214 (1953) (alien who lived in the United States for 25 years and then left for 19 months could be treated as an "entrant alien" and excluded "without a

hearing"). Indeed, there are millions of foreign citizens who have lived in the country for a few years while attending school, working, or otherwise. *See, e.g.*, U.S. Dep't of State, *Table XV(A): Classes of Nonimmigrants Issued Visas (Including Border Crossing Cards) Fiscal Years 2020-2024*, https://perma.cc/EP3K-347P (showing 424,792 student visas issued in 2024 alone). It would be a novel and extraordinary holding to grant such individuals First Amendment protections years after they depart.

The district court also noted that Albanese and her husband own a condominium in Washington, D.C.; they also, not unexpectedly, obtained a mortgage from a U.S. bank (which they have since paid off) and pay property taxes here (as they must). JA168-169; JA21; *see also* JA185 n.1. This, too, fails to distinguish Albanese from millions of other foreign nationals who own property in the country, as an investment or otherwise. A foreign person cannot obtain indefinite First Amendment protections by buying an apartment in the United States.

None of the other circumstances identified by the district court would constitute "substantial connections" to the United States. The

court noted that Albanese has a U.S. citizen daughter and that Albanese was previously affiliated with U.S. universities and would sometimes travel to the United States for professional obligations. JA169. But the Constitution's protections are limited to "the People"—not "the People and their relatives." *Cf. Department of State v. Muñoz*, 602 U.S. 899, 908-909 (2024) (non-citizen husband could not invoke citizen wife's constitutional right of entry). And many foreign persons have tangential connections to, and occasionally visit, the United States as a hub of educational, cultural, and economic activity, but such connections and visits do not endow those foreign persons with First Amendment rights for their speech abroad. Again, nothing about Albanese's connections to the United States differentiate her from many other non-resident aliens.

*TikTok* confirms that connections like Albanese's are insufficient to trigger First Amendment protections. One of the plaintiffs in that case was ByteDance Ltd., a foreign company that was the ultimate parent of TikTok Inc., which is a U.S. company incorporated and headquartered in California. *TikTok*, 604 U.S. at 63. Despite ByteDance's ownership of a U.S. company and extensive cooperation,

including data sharing, with that company, the Supreme Court made clear that "[t]o the extent that ByteDance Ltd.'s asserted expressive activity occurs abroad, that activity is not protected by the First Amendment." *Id.* at 69 n.2. Likewise, the Court in *AOSI* rejected U.S. organizations' argument that their foreign affiliates were entitled to the protections of the First Amendment. 591 U.S. at 432-433, 438. Owning property in the United States or having relationships with U.S. persons is therefore not a sufficient basis to extend the protections of the First Amendment to a foreign person abroad.

The district court's holding would inappropriately extend constitutional protections to foreign nationals in a way the Supreme Court has warned against. If any foreign person who has spent time in the United States or who owns property in the country could assert rights under the Constitution, "actions by American military, intelligence, and law enforcement personnel against … foreign citizens in foreign countries would be constrained by the foreign citizens' purported rights under the U.S. Constitution." *AOSI*, 591 U.S. at 434. Such a construction would mean that during military activity abroad, "enemy elements … could require the American Judiciary to assure

them freedoms of speech, press, and assembly as in the First Amendment." *Eisentrager*, 339 U.S. at 784. The district court's rule is not the law, nor is it tenable.

### C. Plaintiffs' New Arguments Fail To Support The Injunction

In response to the government's stay motion, plaintiffs asserted for the first time that "at least some of the speech that precipitated Albanese's designation" occurred "within the United States." Stay Resp. 16-17. Plaintiffs did not make this argument below, and the district court proceeded on the premise that "the speech at issue occurred outside the United States." JA170; *see also* JA167. This Court ordinarily will not "uphold[] a preliminary injunction based upon a legal theory not embraced by the district court." *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011). That is because "the decision whether to grant a preliminary injunction is a matter of discretion, not a question of right," and "it is for the district court to determine, in the first instance, whether the plaintiffs' showing on a particular claim warrants preliminary injunctive relief." *Id.*

It would be particularly inappropriate to reach plaintiffs' new argument here because it "rests on a factual premise that was not

developed before the District Court." *Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1101 n.12 (D.C. Cir. 1982). In opposing a preliminary injunction, the government represented that the designation rested on "statements made *outside the United States*." Dkt. No. 26, at 25. Plaintiffs said nothing to the contrary. *See, e.g.*, Dkt. No. 32, at 6-8. The district court thus "quite properly resolved the preliminary-injunction motion on the premise that this case turns on speech by an alien outside the United States." Stay Order 5 (Katsas, J., concurring). And even the new evidence presented in plaintiffs' response to the stay motion fails to establish that the speech in question occurred within the United States or that, even if some of that speech did occur within the United States, Albanese's speech abroad would not suffice to support her designation on the SDN List.

