**No. 26-5172**

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

MASSIMILIANO CALI, *et al.*,
*Plaintiffs-Appellees,*
*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, *et al.*,
*Defendants-Appellants.*

On Appeal from the
United States District Court for the District of Columbia (No. 1:26-cv-00688-RJL)

# AMICUS BRIEF OF THE AMERICAN CENTER FOR LAW AND JUSTICE IN SUPPORT OF APPELLANTS

Jordan Sekulow
CeCe Heil*
Shaheryar Gill*
Benjamin P. Sisney
Nathan J. Moelker
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
Phone: (202) 641-9163
Fax: (202) 546-9309
Email: bsisney@aclj.org

*Counsel for Amicus Curiae*

*Not admitted in this court.

## CORPORATE DISCLOSURE STATEMENT

The ACLJ is a non-profit legal corporation dedicated to the defense of constitutional liberties secured by law. The ACLJ has no parent corporation and issues no stock.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

GLOSSARY ........ v

INTEREST OF AMICUS ........ 1

SUMMARY OF ARGUMENT ........ 2

ARGUMENT ........ 4

I. THIS COURT SHOULD NOT GRANT ANY RELIEF THAT EXTENDS BEYOND THE PLAINTIFFS' ALLEGED INJURIES ........ 4

A. Plaintiffs' Article III injuries are narrow and personal—not coextensive with Francesca Albanese's designation. ........ 4

B. Equity demands that any injunction be tailored to Plaintiffs' specific harms, not to the broad invalidation of a foreign policy determination ........ 8

C. Broad injunctive relief against EO 14203 would produce harms to the public interest disproportionate to any marginal benefit to Plaintiffs. ........ 11

II. THE SANCTIONS FRAMEWORK RESTS ON FIRM CONSTITUTIONAL AND STATUTORY FOOTING. ........ 13

A. The President serves as the "sole organ" of the federal government in international relations. ........ 14

B. Congress has delegated to the President substantial authority over international matters ........ 17

C. The major questions doctrine does not squarely apply to foreign affairs matters ........ 20

D. The definition of an international emergency is not something for courts to second guess ........ 24

CONCLUSION ........ 27

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*American Ins. Assn. v. Garamendi*, 539 U.S. 396 (2003)........................................21

*Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987) ...............................1

*Biden v. Missouri*, 595 U.S. 87 (2022) ...................................................................22

*Bush v. Gore*, 531 U.S. 98 (2000)...........................................................................1

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948)........................................................................ 15, 20, 25

*Conway v. Taylor's Ex'r*, 66 U.S. 603 (1861) .........................................................9

*Dalton v. Specter*, 511 U.S. 462 (1994)..................................................................26

*Dames & Moore v. Regan*, 453 U.S. 654 (1981)....................................................19

*Department of State v. Muñoz*, 602 U.S. 899 (2024)................................................5

*FCC v. Consumers' Research*, 606 U.S. 656 (2025)........................... 20, 21, 22, 23

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ..........................................7

*Fischer v. United States*, 603 U.S. 480 (2024) .........................................................1

*Joy v. Wirtz*, 13 F. Cas. 1172 (C.C.D. Pa. 1806) ......................................................9

*Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838) ...................................17

*L.C. v. Trump,* 2026 U.S. Dist. LEXIS 106000, 2026 LX 250227,
2026 WL 1329750 (D.D.C. 2026).................................................................7, 10

*Lamb's Chapel v. Center Moriches Sch. Dist.*, 508 U.S. 384 (1993)........................1

*Learning Resources, Inc. v. Trump,*
2026 U.S. LEXIS 714 (Sup. Ct. 2026) ............................................................21

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................5

*Mathews v. Diaz*, 426 U.S. 67 (1976)....................................................................16

*McConnell v. FEC*, 540 U.S. 93 (2003)....................................................................1

*McDonnell v. United States*, 579 U.S. 550 (2016) ......................................................1

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982)................................................................14

*O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980) ...............................6

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025)........................................... 3, 7, 8, 9, 10

*Trump v. Hawaii*, 585 U.S. 667 (2018) ........................................................ 1, 8, 16

*Trump v. Vance*, 591 U.S. 786 (2020) ......................................................................14

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) ... 15, 16, 22, 23

*West Virginia v. EPA*, 597 U.S. 697 (2022) .............................................................20

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) .........................11

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............................15

*Zemel v. Rusk*, 381 U.S. 1 (1965) ..............................................................................17

*Ziglar v. Abbasi*, 582 U.S. 120 (2017).......................................................................17