## II. PLAINTIFFS DID NOT ESTABLISH THAT THEY WOULD SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

The district court also erred in finding that plaintiffs would suffer irreparable harm absent a preliminary injunction. This Court has set a "high standard" for demonstrating irreparable injury. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

First, the injury "must be both certain and great; it must be actual and not theoretical." *Id.* (quotation marks omitted). The party seeking an injunction "must show the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (alteration and quotation marks omitted). Second, the injury must be "beyond remediation." *Id.*

As an initial matter, plaintiffs' claims of irreparable injury are undermined by their delay in filing suit and seeking a preliminary injunction. Albanese was designated under Executive Order No. 14203 on July 9, 2025, but plaintiffs waited more than seven months, until February 26, 2026, before filing suit and seeking a preliminary injunction. "A party requesting a preliminary injunction must generally show reasonable diligence," and plaintiffs' delay in seeking that relief "undercuts claims of irreparable harm." *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024) (per curiam) (alteration and quotation marks omitted). The district court thought that plaintiffs' delay was excusable because plaintiffs initially "sought assistance from the United Nations in challenging [Albanese's] designation." JA177. But the fact that plaintiffs initially turned to

other avenues to seek to have the sanctions on Albanese lifted—and delayed initiating the judicial process through which plaintiffs could have requested immediate and binding relief from those sanctions—only confirms that plaintiffs' alleged injuries are not great or imminent.

In any event, plaintiffs have failed to demonstrate that they will suffer any irreparable harm absent an injunction. The district court first opined that the designation of Albanese for sanctions "burden[s] L.C.'s 'freedom of travel' as an American citizen." JA174. The court reasoned that Executive Order No. 14203 bars entry to the United States by immediate family members of designated individuals, and although this restriction does not apply to L.C., who is a U.S. citizen, it may impact her ability to travel to the United States as a practical matter because she is a minor and the travel restrictions apply to her parents. *See* JA174; 8 U.S.C. § 1182(f) (permitting the President to suspend the entry of "any aliens"); 90 Fed. Reg. at 9369 (executive order relying on authority of 8 U.S.C. § 1182(f)). The district court erred in thinking that the imposition of any burden on a right to travel would constitute irreparable injury, *see* JA174. This Court has explained that "[e]ven in the sensitive areas of freedom of speech and religion, where

the risk of chilling protected conduct is especially high," the Court "do[es] not 'axiomatically' find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its rights." *Hanson*, 120 F.4th at 244. Rather, plaintiffs "must show why the court will be unable to grant meaningful relief following trial." *Id.* Here, plaintiffs have not identified any concrete plans or intentions for L.C. to travel to the United States, particularly during the period before the district court enters final judgment. Plaintiffs have alleged only that L.C. is "effectively barred" from traveling to the United States, JA39; they have not asserted that she wants to or would travel to the United States absent the restrictions on her parents. Plaintiffs have thus failed to demonstrate actual or imminent injury to L.C.'s travel as would be required to demonstrate irreparable harm. *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) (profession of "'some day' intentions" to travel—"without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of … 'actual or imminent' injury"). Plaintiffs also have not explained why L.C. cannot travel to the United States accompanied by another

adult, with permission of her parents, or what steps plaintiffs have taken to determine whether such travel would be feasible.

The district court also reasoned that Albanese's designation "impairs the Cali family's property rights in their D.C. home." JA175. And while the court recognized that "purely monetary harms are compensable by damages and typically not irreparable," it reasoned that "'unauthorized interference with a real property interest constitutes irreparable harm as a matter of law' since real property is a 'unique commodity.'" JA175. The case that the court cited for this proposition reasoned that the foreclosure of a family farm would constitute not only an economic loss, but also "the loss of generations of family history, sweat-equity, and memories," and that "a piece of property is considered to be a unique commodity for which a monetary remedy … is an inherently inadequate substitute." *Watson v. Perdue*, 410 F. Supp. 3d 122, 131 (D.D.C. 2019) (quotation marks omitted). But Albanese and Cali's condominium in Washington, D.C., is not the family's home; the family has not lived there in more than a decade. And it is nothing like a family farm that they have built up over

generations. At this point, the evidence suggests that it is a rented investment property.[5]