**Statutes**

50 U.S.C. § 1701(a) ..................................................................... 18, 25, 26

50 U.S.C. § 1702(a) .......................................................................................18

International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95–223, §§ 201–7, 91 Stat. 1625, 1626–28 (1977) (codified as amended at 50 U.S.C. §§ 1701–6)...........................................................18

**Other Authorities**

THE FEDERALIST NO. 70 (Alexander Hamilton) .....................................................14

The Pacificus-Helvidius Debates of 1793-94 11 (2007 ed. Frisch, Morton J.) ....................13

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 ....................14

U.S. Const. art. II, § 2, cl. 2 ....................14

U.S. Const. art. II, § 3 ....................14

## GLOSSARY

American Center for Law and Justice: "ACLJ"

International Criminal Court: "ICC"

International Emergency Economic Powers Act: "IEEPA"

Specially Designated National: "SDN"

## INTEREST OF AMICUS[1]

The ACLJ is an organization dedicated to the defense of constitutional liberties and principles secured by law, including separation of powers. ACLJ attorneys have appeared often before the Supreme Court as counsel for parties, e.g., *McConnell v. FEC*, 540 U.S. 93 (2003); *Lamb's Chapel v. Center Moriches Sch. Dist.*, 508 U.S. 384 (1993); *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987); or as *amici*, e.g., *Fischer v. United States*, 603 U.S. 480 (2024); *Trump v. Hawaii*, 585 U.S. 667 (2018); *McDonnell v. United States*, 579 U.S. 550 (2016); and *Bush v. Gore*, 531 U.S. 98 (2000). The ACLJ has a particular interest in preserving the constitutional separation of powers and in ensuring that the Executive Branch retains its full authority in the domains of foreign affairs and national security—areas where the Constitution places primary responsibility in the President. The ACLJ has a longstanding institutional commitment to defending the State of Israel and its right to self-defense, and it has a particular interest in ensuring that the Executive Branch retains the tools necessary to counter efforts by international bodies to subject American allies to illegitimate legal processes.

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), Amicus states that no party's counsel in this case authored this brief in whole or in part. No party or party's counsel contributed any money intended to fund preparing or submitting this brief. No person, other than amicus, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this amicus brief.

## SUMMARY OF ARGUMENT

This case is, at its core, a question about remedy. Plaintiffs assert that sanctions imposed on Francesca Albanese have disrupted their family and property interests. But any arguable remedy those injuries warrant is calibrated to the injuries themselves. It should not have extended to the wholesale invalidation of a foreign policy determination by the Secretary of State, or to an injunction against a presidential executive order. The Constitution does not permit that reach, and equity does not require it.

Three principles govern the outcome here.

First, Plaintiffs' alleged Article III injuries—to the extent they are cognizable—are narrow and personal. L.C.'s injuries concern her own family relationship and her exposure to potential criminal liability for ordinary domestic transactions with her mother. Massimiliano Cali's injuries concern his property in the District of Columbia and disruptions to his professional activities here. These are *not* the injuries of Francesca Albanese, who is *not* a Plaintiff and who has chosen *not* to appear in this proceeding. The alleged professional, financial, and reputational harms Albanese ostensibly suffered because of her designation cannot be redressed through this vehicle.

Second, even where plaintiffs have cognizable injuries, equity requires that any injunction be tailored to remedy those specific harms and no more. The

preliminary injunction Plaintiffs seek—which would effectively invalidate a foreign policy determination by the Secretary of State and enjoin application of a presidential executive order — is a remedy vastly and immeasurably disproportionate to the injuries L.C. and Massimiliano Cali have actually alleged. The district court's treatment of *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), was relegated to a single footnote and consisted of a conclusion rather than reasoning: the court assumed that enjoining the designation in full was necessary for "complete relief" without ever asking whether a more clearly drawn parental license would fully address Plaintiffs' identified injuries without disturbing the Secretary of State's underlying determination. That question answers itself. The remedy for an insufficiently drawn license is a better license — not a court order nullifying a senior foreign policy judgment.

Third, the sanctions framework itself rests on firm constitutional and statutory footing that should have given the district court substantial pause before issuing broad injunctive relief. IEEPA confers sweeping authority on the President to respond to international emergencies through economic measures. That authority is at its zenith — not its nadir — when directed at a foreign national's conduct in connection with a foreign tribunal's effort to prosecute an ally's head of government. The major questions doctrine, developed to police domestic regulatory overreach by unelected administrative officials, has no purchase in this domain. And whether the

ICC's issuance of arrest warrants against a sitting Prime Minister constitutes an "unusual and extraordinary threat" to American foreign policy is precisely the kind of geopolitical judgment that the Constitution commits to the Executive, not the Judiciary.