Furthermore, Cali would not be deprived of the property absent a preliminary injunction. An OFAC license permits Cali to "maintain and upkeep the [p]roperty," including by engaging in "transactions related to mortgage payments, payments for property taxes, insurance, or other fees, as well as contracts and payments to vendors and contractors associated with the Condominium's upkeep and maintenance." JA63. Cali can also sell the condominium, if he wishes to do so. JA63. The proceeds of such a sale would need to be placed into an interest-bearing blocked account, JA63, but if plaintiffs prevail in this litigation, the proceeds of the sale, and accrued interest, could be made available for Cali's use. Any temporary injury is thus a typical economic one that is reparable at the conclusion of litigation. *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) ("Financial

---

[5] According to public records, Albanese has formally registered real property in Washington, D.C., as a rental unit. *See* D.C. Dep't of Hous. & Cmty. Dev., *Rent Registry: registrations*, https://rentregistry.dc.gov/data-exports/ (last visited September 11, 2026) (listing of rent "registrations," searchable by owner name).

injury is only irreparable where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'").

Finally, the district court thought that "defendants' actions burden L.C.'s constitutionally protected interests in familial relations" by subjecting plaintiffs to "potential felony liability for interacting with or transacting business with Albanese, in violation of the 'constitutional protection' afforded the 'creation and sustenance of a family,' including 'the raising and education of children.'" JA175. This allegation of irreparable injury fails in light of the OFAC license permitting U.S. persons to engage in otherwise-prohibited transactions "that are ordinarily incident and necessary to … Albanese's role as the parent and legal guardian of [L.C.]." JA66. That license permits, *inter alia*, purchases and payments for "health and medical expenses, transportation, telecommunication costs, housing costs, food, clothing, insurance, and legal fees and expenses." JA66. The district court thought that Albanese's designation nevertheless burdened L.C.'s relationship with her mother because it covers only transactions "ordinarily incident and necessary" to Albanese's role as parent and

guardian, and not all interactions between Albanese and her daughter. JA175-176. But the Constitution does not protect every interaction between a child and her parent, and the district court's reliance on *Franz v. United States*, 707 F.2d 582, 602 (D.C. Cir. 1983)—in which a father and his children were "totally and permanently prevented from ever seeing one another"—fails to demonstrate otherwise. For example, L.C. does not have a constitutional right to give her mother a gift. *Contra* JA164 & n.2. In any event, the evidence demonstrates that OFAC "would generally view the types of activities" that plaintiffs say L.C. would like to engage in—"such as L.C. 'giving her mother a Christmas gift, buying her mother's books, [and] travelling with her mother to public events'"—"as authorized by the Parental License or otherwise exempt" from sanctions. JA80-81 (alteration omitted). Plaintiffs have not identified any interactions that L.C. wishes to engage in with her mother for which there is a credible threat of enforcement. Plaintiffs therefore have not established "certain," "great," and "imminen[t]" injury as would be necessary to warrant a preliminary injunction. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (emphasis and quotation marks omitted).

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN DEFENDANTS' FAVOR

The last two preliminary-injunction factors—which merge because the government is the party opposing an injunction, *see Nken v. Holder*, 556 U.S. 418, 435 (2009)—strongly favor defendants. The President's judgment in the "sensitive" areas of "national security and foreign affairs" is "entitled to significant weight," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 36 (2010), and "preserving the President's autonomy under a statute" like IEEPA "that expressly recognizes his national-security expertise is within the public interest," *National Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 (D.C. Cir. May 16, 2025) (per curiam). "The interest in preserving national security is 'an urgent objective of the highest order,'" and to interfere with the government's national-security and foreign-affairs functions "would appreciably injure [the Nation's] interests." *Trump v. International Refugee Assistance Project*, 582 U.S. 571, 581-582 (2017) (per curiam); *see Winter*, 555 U.S. at 33 (vacating a preliminary injunction, in part because there was "no basis for jeopardizing national security"). The district court's preliminary injunction "inflicts irreparable harm on the President by interfering with the national-

security" and foreign-policy determinations "entrusted to him by Congress." *American Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *3 (D.C. Cir. June 20, 2025) (per curiam).

The government's interests here are concrete and substantial. The President determined that efforts by the ICC to investigate, arrest, detain, or prosecute protected persons, including U.S. persons, without the consent of their country of nationality constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. *See* 90 Fed. Reg. at 9369-9370. The President further found that the ICC had "engaged in illegitimate and baseless actions targeting America and our close ally Israel," and that such actions "directly endanger[] current and former United States personnel," threaten "to infringe upon the sovereignty of the United States," and "undermine[] the critical national security and foreign policy work of the United States Government and our allies." *Id.* at 9369. Executive Order No. 14203 reflects the President's judgment regarding how best to address that threat—a judgment reflected in the designation at the center of this case. Review of that judgment, which lies "at the intersection of national security[ and] foreign policy," must be

"extremely deferential." *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007).