This Court should reverse the preliminary injunction to the extent it seeks invalidation of the Albanese designation or broad injunctive relief against EO 14203, broad relief that is not appropriately tailored to the actual alleged injuries of the Plaintiffs without nullifying the Secretary of State's foreign policy determination. That is the remedy Article III, *CASA*, and basic equitable principles all point toward. The sweep of the injunction entered below goes beyond the limited remedies the Constitution authorizes.

## ARGUMENT

### I. THIS COURT SHOULD NOT GRANT ANY RELIEF THAT EXTENDS BEYOND THE PLAINTIFFS' ALLEGED INJURIES.

#### A. Plaintiffs' Article III injuries are narrow and personal — not coextensive with Francesca Albanese's designation.

It bears emphasis at the outset what this case is *not*. It is *not* a challenge brought by Francesca Albanese to her own designation as a SDN. Albanese, for institutional reasons relating to her status as a United Nations Special Rapporteur, has chosen not to bring such a challenge directly. That choice has legal consequences. When the designated person herself declines to contest the

designation, those around her—however genuinely affected—cannot simply step into her shoes and obtain through third-party litigation the relief she has not sought for herself. Article III's requirements, which exist not as procedural technicalities but as structural limits on judicial power, demand that the Court attend carefully to the distinction between L.C.'s own injuries and those of her mother.

The constitutional requirement of redressability—the third prong of the familiar *Lujan* analysis—asks whether "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992) (internal citation omitted). That requirement disciplines the scope of judicial relief by tethering it to the specific harm the Plaintiff has demonstrated. A plaintiff whose alleged cognizable injury is the disruption of her family relationship and her own exposure to criminal liability for family transactions cannot, consistent with Article III, obtain as her remedy the wholesale invalidation of her mother's sanctions designation and the enjoining of a presidential executive order. Those are not the remedies that redress her injury. They are the remedies that vindicate her mother's interests—and her mother is not here.

The governing principle is not novel. In *Department of State v. Muñoz*, the Supreme Court held that a U.S. citizen did not have a fundamental liberty interest in her noncitizen spouse being admitted to the country. 602 U.S. 899, 899 (2024). A U.S. citizen brought a constitutional challenge to the State Department's denial of

her noncitizen husband's visa, arguing that the denial infringed her own liberty interest in living with her spouse. The Court rejected the claim. Any alleged harm to the citizen did not give her a constitutional right to participate in or challenge the government's action, because the visa denial did not impose a "direct restraint" on her liberty. *Id.* at 917 (quoting *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 788 (1980)). The government's action was directed at the noncitizen; the citizen's injury, however genuine, was indirect and derivative. She could not transmute that downstream harm into a right to contest the underlying determination.

The principle is equally applicable here. The designation was directed at Francesca Albanese. L.C.'s alleged injuries are downstream consequences of an action taken against her mother. Those consequences do not give L.C. a constitutional right to challenge the designation itself. Her alleged Article III injury is her own exposure to licensing uncertainty and potential liability—not the alleged unlawfulness of the designation, which is her mother's claim to raise or not to raise. The same is true of her father. His alleged injuries are property-specific and relationship-specific. They do not extend to the broad professional, reputational, and financial harms Albanese has allegedly suffered as a designated person—harms that are not his to vindicate in this proceeding.

The district court cataloged three categories of alleged cognizable harm: monetary injury, property injury, and constitutional injury. *L.C. v. Trump,* 2026 U.S.

Dist. LEXIS 106000, *13, 2026 LX 250227, 2026 WL 1329750 (D.D.C. 2026) (citing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024)). But identifying cognizable injuries does not answer the remedial question. The district court treated the source of all three categories of harm as Albanese's designation—and from that premise concluded that enjoining the designation was necessary to provide "complete relief." *Id.* at 31 n.5 (*citing Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025)). That premise deserves scrutiny. L.C.'s property-related injury flows from the frozen proceeds provision of the Property License—a function of the license's terms, not the designation itself. L.C.'s familial-relations injury flows from the alleged ambiguity of the Parental License and the potential criminal liability it creates for ordinary domestic transactions. The designation is not the source of Plaintiffs' injury; the alleged insufficiency of the existing license carve-outs is. Remedying that insufficiency requires no more than targeted license relief. Categorically reviewing the designation itself is simply unnecessary.

A court that carefully matches remedy to injury will find that the designation itself—the Secretary of State's determination that Francesca Albanese's advocacy warranted SDN status—need not be addressed, regardless of the analysis of the Plaintiffs' claims on the merits.