Even if plaintiffs had demonstrated irreparable harm absent a preliminary injunction, any such injury is "plainly outweighed" by the public interest and the government's interest in preserving the Executive Branch's prerogatives in areas of national security and foreign affairs. *Winter*, 555 U.S. at 33.

## IV. THE DISTRICT COURT FAILED TO TAILOR THE INJUNCTION TO REMEDY PLAINTIFFS' INJURY

The Supreme Court recently reaffirmed in *Trump v. CASA* that injunctions should be no "broader than necessary to provide complete relief to each plaintiff." 606 U.S. at 861; *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (holding that injunctions "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"). The preliminary injunction here, however, prohibits defendants from enforcing the sanctions against Albanese at all, including against third parties. The injunction thus goes far beyond what is necessary to provide complete relief to plaintiffs. Accordingly, even if this Court finds that the district court properly issued an injunction, it should reverse with instructions to narrow the injunction

or, at the very least, this Court should narrow the injunction itself. *See Los Angeles Press Club v. Noem*, 171 F.4th 1179, 1190-1192 (9th Cir. 2026) (vacating overbroad injunction and remanding to district court "to fashion a narrower preliminary injunction"); *United States v. Mahoney*, 247 F.3d 279, 287 (D.C. Cir. 2001) (vacating injunction as overbroad).

It bears reiterating that Albanese is not a plaintiff; only her husband and daughter sued. The district court found that Cali and L.C. demonstrated three injuries: (1) harm to Cali's property interest in his condominium in Washington, D.C., because the proceeds from any sale must be placed in an interest-bearing blocked account; (2) injury to L.C.'s right to travel to the United States because she is "effectively unable" to travel internationally without her parents; and (3) a burden on L.C.'s familial relations because L.C. "faces potential criminal liability for any transactions with her mother." JA162-163; JA174-176. As already explained, plaintiffs' allegations of harm are unsubstantiated, and plaintiffs failed to identify any transactions that they intend to engage in that would not be exempt under the licenses OFAC has already issued or other applicable exemptions. *See supra* Part II. But even if plaintiffs had actually established these three

injuries, it would have been easy to afford them complete relief through a narrow injunction that required defendants to permit the transfer of proceeds from a sale of the condominium, permitted Cali and/or Albanese to travel to the United States for the limited purpose of accompanying L.C., and prohibited the government from implementing or enforcing the sanctions with respect to L.C.

Although the government urged the district court to limit any injunction, *see* Dkt. No. 26, at 44-45, the court refused to do so, instead broadly prohibiting defendants from "implementing or enforcing the designation of Francesca Albanese as a designated foreign national," JA179. The court thus prohibited the government from implementing or enforcing the sanctions against Albanese *at all*, permitting persons unrelated to plaintiffs to engage in any and all transactions with Albanese and giving Albanese access to the U.S. banking system for any purpose. The district court thus let the tail wag the dog, using a narrow challenge predicated on a few potential transactions to upend the entire designation.

The district court gave only a footnote of explanation, stating that "[i]t is unclear how defendants could limit the impact of Albanese's

designation as to plaintiffs while otherwise enforcing the designation." JA177 n.5. In fact, it is obvious—the court could have enjoined the government from enforcing the sanctions as to certain transactions (*e.g.*, regarding the condominium) or certain individuals (*e.g.*, L.C.). The court further stated that because "Albanese's designation as an SDN is the source of plaintiffs' harm," the court "must enjoin Albanese's designation in full" to "provide 'compete relief to the plaintiffs.'" *Id.* That reasoning runs directly contrary to *CASA*, imposing an injunction crafted to "offer[] complete relief to *everyone* potentially affected by an allegedly unlawful act" (the designation of Albanese) rather than one tailored to "offer complete relief *to the plaintiffs before the court*." 606 U.S. at 852; *see also id.* at 857-858 (rejecting a "law-declaring vision" of injunctive relief that would require the Executive to "conform to [a single district court's] view, ceasing its enforcement of the law against anyone, anywhere").

Furthermore, *CASA* makes clear that complete relief to the plaintiffs is the "maximum a court can provide"; it "is not a guarantee." 606 U.S. at 854. This case is a good example of why that is so: Even if there was some harm to the plaintiffs from application of the sanctions

beyond the circumstances identified above, that cannot justify enjoining the much broader set of important applications that indisputably impose no harm at all to plaintiffs. The district court erred by enjoining defendants from "implementing or enforcing the designation of Francesca Albanese" writ large. JA179.

## CONCLUSION

The district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

SHARON SWINGLE

/s/ *Joshua M. Koppel*
JOSHUA M. KOPPEL
*Attorneys, Appellate Staff*
*Civil Division, Room 7212*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4820*
*joshua.m.koppel@usdoj.gov*

September 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,689 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Joshua M. Koppel*
Joshua M. Koppel