### B. Equity demands that any injunction be tailored to Plaintiffs' specific harms, not to the broad invalidation of a foreign policy determination.

Even where standing exists, the principles governing equitable relief impose an independent constraint on the scope of the injunction the district court issued. Those principles are not formalities. They reflect the considered judgment of centuries of equity jurisprudence that judicial remedies should be the minimum necessary to cure the demonstrated wrong—no more, no less. That principle applies with special force where, as here, broad relief would disturb a determination at the core of the Executive's foreign affairs authority.

The Supreme Court gave these principles their most authoritative recent formulation in *Trump v. CASA, Inc.*, where the Court held that federal courts lack authority to issue injunctions broader than necessary to remedy the named Plaintiffs' own injuries. 606 U.S. 831 (2025). Writing for the Court, Justice Barrett explained that the Judiciary Act of 1789 authorizes only those equitable remedies available in English equity practice at the founding—and that English courts of equity issued only party-specific relief. The Court drew a sharp distinction between "complete relief" and "universal relief": the former, which equity has always permitted, means full redress of the plaintiff's own injury; the latter, which equity has never sanctioned, extends a court's remedial reach to nonparties and interests not before it. *Id.* at 851. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 721 (2018) (Thomas, J.,

concurring) (explaining how such equitable relief is "legally and historically dubious"). This principle was long standing: American courts of equity would consistently decline to award relief that went "beyond the case before" them. *Conway v. Taylor's Ex'r*, 66 U.S. 603, 632 (1861). For instance, Justice Bushrod Washington, in recognizing an equitable remedy for creditors in *Joy v. Wirtz*, noted that "it is necessary to distinguish between active and passive parties . . . that no decree can be made without their being before the court; and . . . that complete relief can be afforded to those who seek it, without affecting the rights of those who are omitted." 13 F. Cas. 1172, 1173 (C.C.D. Pa. 1806).

*CASA* applies with direct force here. Plaintiffs seek, in substance, two broad forms of relief: invalidation of Francesca Albanese's SDN designation and a preliminary injunction against EO 14203. Under *CASA*, neither form of relief is available unless it is necessary to remedy Plaintiffs' own cognizable injuries—and neither is. What L.C. and Massimiliano Cali actually seek is greater clarity and protection in the licensing regime regarding their interactions with Albanese. That is the scope of their injury; that is the limit of permissible relief. Any relief beyond that would violate *CASA*.

Consider what actually is alleged to harm L.C. It is not, at bottom, the designation itself. It is the alleged uncertainty created by the existing parenting license, which authorizes transactions "ordinarily incident and necessary" to

Albanese's role as L.C.'s parent. To the extent that injury needs any redress, which amicus does not concede, any redress could occur without addressing in any way the designation itself.

The district court's treatment of the *CASA* question, relegated to a footnote, illustrates precisely the analytical elision that this Court should correct. The district court acknowledged defendants' (and this amicus's) argument that any injunction should be limited to its application to Plaintiffs rather than enjoining the designation in full. It rejected that argument on the ground that "it is unclear how defendants could limit the impact of Albanese's designation as to plaintiffs while otherwise enforcing the designation," and that enjoining the designation in full was necessary to provide "complete relief." *L.C.*, 2026 U.S. Dist. LEXIS 106000, *31 (citing *CASA*, 606 U.S. at 852). But *CASA* does not ask whether limiting relief is operationally convenient—it asks whether broader relief is *necessary* to redress Plaintiffs' own injuries.

The court's answer to that question was a conclusion dressed as reasoning. It assumed that Albanese's designation is the irreducible source of Plaintiffs' harm, and from that assumption concluded that only invalidating the designation would provide complete relief. It never asked whether targeted license modifications—reviewing the Parental License itself, in other words, would fully remedy the identified injuries without disturbing the designation at all. The remedy for an

allegedly insufficiently drawn license is a better license, not a court order nullifying the Secretary of State's foreign policy determination.

To grant instead the broad injunctive relief Plaintiffs seek, invalidating the designation of a foreign national based on the family-related injuries of her husband and daughter, would be to use equity as a surgical instrument to perform an operation far more invasive than the complaint describes. It would transform a case about a family's ability to conduct ordinary domestic life into a vehicle for reviewing a senior foreign policy determination by the Secretary of State concerning an international tribunal's conduct. Nothing in Article III, and nothing in the law of equity, authorizes that transformation.

### C. Broad injunctive relief against EO 14203 would produce harms to the public interest disproportionate to any marginal benefit to Plaintiffs.

The preliminary injunction standard requires that a movant demonstrate, among other things, that the balance of equities tips in their favor and that the injunction serves the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Where the injunction sought would disturb foreign policy determinations of the Executive Branch, those factors weigh heavily against broad relief.

The government's interest in maintaining the integrity of its IEEPA sanctions architecture is substantial. The designation of Albanese reflects a determination by the Secretary of State—made pursuant to a presidential emergency declaration—that

her conduct in connection with ICC proceedings targeting an American ally's head of government constituted a threat to American foreign policy. Enjoining that designation, or broadly restraining EO 14203, signals to foreign governments, international tribunals, and potential future designees that federal courts stand ready to second-guess executive foreign policy judgments at the behest of family members of sanctioned individuals. That signal would materially impair the deterrent effect of IEEPA sanctions across a wide range of national security and foreign affairs contexts.

By contrast, the marginal benefit to Plaintiffs of broad injunctive relief over targeted license relief is minimal. The designation's continued existence does not injure either Plaintiff in any way that targeted review of specific licensing cannot address. Where targeted relief provides complete redress for the demonstrated injuries, broad injunctive relief is not merely unnecessary—it is inequitable. The equitable tradition has never recognized a plaintiff's right to relief more burdensome to the defendant than her injury requires, and it has never treated the availability of a narrower adequate remedy as license for a broader one. This Court should apply those principles here and reverse the sweeping relief Plaintiffs seek in favor of the narrower remedy that would fully address their actual situation.

## II. THE SANCTIONS FRAMEWORK RESTS ON FIRM CONSTITUTIONAL AND STATUTORY FOOTING.

The sanctions framework challenged here rests on a solid constitutional and statutory foundation. That foundation matters both because it bears on the likelihood-of-success prong of the preliminary injunction standard and because it confirms that the Court need not—and should not—reach the question of broad invalidity on this record. The Constitution's allocation of foreign affairs powers reflects a deliberate choice by those who drafted and ratified our founding charter. The Founders understood that effective diplomacy in international relations and national security demand a single executive. As Alexander Hamilton wrote, the President and the Executive Branch is "the *organ* of intercourse between the Nation and foreign Nations" and "that Power which is charged with the command and application of the Public Force." Alexander Hamilton, Pacificus No. 1 *in* The Pacificus-Helvidius Debates of 1793-94 11 (2007 ed. Frisch, Morton J.) (emphasis in original). When federal judges substitute their judgment for the President's assessment of international threats and emergencies—matters where the Constitution places primary responsibility with the Executive—they venture beyond their appropriate constitutional role and risk disrupting the careful balance of powers our constitutional framework envisions.

### A. The President serves as the "sole organ" of the federal government in international relations.

The President's unique constitutional position in foreign affairs stems from the Constitution's text. Article II vests "[t]he executive Power" in the President. U.S. Const. art. II, § 1, cl. 1. This provision, combined with the President's authority to "receive Ambassadors and other public Ministers" and ensure that "the Laws be faithfully executed," establishes the Executive as the primary constitutional actor in foreign affairs. *Id.* § 2, cl. 2; *id*. § 3.

The Founders chose a single executive precisely because they understood that effective foreign policy requires what Alexander Hamilton called "Decision, activity, secrecy, and despatch"—qualities that "characterize the proceedings of one man in a much more eminent degree than the proceedings of any greater number." THE FEDERALIST NO. 70 (Alexander Hamilton). A committee of 535 legislators cannot negotiate treaties, respond to international crises, or speak with one voice to foreign nations and tribunals. Only the President can.

The Supreme Court has long recognized the President's "unique position in the constitutional scheme." *Trump v. Vance*, 591 U.S. 786, 800 (2020) (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982)). The President's "duties, which range from faithfully executing the laws to commanding the Armed Forces, are of unrivaled gravity and breadth." *Id.* In particular, the President has a "vast share of

responsibility for the conduct of our foreign relations." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring).

The foundational precedent establishing executive primacy in foreign affairs remains the Supreme Court's decision in *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936). The Court recognized that presidential foreign affairs authority derives "not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations. . . ." *Id.* at 319–20.

The *Curtiss-Wright* Court emphasized the practical necessities that support executive authority in foreign affairs. Successful foreign policy requires "unity of design" that only executive leadership can ensure. *Id.* at 319 (citation omitted). The fragmented, deliberative processes of Congress and the judiciary are ill-suited to the continuous, coordinated decision-making that effective foreign policy demands. As the Supreme Court elsewhere observed, foreign relations involve "delicate" and "complex" considerations that "involve large elements of prophecy" and require decisions "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility." *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

Furthermore, foreign policy decisions often require access to confidential information available only to the Executive. The President's "opportunity of knowing the conditions which prevail in foreign countries" and his access to "confidential sources of information" give him unique advantages in making foreign policy judgments. *Curtiss-Wright*, 299 U.S. at 320. Courts, lacking such access, cannot effectively second-guess executive foreign policy determinations without undermining both the separation of powers and national security.

Recent decisions of the Supreme Court have reaffirmed these principles. In *Trump v. Hawaii*, the Supreme Court applied strong deference to executive decisions on immigration and national security that implicate foreign policy concerns. 585 U.S. 667 (2018). Presidential travel restrictions were upheld because immigration decisions involving national security "are frequently of a character more appropriate to either the Legislature or the Executive" than to the Judiciary. *Id.* at 702 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)). The Supreme Court emphasized that such determinations involve "predictive judgments" about "sensitive and weighty interests of national security and foreign affairs." *Id.* at 708 (citations and internal quotations omitted).

Similarly, in *Ziglar v. Abbasi*, the Supreme Court recognized that "[n]ational-security policy is the prerogative of the Congress and President" and that "[j]udicial inquiry into the national-security realm raises concerns for the separation of powers

in trenching on matters committed to the other branches." 582 U.S. 120, 142 (2017). The Court noted that "courts have shown deference to what the Executive Branch has determined . . . is essential to national security" and "traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs unless Congress specifically has provided otherwise." *Id.* at 142-43 (citation and internal quotations omitted).

This principle reflects the fundamental separation of powers and the President's unique function within the constitutional structure: "executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power." *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 610 (1838). This principle is at its zenith in international relations. *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("[B]ecause of the changeable and explosive nature of contemporary international relations, . . . Congress -- in giving the Executive authority over matters of foreign affairs -- must of necessity paint with a brush broader than that it customarily wields in domestic areas.").

### B. Congress has delegated to the President substantial authority over international matters.

Congress granted the executive broad discretion when it enacted IEEPA, Pub. L. No. 95–223, §§ 201–7, 91 Stat. 1625, 1626–29 (1977) (codified as amended at 50

U.S.C. §§ 1701–6). The statute grants the President authority to "investigate, regulate, or prohibit" specified international economic activities. 50 U.S.C. § 1702(a). Congress did not say "may sometimes regulate" or "may regulate in limited circumstances," but "may regulate." Indeed, Congress picked broad verbs—"investigate," "regulate," "prohibit"—and paired them with expansive objects covering many kinds of foreign transactions. The trigger is equally broad: "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States. . . ." 50 U.S.C. § 1701(a). Congress used the word "any"—as capacious a term as English provides. It chose "unusual and extraordinary"—standards that inherently require judgment calls about complex, evolving situations. This is the language of delegation. This broad delegation reflects Congress's recognition that international economic emergencies require rapid, coordinated responses by Executive action. The statute's language is sweeping by design, granting the President authority to "regulate" or "prohibit" entire categories of international economic activity. Congress deliberately chose expansive terms that would provide the Executive with maximum flexibility to address diverse and unpredictable international threats.

The Supreme Court has consistently recognized the breadth of this congressional delegation. In *Dames & Moore v. Regan*, the Supreme Court analyzed IEEPA in the context of the Iranian hostage crisis and concluded that the statute

provided sufficient authority for the President's actions in response. 453 U.S. 654, 677–88 (1981). The Court emphasized that the "language of IEEPA is sweeping and unqualified." *Id.* at 671. The Supreme Court held that "congressional acquiescence" in longstanding executive practice provides strong evidence of congressional approval. *Id.* at 684. When Congress has multiple opportunities to restrict presidential authority but repeatedly chooses not to do so, courts should interpret that pattern as confirming rather than questioning the scope of delegated authority. *Id.* at 677–78 (noting that Congress has elsewhere shown its "acceptance of a broad scope for executive action in circumstances such as those presented" there and that IEEPA "delegates broad authority to the President to act in times of national emergency with respect to property of a foreign country").

Congress has crafted IEEPA with deliberately broad language, granting the President authority to "investigate, regulate, or prohibit" a sweeping range of international economic activities. Congress has had decades of opportunity to narrow this delegation—through amendment, oversight, or new legislation—yet has consistently chosen not to do so. This pattern of congressional acquiescence carries persuasive weight. When the legislative branch repeatedly observes executive action under a statute and acquiesces in it, it signals approval of that interpretation.

### C. The major questions doctrine does not squarely apply to foreign affairs matters.

The major questions doctrine developed as a tool for interpreting domestic regulatory statutes where Congress typically legislates with greater specificity and where concerns about democratic accountability are paramount. In "certain extraordinary cases," circumstances give "reason to hesitate before concluding that Congress meant to confer" the authority needed to uphold a challenged government action. *West Virginia v. EPA*, 597 U.S. 697, 723, 721 (2022) (internal quotation marks and citation omitted). However, this doctrine has limited applicability in the foreign affairs and national security context, where different constitutional principles and practical necessities govern the relationship between Congress and the Executive. *See, e.g., Waterman S.S.*, 333 U.S. at 109 ("The President . . . possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs.").

Justice Kavanaugh emphasized this distinction in his concurrence in *FCC v. Consumers' Research*, noting that "the major questions canon has not been applied by this Court in the national security or foreign policy contexts" because it "does not reflect ordinary congressional intent in those areas." 606 U.S. 656, 706 (2025) (Kavanaugh, J., concurring). Rather, "the usual understanding is that Congress intends to give the President substantial authority and flexibility to protect America and the American people—and that Congress specifies limits on the President when

it wants to restrict Presidential power in those national security and foreign policy domains." *Id.* at 706-07.

Plaintiffs lean heavily on *Learning Resources, Inc. v. Trump,* 2026 U.S. LEXIS 714 (Sup. Ct. Feb. 20, 2026). But as Justice Kavanaugh emphasized in that case, "the Court has never before applied the major questions doctrine in the foreign affairs context, including foreign trade." *Id.* at *143 (Kavanaugh, J., dissenting). In fact, the President exercises the "vast share of responsibility for the conduct of our foreign relations." *American Ins. Assn. v. Garamendi*, 539 U.S. 396, 414 (2003) (quotation marks omitted). Justice Kavanaugh emphasized that, as only three justices agreed with the application of the major questions doctrine in that case, he would "doubt that the major questions doctrine analysis in The Chief Justice's opinion for those three Justices is controlling for future cases as a matter of precedent under the Marks rule." *Learning Res., Inc.*, 2026 U.S. LEXIS 714, at *203 n.24 (Kavanaugh, J., dissenting). In the absence of a majority opinion reaching such a conclusion, "the question of whether or how the major questions doctrine applies in foreign affairs cases remains at least an open question," *id.*, wherein this Court should remain guided by the Supreme Court's well established principles of deference. Moreover, whatever the force of the major questions argument in the context of IEEPA tariffs on consumer goods, the concerns animating that argument have no application here. EO 14203 does not reshape domestic markets, impose costs on American

consumers, or regulate any category of domestic commercial activity. It targets the conduct of a foreign national in connection with a foreign tribunal's exercise of jurisdiction over an allied head of government. That is foreign policy in the most direct and unambiguous sense—and the major questions doctrine has nothing useful to contribute to its analysis.

This understanding reflects both constitutional structure and practical necessity. In domestic affairs, the major questions doctrine serves as a democracy-forcing mechanism, requiring Congress to speak clearly when authorizing agencies to make decisions of vast economic and political significance. *See Biden v. Missouri*, 595 U.S. 87, 89 (2022). The doctrine rests on the assumption that such decisions should be made by elected representatives rather than unelected administrators. But here, "the President and his subordinate executive officials maintain control over the executive actions undertaken pursuant to a delegation. And the President is elected by and accountable to all the American people." *FCC*, 606 U.S. at 707 (Kavanaugh, J., concurring).

Foreign affairs and national security present fundamentally different considerations. While Congress retains important powers in this sphere—including the authority to declare war, regulate foreign commerce, and control appropriations—the President serves as the nation's "sole organ" in international relations. *See Curtiss-Wright*, 299 U.S. at 320. This constitutional allocation means

that broad congressional delegations in foreign affairs enhance rather than diminish democratic accountability by placing responsibility with the constitutionally designated actor.

Second, the practical requirements of foreign policy differ markedly from those of domestic regulation. "The canon does not translate to those contexts because of the nature of Presidential decision-making in response to ever-changing national security threats and diplomatic challenges." *FCC*, 606 U.S. at 707 (Kavanaugh, J., concurring). International relations demand rapid response capabilities, access to classified information, and the ability to coordinate complex diplomatic, economic, and military instruments. These requirements favor broad executive discretion rather than detailed legislative specification. As the Supreme Court observed in *Curtiss-Wright*, Congress "must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved." 299 U.S. at 320.

Third, the major questions doctrine's emphasis on clear congressional authorization is inapplicable in the established pattern of broad delegation in foreign affairs and national security statutes. Congress has consistently granted sweeping authority to the President in these areas. These delegations reflect Congress's recognition that it cannot anticipate all possible international contingencies or

specify appropriate responses in advance. The language of IEEPA is undeniably broad on its face.

Simply put, the major questions doctrine does not fit the foreign affairs context. That doctrine arose to address a specific problem—agencies making transformative policy decisions based on vague statutory language in areas where Congress typically legislates with specificity. But foreign affairs statutes work differently, and for good constitutional reasons. Here, Congress intentionally wrote IEEPA in broad terms because international crises are unpredictable and diverse. The Executive needs flexibility to respond to threats Congress cannot foresee.

### D. The definition of an international emergency is not something for courts to second guess.

Finally, the determination of what constitutes an international emergency threatening American economic interests represents a quintessentially executive function, a political question that courts are institutionally ill-suited to review. Such determinations require assessment of complex geopolitical factors, access to classified intelligence, evaluation of economic data and trends, and consideration of potential responses and their likely consequences. These questions reside uniquely within the Executive Branch's domain.

Emergency determinations often involve "large elements of prophecy" that require predictive judgments about future developments and their potential impact

on American interests. *Waterman S.S.*, 333 U.S. at 111. Courts lack both the expertise and institutional capacity to make such forward-looking assessments. Crises can develop rapidly, requiring immediate responses to prevent significant harm to American interests.

The statutory structure of IEEPA confirms Congress's intent to vest emergency determination authority in the Executive. The statute requires the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States. . . ." 50 U.S.C. § 1701(a). This language grants the President broad discretion to identify threats that warrant emergency response, using terms like "unusual," "extraordinary," and "threat" that inherently involve subjective assessments.

Unlike Congress, which consists of hundreds of members representing diverse constituencies, or the federal judiciary, which operates through multiple, independent courts, the Presidency provides the single, clarion voice that international relations require. Foreign nations need to know with whom they are dealing and must be able to rely on consistent, authoritative communications from the United States government. When courts intrude upon executive foreign policy authority, they violate this constitutional allocation of functions.

In short, "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [judicial] review," *Dalton v. Specter*, 511 U.S. 462, 476 (1994). IEEPA authorizes the President to take certain actions in response to a declared national emergency arising from an "unusual and extraordinary threat[] . . . to the national security, foreign policy, or economy of the United States . . . ." 50 U.S.C. § 1701(a), and the question whether the sanction at issue here satisfies the unusual-and-extraordinary-threat requirement, is not a judicial question but a political one. The Court need not and ought not weigh in on those political judgments or economic debates one way or another; rather, they are political questions suited to the political branches.

The specific emergency that prompted EO 14203 illustrates why this deference is warranted. The ICC's issuance of arrest warrants targeting a sitting Prime Minister of Israel—a close American ally—represents a genuinely novel escalation of international legal proceedings against the nationals of a United States partner. The proposition that this development constitutes an "unusual and extraordinary threat" to American foreign policy is well within the range of reasonable executive determination. Even if this Court were inclined to examine the merits of EO 14203's factual predicate—the Executive's determination that the ICC's actions constitute an "unusual and extraordinary threat" to American foreign policy—it would quickly encounter a question that is not amenable to judicial

resolution. Assessing whether an international tribunal's conduct threatens American foreign policy interests requires the Court to evaluate complex geopolitical relationships, weigh classified intelligence, make predictive judgments about diplomatic consequences, and assess the credibility of American commitments to its allies. These are not questions that courts are equipped to address.

## CONCLUSION

For the foregoing reasons, *Amicus Curiae* the American Center for Law and Justice respectfully asks this Court to reverse the judgment below.

Respectfully Submitted,

Jordan Sekulow
CeCe Heil*
Shaheryar Gill*
Benjamin P. Sisney
/s/ Nathan J. Moelker
Nathan J. Moelker
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
Phone: (202) 641-9163
Fax: (202) 546-9309
Email: bsisney@aclj.org

*Counsel for Amicus Curiae*
*Not admitted in this court.

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd Day of September, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system, which will send notification of that filing to all counsel of record in this litigation.

/s/ Nathan J. Moelker
Nathan J. Moelker
*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

**with type volume limit, typeface Requirements and type-style requirements**

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(b) because it contains 5,843 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft word for office 365 in 14-point Times New Roman font.

**Signature** /s/ *Nathan J. Moelker* **Date:** September 22, 2026